# 19-156

## United States Court of Appeals

*for the*

## Second Circuit

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC.,
ROBERT NASH, and BRANDON KOCH,

*Plaintiffs-Appellants*,

v.

GEORGE P. BEACH II, in his official capacity as Superintendent
of the New York State Police, and RICHARD J. MCNALLY, JR., in his
official capacity as Justice of the New York Supreme Court, Third
Judicial District, and Licensing Officer for Rensselaer County,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK (No. 1:18-cv-134-BKS-ATB)

**BRIEF OF PLAINTIFFS-APPELLANTS NEW YORK STATE RIFLE AND
PISTOL ASSOCIATION, INC., ROBERT NASH, AND BRANDON KOCH**

Kathleen McCaffrey Baynes
KATHLEEN MCCAFFREY
   BAYNES, ESQ., PLLC
1826 Western Avenue
Albany, New York 12203
(518) 641-0401
(518) 449-4798 (fax)
kmb@kmbaynes.com

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

New York State Rifle and Pistol Association, Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.


Dated: March 20, 2019                                    s/ David H. Thompson
                                                         David H. Thompson

                                                         *Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED ...........................................................................3

STATEMENT OF THE CASE ...............................................................3

I.      New York's "proper cause" requirement .....................................4

II.     Defendants' refusal to issue handgun carry licenses to Plaintiffs ..................6

III.    The proceedings below ...............................................................7

SUMMARY OF THE ARGUMENT .....................................................8

ARGUMENT .......................................................................................10

I.      The conduct restricted by New York's "proper cause" requirement
        lies at the core of the Second Amendment. ................................12

        a.      Text, history, precedent, and purpose all confirm that the right
                to keep and bear arms extends outside the home. .............12

        b.      *Kachalsky* erred in concluding that the right to carry firearms
                outside the home is not at the core of the Second Amendment. .........27

II.     Under *Heller*, Defendants' requirement that law-abiding citizens
        demonstrate a special need for self-defense to exercise their Second
        Amendment rights is categorically unconstitutional. ....................30

III.    *Kachalsky* was wrong to uphold New York's "proper cause" restriction
        under intermediate scrutiny. ........................................................35

        a.      Strict scrutiny should apply. ............................................35

i

b.    New York's "proper cause" restriction fails even intermediate scrutiny, properly applied...................................................................36

CONCLUSION .......................................................................................48

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Application of O'Connor*, 585 N.Y.S.2d 1000 (Sup. Ct. West. Cty. 1992) .............5

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ................................18

*Aymette v. State*, 21 Tenn. 154 (1840) ..............................................29, 30

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)...................................22, 29

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................34

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ...................................14

*Center for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153 (9th Cir. 2003).......37

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ..................10, 37

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ........................36, 37

*Commonwealth v. Caetano*, 26 N.E.3d 688 (Mass. 2015) .....................................15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)......................................... 1, 2, 9, 10, 12, 13, 14, 16, 20, 22,
                                                        24, 27, 28, 30, 31, 32, 34, 48

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...........................................47

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) .........................................25

*Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ......34

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) .....................................16

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016)...........36, 38, 47

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............................11

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).................10, 37, 38

*Joelner v. Village of Washington Park*, 378 F.3d 613 (7th Cir. 2004)....................37

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ..................................... 2, 4, 7, 15, 27, 28, 29, 30, 42

*Klenosky v. New York City Police Dep't*,
    428 N.Y.S.2d 256 (App. Div. 1980)................................. 1, 5, 6, 31, 32, 34, 35

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...............................13

*Martinek v. Kerik*, 743 N.Y.S.2d 80 (App. Div. 2002) ...........................................5

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ................................................46, 47

iii

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)................................................ 8, 16, 17, 18, 26, 27, 31, 36

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) .............................. 9, 10, 13, 15, 17, 20, 30, 39, 46

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ..........................................33

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*,
    354 F. Supp. 3d 143 (N.D.N.Y. 2018)............................................................4, 8

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ......................................................................10, 11

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ..................................33

*Nunn v. State*, 1 Ga. 243 (1846).......................................................................22, 29

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)............................19

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .................13, 21, 22

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)..................................................19, 23

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ............................35

*Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013)...................................................42

*Sierra Club v. Con-Strux, LLC*, 911 F.3d 85 (2d Cir. 2018) ..................................10

*Simpson v. State*, 13 Tenn. 356 (1833) ...................................................................23

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ...........................................22

*State v. Chandler*, 5 La. Ann. 489 (1850)...............................................................29

*State v. Huntly*, 25 N.C. 418 (1843).......................................................................23

*State v. Reid*, 1 Ala. 612 (1840) .......................................................................22, 29

*Staub v. City of Baxley*, 355 U.S. 313 (1958) ........................................................33

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ....................34

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ..........................................40

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)..........................................12

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................39

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).............................43

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017).................. 8, 9, 15, 16, 22, 27, 28, 29, 30, 35, 38

iv

## Constitutional and Statutory Provisions and Legislative Materials

U.S. CONST. amend. II................................................................2, 8, 12

Civil Rights Act of 1866, sec. 1, 14 Stat. 27 (1866)................................26

Freedmen's Bureau Bill of 1866, sec. 14, 14 Stat. 173 (1866) ...............26

N.Y. PENAL LAW

    § 265.01(1)......................................................................4, 44

    § 265.20(a)(3) ........................................................................4

    § 400.00(1)............................................................................5

    § 400.00(2)(f)................................................................1, 5, 8

    § 400.00(3)(a) .......................................................................4

    § 400.00(4) ...........................................................................5

Act of Dec. 6, 1825, sec. 8, 1825 Fla. Laws 52, 55 ...............................24

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ...............................24

An Act To Punish Certain Offences Therein Named, and for Other Purposes,
    ch. 23, § 1, 1865 Miss. Laws 165 ...............................................25

CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866)
    (statement of Sen. Trumbull)......................................................26

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866)
    (statement of Sen. Pomeroy)...................................................26, 27

Letter from Assistant Comm'r Fisk, H.R. EXEC. DOC. NO. 70, 39th Cong.
    (1st Sess. 1866) ...............................................................25, 26

## Other

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of
Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6
MASTERPIECES OF ELOQUENCE (Hazeltine et al. eds., 1905) .............................21

AKHIL REED AMAR, THE BILL OF RIGHTS (1998)......................................26

1 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803).............20

2 WILLIAM BLACKSTONE, COMMENTARIES (Christian ed., 1794)..........................19

4 WILLIAM BLACKSTONE, COMMENTARIES ..............................................22

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803).......18, 20

*NCVS Victimization Analysis Tool*, BUREAU OF JUSTICE STATISTICS ......................17

H. STERLING BURNETT, NATIONAL CENTER FOR POLICY ANALYSIS, TEXAS
    CONCEALED HANDGUN CARRIERS: LAW-ABIDING PUBLIC BENEFACTORS (2000),
    https://goo.gl/7MvkD9 .........................................................................44

CDC, MORBIDITY & MORTALITY WEEKLY REPORT VOL. 52, FIRST REPORTS
    EVALUATING THE EFFECTIVENESS OF STRATEGIES FOR PREVENTING VIOLENCE:
    FIREARMS LAWS (Oct. 3, 2003).............................................................41

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009)...39,
    40

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward
    an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991).................24, 25

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893)......................21

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION
    (1906) ...............................................................................................25

FLORIDA DEP'T OF AGRIC. & CONSUMER SERVS., DIVISION OF LICENSING,
    CONCEALED WEAPON OR FIREARM LICENSE SUMMARY REPORT,
    OCT. 1, 1987–FEB. 28, 2019 ..................................................................44

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic
    Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005)............................................41

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the
    Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986)....................43

1 SIR MATTHEW HALE, HISTORIA PLACITORUM CORONAE
    (Sollom Emlyn ed. 1736)......................................................................18

Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation
    & Rates of Homicide & Other Violent Crime*,
    228 J. AM. C. SURGEONS 1 (2019).........................................................41

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716)....18, 22, 23

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN
    KENTUCKY (1822) ..............................................................................23

INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL, PRIORITIES FOR
    RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE
    (2013) .........................................................................................41, 45

1 THE WORKS OF THOMAS JEFFERSON (H. A. Washington ed., 1884)....................21

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012) ..................................................................................19, 20

Gary Kleck, *What do CDC's Surveys Say About the Frequency of Defensive Gun Uses?* (July 11, 2018), https://goo.gl/nu1NiW ...........................................45

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995) ...........................................................................................................44, 45

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998) ...........................................................................................................45, 46

David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515 (2009) ..............................................................................44

WILLIAM LAMBARD, EIRENARCHA (1588)..........................................................22, 28

*Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE (1785)....................19

*Firearms*, MONTICELLO..............................................................................................21

David B. Mustard, *Comment, in* EVALUATING GUN POLICY (Jens Ludwig & Philip J. Cook eds., 2003) ........................................................39

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005) .........40, 45

*Gun Laws*, NRA-ILA, https://goo.gl/Nggx50 ........................................................39

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833)..........................................................................................................................33

HARLOW GILES UNGER, LION OF LIBERTY (2010)....................................................21

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .........23

## INTRODUCTION

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

Yet New York has imposed limits on "the right of the people to . . . bear Arms," U.S. Const. amend. II, that flout these basic constitutional principles at every turn. It has seized the very power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a license to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, has, in the estimation of its local licensing authorities, shown a sufficiently "proper cause" to exercise that right, N.Y. Penal Law § 400.00(2)(f). Worse still, the State has determined that a general desire to carry a firearm for the purpose of self-defense is not a sufficiently good reason—demanding, instead, proof that a law-abiding citizen wishing to exercise the right has "a special need for self-protection distinguishable from that of the general community." *Klenosky v. New York City Police Dep't*, 428 N.Y.S.2d 256, 257 (App. Div. 1980), *aff'd*, 421 N.E.2d 503 (N.Y. 1981). New York has thus

1

struck a balance *directly contrary* to the Constitution's demand that the right to self-defense be protected as "the *central component*" of the Second Amendment. *Heller*, 554 U.S. at 599.

To be sure, as the district court pointed out, this Court—in precedent we concede is binding on this panel at this stage in the litigation—has upheld New York's "proper cause" limit. *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). But *Kachalsky* is deeply flawed, and it should be overturned at the first opportunity by a court competent to do so. *Kachalsky* does not meaningfully acknowledge the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts merely "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Kachalsky*'s application of it—deferring to the State's judgment without discussing or even *identifying* the empirical evidence on which that judgment was supposedly based—is not.

In sum, although this Court is presently bound by precedent to uphold it, New York's "proper cause" restriction is unconstitutional.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiffs' constitutional challenge to the state laws and regulations governing the carrying of firearms outside

the home in New York under 28 U.S.C. §§ 1331, 1343. The district court entered a final order dismissing Plaintiffs' sole claim against all Defendants under Fed. R. Civ. P. 12(b)(6) on December 17, 2018. Joint Appendix at 28 ("JA"). Plaintiffs timely noticed their appeal from the district court's final judgment on January 15, 2019, JA 30, and this Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the Second Amendment protects the right to carry a firearm outside the home for self-defense.

2.     Whether the government may condition the exercise of the right to bear arms on a showing that a citizen has a "proper cause" for carrying a firearm beyond self-defense.

3.     Whether this Court's decision in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), should be overruled.

## STATEMENT OF THE CASE

Plaintiffs filed this action on February 1, 2018, alleging that New York's requirement that law-abiding citizens must show a "proper cause" before receiving a permit to carry a handgun outside the home for self-defense infringes upon the Second Amendment right to bear arms in public. Plaintiffs sought a declaration that the "proper cause" requirement is unconstitutional and an injunction barring Defendants from enforcing it. Plaintiffs' complaint acknowledged that their claim

3

was foreclosed by this Court's opinion in *Kachalsky*, 701 F.3d 81, but they brought suit to prompt a reconsideration of that decision by a court with authority to do so. JA 08–09. Defendants moved to dismiss pursuant to FED. R. CIV. P. 12(b)(6), and on December 17, 2018, the district court, Judge Brenda K. Sannes presiding, entered an opinion and order granting that motion and dismissing the case. That opinion is reported at *New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018), and reproduced at JA 19.

## I. New York's "proper cause" requirement

New York law generally forbids any person to "possess[ ] any firearm," N.Y. PENAL LAW § 265.01(1), without first obtaining "a license therefor," *id.* § 265.20(a)(3). An ordinary member of the general public who wishes to carry a handgun outside the home must first obtain a license to "have and carry [a handgun] concealed" (a "Handgun Carry License") pursuant to Section 400.00(2)(f) of New York's Penal Law. A person seeking such a license must submit an application to the Licensing Officer for the city or county where the applicant resides, on an application form approved by the Superintendent of the New York State Police, Defendant Beach. N.Y. PENAL LAW § 400.00(3)(a). New York law imposes a number of objective restrictions on the eligibility for a Handgun Carry License. For example, an applicant must be at least 21 years old, must not have been convicted of any felony or serious offense, must not be an unlawful user of a controlled substance,

and must not have a history of mental illness. *Id.* § 400.00(1). Before issuing a license, the Licensing Officer must conduct a rigorous investigation and background check to verify that each of these statutory requirements is satisfied. *Id.* § 400.00(4).

In addition to these eligibility requirements, New York law also imposes a more subjective restriction on the availability of Handgun Carry Licenses: an applicant must demonstrate that "proper cause exists for the issuance thereof." *Id.* § 400.00(2)(f). While Licensing Officials retain some discretion in determining what constitutes "proper cause" under this standard, a significant body of New York case-law provides several examples of reasons that *do not* qualify. The courts have determined, for instance, that "[a] generalized desire to carry a concealed weapon to protect one's person and property does not constitute 'proper cause.' " *Application of O'Connor*, 585 N.Y.S.2d 1000, 1003 (Sup. Ct. West. Cty. 1992). They have further clarified that merely traveling through "high crime areas . . . is too vague to constitute 'proper cause' within the meaning of Penal Law § 400.00(2)(f)," *Martinek v. Kerik*, 743 N.Y.S.2d 80, 81 (App Div. 2002), instead requiring an applicant to "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession," *Klenosky*, 428 N.Y.S.2d at 257.[1]

---

[1] Some Licensing Officers grant what they call "restricted licenses," which are licenses that are marked by certain restrictions, such as "hunting and target."

5

Accordingly, typical New Yorkers—the vast majority of citizens who cannot "demonstrate a special need for self-protection distinguishable from that of the general community," *id.*—effectively remain subject to a ban on carrying handguns outside the home for self-defense.

## II.    Defendants' refusal to issue handgun carry licenses to Plaintiffs

Pursuant to this restriction, Defendants denied requests by each of the individual Plaintiffs and at least one member of Plaintiff New York State Rifle and Pistol Association for a Handgun Carry License that would allow them to carry a handgun outside the home for self-defense. JA 13–14, 15–16 (Compl. For Declaratory and Injunctive Relief ¶¶ 27–29, 36–38, 40 (May 16, 2018), Doc. 31 ("Am. Compl.")).

For instance, Plaintiff Nash, a resident of Rensselaer County, satisfies all of the eligibility and training requirements imposed by New York law and has held a Handgun Carry License since 2015. JA 12–13 (Am. Compl. ¶¶ 22–25). But the license Mr. Nash was issued is marked "Hunting, Target only," and it thus allows him to carry a firearm outside the home only while hunting and target shooting—not for the general purpose of self-protection. JA 13 (Am. Compl. ¶¶ 25–26). Mr. Nash

---

These licenses may be granted without a showing of a special need for self-defense, but they allow the licensee to carry a firearm *only* when engaged in the specified activities. Such a license thus *does not* permit the carrying of a firearm in public for the purpose of self-defense.

requested that his local Licensing Officer, Defendant Richard N. McNally, Jr., remove the "hunting and target" restrictions from his license and issue him a license allowing him to carry a firearm for self-protection, citing a string of recent robberies in his neighborhood and the fact that he had recently completed an advanced firearm safety training course. JA 13 (Am. Compl. ¶ 27). But on November 1, 2016, Defendant McNally denied Mr. Nash's request, concluding that he had failed to show "proper cause" because he did not demonstrate a special need for self-defense that distinguished him from the general public. JA 13–14 (Am. Complaint ¶¶ 28–29).

## III.    The proceedings below

On February 1, 2018, Plaintiffs Nash and the New York State Rifle and Pistol Association filed suit against Defendant McNally and Defendant George P. Beach II, the Superintendent of the New York State Police, in the U.S. District Court for the Northern District of New York, alleging that New York's "proper cause" restriction on the availability of Handgun Carry Licenses is facially unconstitutional under the Second Amendment, which is applicable to New York under the Fourteenth Amendment. Plaintiffs' Complaint conceded that their Second Amendment claim was foreclosed at the district-court level by this Court's decision in *Kachalsky*, 701 F.3d 81, which specifically upheld New York's "proper cause" requirement against an earlier Second Amendment challenge.

7

On March 26, 2018, Defendants Beach and McNally moved to dismiss Plaintiffs' Second Amendment claim under FED. R. CIV. P. 12(b)(6), on *Kachalsky*'s authority. In response, Plaintiffs again conceded that *Kachalsky* is controlling but argued that it was wrongly decided and should be overruled by a court competent to do so. JA 26 (Memorandum at 8). After Defendants had moved to dismiss, the district court granted Plaintiffs leave to file an Amended Complaint, which added an additional Plaintiff, Mr. Koch, but which was otherwise substantively identical to the original complaint. JA 05 (Text Order); JA 06 (Am. Complaint). On December 17, 2018, the district court granted Defendants' motion to dismiss, reasoning that "because the Second Circuit has expressly upheld the constitutionality of New York State Penal Law § 400.00(2)(f), Plaintiffs' claims must fail." JA 27 (Memorandum at 9).

Plaintiffs timely noticed this appeal. JA 30.

## SUMMARY OF THE ARGUMENT

I.     The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has twice affirmed, in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), that the Second Amendment at its core guarantees the right to keep and bear arms for purposes of self-defense. And the abundant historical record from every relevant period confirms what is clear from the constitutional text alone: "the individual right

8

to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections." *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017). Indeed, a contrary holding would require this Court to *repudiate* the Supreme Court's binding analysis of the Second Amendment's text, history, and purpose. *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

II.     Because New York's restrictions on carrying firearms in public severely impinge on the right of ordinary, law-abiding citizens to carry arms for self-defense, they are unconstitutional *per se*. *Heller* makes clear that a restriction on core Second Amendment conduct so severe that it is akin to a total ban is unconstitutional categorically, without regard to "the traditionally expressed levels [of scrutiny]." *Heller*, 554 U.S. at 634–36. The "proper cause" requirement, by limiting the core right to bear arms to those with a special, atypical self-defense need, "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs," so it must meet the same fate. *Wrenn*, 864 F.3d at 666. Accordingly, it is flatly inconsistent with the Second Amendment.

III.     New York's requirement that law-abiding citizens wishing to exercise their Second Amendment rights outside the home must establish "proper cause" to do so—other than the desire for self-defense—also fails any potentially applicable level of constitutional scrutiny. New York's real goal is not some generic interest in

9

public safety, but rather the naked desire to eliminate as much Second Amendment conduct as it can get away with. That goal is never legitimate—even if used as an indirect means of curbing secondary effects purportedly associated with protected conduct. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449–50 (2002) (Kennedy, J., concurring in judgment); *Heller v. District of Columbia ("Heller III")*, 801 F.3d 264, 280 (D.C. Cir. 2015). What is more, the empirical record does not provide anything more than a rational basis, at most, for speculating that restrictions like New York's will cause any improvement in public safety. *Moore*, 702 F.3d at 939, 942.

## ARGUMENT

This Court "review[s] de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85 (2d Cir. 2018). In weighing a challenge brought under the Second Amendment, the Court has adopted "a two-step inquiry." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015). The first step considers "whether the restriction burdens conduct protected by the Second Amendment." *Id.* Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35, deciding whether a government restriction impinges upon the Second

10

Amendment right involves a close "textual and historical analysis," *New York State Rifle & Pistol Association*, 804 F.3d at 253. If the answer to this first question is yes, the Court "move[s] to the second step of [the] inquiry, in which [it] must determine and apply the appropriate level of scrutiny." *Id.* at 254.[2]

Here, the conduct restricted by New York—carrying the quintessential self-defense weapon outside the home for self-protection—lies not only within the scope of the Second Amendment but at its very core. Because New York's "proper cause" requirement effectively bans typical law-abiding citizens from engaging in core Second Amendment conduct, under *Heller* it is unconstitutional *per se*, wholly apart from any means-end scrutiny. And even if that were not so, New York's law fails any form of heightened constitutional scrutiny.

---

[2] Applying a means-end scrutiny balancing test is inconsistent with *Heller*'s textual and historical approach, *see Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and we reserve the right to argue as much in the Supreme Court.

11

I.    **The conduct restricted by New York's "proper cause" requirement lies at the core of the Second Amendment.**

    a.   **Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home.**

Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35, deciding whether a government restriction challenged on Second Amendment grounds can be squared with that provision involves close "textual analysis" and "historical inquiry," *United States v. Chester*, 628 F.3d 673, 675, 680 (4th Cir. 2010). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the home for self-defense is squarely protected by the Second Amendment right.

    1.   The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). This turn-of-phrase is not, the Supreme Court has held, "some sort of term of art" with a "unitary meaning," but is rather a conjoining of two related guarantees. *Heller*, 554 U.S. at 591. Interpreting the protections of the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be

12

sufficient to protect the right to have arms in the home. Any such interpretation would directly contradict the fundamental canon that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

Indeed, because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore*, 702 F.3d at 936. "[T]he idea of carrying a gun," after all, "does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee." *Peruta v. County of San Diego*, 742 F.3d 1144, 1152 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc). Limiting the Second Amendment to the home would thus be flatly contrary to its text, for it would require either reading "the right to keep and bear arms" as a single, unitary right in the way *Heller* expressly forbids, or striking the word "bear" from the provision altogether.

2. Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case

13

of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also clearly, if implicitly, recognizes a general right to bear arms in public; otherwise, there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612. Indeed, the bulk of *Heller*'s textual and historical analysis treats with the Second Amendment's guarantee of the right *to bear* arms, rather than the right to keep them. *See id.* at 584–91.

The Supreme Court's recent decision in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), provides further confirmation that the Second Amendment is not a home-bound right. The defendant in that case, Jaime Caetano, challenged her conviction for carrying a stun gun, illegal under Massachusetts law, in a public parking lot. The Massachusetts Supreme Judicial Court rejected Caetano's argument

14

that *Heller* and *McDonald* "afford her a right under the Second Amendment to the United States Constitution to possess a stun gun *in public* for the purpose of self-defense," *Commonwealth v. Caetano*, 26 N.E.3d 688, 689 (Mass. 2015) (emphasis added), but the Supreme Court summarily vacated that judgment. And while the reasoning of both the state court and Supreme Court opinions primarily concerns whether stun guns are "Arms" protected by the Second Amendment, if that provision did not protect a right to bear arms outside the home, all that analysis would be utterly irrelevant.

While this Court in *Kachalsky* "proceed[ed] on th[e] assumption" that the Second Amendment "must have *some* application" outside the home, 701 F.3d at 89, it has not squarely resolved the question—and, indeed, *Kachalsky* characterized the issue as a "vast '*terra incognita*.' " *Id.* (quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)). Other courts have not had such difficulty charting this terrain. Three circuit courts have held that the Second Amendment right to armed self-defense does not give out at the doorstep. In *Moore*, the Seventh Circuit held that because the "right to bear arms for self-defense . . . is as important outside the home as inside," limiting the right to the home would require the court "to repudiate the [Supreme] Court's historical analysis" in *Heller*. 702 F.3d at 935, 942. "That [an appellate court] can't do." *Id.* at 935. In *Wrenn*, the D.C. Circuit similarly concluded that "the individual right to carry common firearms beyond the home for

self-defense . . . falls within the core of the Second Amendment's protections." 864 F.3d at 661. And in *Gould v. Morgan*, the First Circuit read "*Heller* as implying that the right to carry a firearm for self-defense guaranteed by the Second Amendment is not limited to the home." 907 F.3d 659, 670 (1st Cir. 2018). By contrast, *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

3.     Confining the Second Amendment's reach to the home would also be at war with its purposes. As announced by its "prefatory" clause, the Second Amendment was codified "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home plainly would be ill-suited to the purpose of "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public, they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms only within their homes. And the same reasoning applies with even more force to the Second Amendment's "core lawful purpose" of safeguarding the right to "self-defense." *Id.* at 630. *Heller* held that individual self-defense is "the *central component*" of the Second Amendment right. *Id.* at 599. The Supreme Court's subsequent decision in *McDonald* reiterates that "in *Heller*, we held that individual

16

self-defense is the central component of the Second Amendment right." 561 U.S. at 767 (quotation marks and emphasis omitted). These cases hold that the core of the Second Amendment is individual self-defense—*period*. There is nothing in the Court's language to suggest that this core purpose may only be pursued in the home—and there is certainly no such suggestion in the text of the Second Amendment, which presumptively must protect both the right of keeping *and bearing* arms in self-defense.

As the Seventh Circuit has held, "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id.* at 942. Indeed, according to the Bureau of Justice Statistics, in 2017 only 36.4% of violent crimes occurred at or in the victim's home, and since 1993 that number has never exceeded 50% (it has ranged between 24.3% and 41.4%).[3] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

---

[3] *See NCVS Victimization Analysis Tool*, BUREAU OF JUSTICE STATISTICS, https://goo.gl/3d9o6V (Under "Custom Tables" tab, select "Personal Victimization" for years 1993-2017, victimization type "violent victimization," and first variable "location of incident").

17

4.     Finally, the historical understanding of the right to keep and bear arms strongly supports what is obvious from the text of the Second Amendment and the binding and persuasive case law interpreting it: the right to keep and bear arms extends outside the home.

As *McDonald* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. at 767. And because the need for self-defense may arise in public, it was recognized in England long before the Revolution that the right to self-defense may be exercised in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house, in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added) (original emphasis omitted). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716); *see also* 1 SIR MATTHEW HALE, HISTORIA PLACITORUM CORONAE 481 (Sollom Emlyn ed. 1736) ("If a thief assault a true man *either* abroad *or* in his house to rob or kill him, the true man is not bound to give back, but may kill the assailant, and it is not felony." (emphasis added)).

18

Because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London—a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "[t]he right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable." *Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the home, for they included "immediate self-defence, . . . suppression of violent and felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id*. at 63 (parentheses omitted). Likewise, Edward Christian, a law professor at Cambridge, published an edition of Blackstone in which he noted that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game." 2 WILLIAM BLACKSTONE, COMMENTARIES *412 n.2 (Christian ed., 1794).

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as

when traveling or attending church. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a civic duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, the law necessarily conferred on those citizens a corresponding right to do so.

This understanding endured in the next century, both before and after the Revolution. As *Heller* noted, for example, "nine state constitutional provisions written in the 18th century or the first two decades of the 19th . . . enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state,' " *Id.* at 584–85—language that is not amenable to a homebound interpretation, since the need "for self-defense . . . is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 WILLIAM BLACKSTONE, COMMENTARIES App. n.D, at 289 (St. George Tucker ed., 1803).

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, MONTICELLO, https://goo.gl/W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the

right to carry in public." 742 F.3d at 1160; *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822). "Indeed, the few nineteenth-century cases that *upheld* onerous limits on carrying against challenges under the Second Amendment or close analogues are sapped of authority by *Heller* . . . because each of them assumed that the Amendment was only about militias and not personal self-defense"—a premise flatly rejected by the Supreme Court. *Wrenn*, 864 F.3d at 658.

To be sure, as *Heller* itself recognized, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. For example, in the pre-history of the Second Amendment, English courts had read the medieval Statute of Northampton as "prohibiting the carrying of 'dangerous and unusual weapons,' " *id.* at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). But this rule against "*riding* or *going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such [c]ircumstances as are apt to terrify the [p]eople," 1 WILLIAM HAWKINS, A TREATISE

22

OF THE PLEAS OF THE CROWN 136 (1716). After all, even by the late seventeenth century there was "a general connivance to gentlemen to ride armed for their security." *Rex*, 90 Eng. Rep. 330.

Early American courts and commentators shared this same understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843) ("[T]he carrying of a gun *per se* constitutes no offence. For any lawful purpose—either of business or amusement— the citizen is at perfect liberty to carry his gun."); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833) (to the extent the Statute of Northampton stood as a prohibition on bearing arms, a state constitutional guarantee of the right to keep and bear arms "abrogated" it).

23

This reading of the Second Amendment persisted throughout the nineteenth century. Under *Heller*, Reconstruction Era views are "instructive" evidence of the Second Amendment's historical scope because they reflect "the public understanding of [the Amendment] in the period after its enactment." 554 U.S. at 605, 614 (emphasis omitted). And those who wrote and ratified the Fourteenth Amendment in 1868 clearly understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed to prevent their enslaved and free black populations from bearing arms at every turn. An 1825 Florida statute, for example, authorized the creation of "patrols" which were directed to "enter into all negro houses and suspected places, and search for arms and other offensive or improper weapons . . . and take away all such arms . . . ." Act of Dec. 6, 1825, sec. 8, 1825 Fla. Laws 52, 55. An 1832 Delaware law forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice

24

Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as citizens precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for their self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Like restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. In an ordinance strikingly similar in operation to New York's "proper cause" law, several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906). And a series of 1866 reports to Congress from a Freedmen's Bureau Commissioner in Kentucky lamented that the State's "civil law prohibits the colored man from bearing arms," Letter from Assistant Comm'r Fisk, H.R. EXEC. DOC. NO. 70, 39th Cong., at 233 (1st Sess. 1866), and detailed how "[o]utlaws in different sections of the State . . . make brutal attacks and raids upon

the freedmen, who are defenceless, for the civil law-officers disarm the colored man and hand him over to armed marauders," *id.* at 239.

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. On July 16, 1866, for example, Congress passed—over President Johnson's veto—the Freedman's Bureau Bill of 1866, which secured to the citizens of former slave States the "full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to bear arms*, . . . without respect to race or color, or previous condition of slavery." Freedmen's Bureau Bill of 1866, sec. 14, 14 Stat. 173, 176–77 (1866) (emphasis added).

The contemporaneously enacted Civil Rights Act of 1866, by similarly securing the "full and equal benefit and all laws . . . for the security of person and property" without regard to race, Civil Rights Act of 1866, sec. 1, 14 Stat. 27 (1866), was likewise designed to "destroy" the southern States' continued efforts to "prohibit any negro or mulatto from having fire-arms," CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866) (statement of Sen. Trumbull); *see also* AKHIL REED AMAR, THE BILL OF RIGHTS 264–66 (1998). And of course, Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his

26

homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

> **b.** ***Kachalsky* erred in concluding that the right to carry firearms outside the home is not at the core of the Second Amendment.**

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment, it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id.* at 599. Given that the Second Amendment's text, history, and purposes all show that its protections extend outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond those four walls as well. *Id.* at 630. "Thus, the Amendment's core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

*Kachalsky* disagreed with this conclusion. While assuming for the sake of argument "that the Amendment must have *some* application in the . . . context of the public possession of firearms," the *Kachalsky* panel held that bearing arms in public "falls outside the core Second Amendment protections identified in *Heller*." *Kachalsky*, 701 F.3d at 89, 94. That reasoning fails for multiple reasons. To begin, because *Kachalsky* failed to conduct any meaningful textual and historical analysis of whether the Second Amendment applies outside the home, it had little basis for concluding that the right to bear arms outside the home "falls outside the core" of

27

the Second Amendment. *Id.* at 94. While *Kachalsky*'s decision to "proceed[ ] on this assumption" that the Second Amendment applies in public, *id.* at 89, may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to sweep under the rug the overwhelming historical and textual support, discussed above, for the conclusion that the right to bear arms in public lies at the very heart of the Second Amendment. *Wrenn*, 864 F.3d at 663.

Instead of grappling with the historical evidence discussed above, *Kachalsky* cited a series of laws, dating from the nineteenth century and later, which targeted the carrying of *concealed* weapons.[4] These laws, according to the Court in *Kachalsky*, evinced "a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety." *Kachalsky*, 701

---

[4] The only historical restrictions cited by *Kachalsky* that date to the founding period—the most relevant historical time frame for determining the scope of the Second Amendment, *see Heller*, 554 U.S. at 614—are: (1) scattered eighteenth-century state laws "prohibit[ing] the use of firearms on certain occasions and in certain locations" and regulating "the storage of gun powder"; and (2) the versions of the Statute of Northampton enacted in North Carolina, Massachusetts, and Virginia. *Kachalsky*, 701 F.3d at 95 & n.19. The first type of colonial-era restrictions were also a cornerstone of Justice Breyer's *dissent* in *Heller*, *see* 554 U.S. at 683–84 (Breyer, J., dissenting), and the majority *expressly rejected* the relevance of these narrow and minor limits on firing arms in certain situations (such as during New Year's Day celebrations), concluding that they "provide no support" for across-the-board, significant restrictions, like New York's here, *id.* at 631–33 (majority). And for the reasons discussed above, *see supra*, pp. 22–23, Northampton and its colonial and state analogues were simply not understood as applying to the carrying of arms "usually worne and borne" for otherwise lawful purposes like self-defense. EIRENARCHA, *supra*, at 135.

28

F.3d at 94–95. Not so. While these laws limited the carrying of *concealed* firearms—a practice that was considered dishonorable and especially dangerous by the social mores of the day—they did so against the background of *freely allowing* the *open* carrying of arms, thus "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left intact the right to carry firearms in *some* manner was absolutely *critical* to most of the judicial opinions assessing their constitutionality. The distinction was relied on by courts that upheld this type of law against constitutional challenge. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *Reid*, 1 Ala. at 616–17. And it was also endorsed by the opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also Bliss*, 12 Ky. at 91–94.[5] These

---

[5] A few courts from this era upheld concealed carry bans without relying on this distinction, but as *Kachalsky* itself notes, they did so "on the basis of an

laws thus provide no historical pedigree for restrictions, like New York's, which prohibit *both* open and concealed carrying and thus add up to "a denial of the right altogether." *Aymette*, 21 Tenn. at 161.

Had *Kachalsky* fairly engaged in the textual and historical analysis required by *Heller*, it would have been forced to reach the same conclusion as the two circuits that *have* treated seriously with the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them.

## II. Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional.

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. "The very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634.

---

interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" 701 F.3d at 91 n.14. Those outlier decisions are thus "sapped of authority by *Heller*," and cannot be cited as reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

But that is precisely what New York does here—it reserves to itself the right to determine whether a citizen is justified in exercising the right to bear arms, and, worse still, rejects the simple desire for self-defense as a valid justification. New York's wholesale prohibition on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense is an infringement of core Second Amendment conduct that is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on the right to keep arms at issue there under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id*. at 689–90 (Breyer, J., dissenting), ruling instead that the people themselves already had balanced the interests in favor of the right to keep and bear arms when they chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion). This reasoning applies equally to the broad ban on the right to bear arms at issue here.

New York's demand that applicants show a need for self-defense that is "distinguishable from that of the general community," *Klenosky*, 428 N.Y.S.2d at

31

257, *extinguishes* the core Second Amendment rights of *typical* citizens—who, by definition, cannot distinguish their need for self-defense from that of the general population. To be sure, Defendants' limits allow individuals who can show "a special need for self-protection" to carry firearms, if they can demonstrate that need in advance to the satisfaction of the government. *Id.* But the Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose lives or safety are being threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "special need for self-protection" in advance*. Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme turns the right to bear arms on its head.

Indeed, New York's demand that citizens prove to the State's satisfaction that they have a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. Constitutional rights by their very nature and design are meant to settle, at least to some extent, the permissible scope of state power; they settle nothing at all if the state has authority to require law-abiding citizens to show "proper cause" before exercising the right. Put differently, the Second Amendment right has force as a right only if those who disagree with the central value choice

32

made by those who adopted it—that an individual's interest in self-defense is of such paramount importance that the freedom "to possess and carry weapons in case of confrontation" must be given constitutional protection, *id.*—are bound to follow it in the teeth of that disagreement. By seizing the authority to veto the ordinary, law-abiding citizen's choice to carry a firearm, New York has struck at the heart of the Second Amendment.

It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. That principle is perhaps most familiar in the free speech context, where it has been understood for centuries that the most serious infringement on the right of free expression is the "prior restraint": a requirement that before you get permission to speak, you must explain to the government why what you have to say is worth hearing. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–23 (1931); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 732–44 (1833). The Constitution simply will not brook a licensing scheme that allows government officials to bar one from speaking because "they do not approve" of the proposed speech's "effects upon the general welfare." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

The rule that the government can no more demand an explanation for the desire to engage in constitutionally protected conduct than it may prohibit such conduct altogether is also well established in the free exercise context. The government cannot, for example, arrogate to itself the authority to second-guess citizens' religious judgments. Those judgments are for citizens, and citizens alone, to make. While courts can determine whether an asserted religious conviction is an "honest" one, *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981), they cannot proceed to "question the centrality" or "plausibility" of that conviction, *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

A shared principle unites these doctrinal contexts: if the government cannot prohibit a person from engaging in certain constitutionally protected conduct, it also cannot condition a person's right to engage in the protected conduct upon demonstration of a "proper cause" for wanting to engage in it. "A Constitutional guarantee subject to future . . . assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. But New York has seized *precisely* this power. By requiring its residents to prove that they have "a special need for self-protection distinguishable from that of the general community," *Klenosky*, 428

N.Y.S.2d at 257, New York has arrogated to itself the authority to ban any exercise of this Second Amendment conduct by typical, law-abiding citizens.

In short, as the D.C. Circuit persuasively concluded, a "good reason" requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666, 668. Indeed, such a restriction "destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . , but by design: it looks precisely for needs 'distinguishable' from those of the community." *Id.* at 666. Such a prohibition is unconstitutional *per se*, "apart from any particular balancing test," since no "showing[ ] of public benefits could save this destruction of so many commonly situated . . . residents' constitutional right to bear common arms for self-defense in any fashion at all." *Id.*

## III. *Kachalsky* was wrong to uphold New York's "proper cause" restriction under intermediate scrutiny.

### a. Strict scrutiny should apply.

Even if Defendants' restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

35

And the right to bear arms is not only enumerated in the constitutional text, it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Kachalsky*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

### b. New York's "proper cause" restriction fails even intermediate scrutiny, properly applied.

Ultimately determining the correct standard of scrutiny is immaterial, however, because the "proper cause" restriction should be struck down under *any* level of heightened scrutiny.

1.      That is so, first, as a matter of law. By design, Defendants' restrictions will reduce firearm violence, if at all, *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres,*

36

*Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49.

Justice Kennedy's controlling[6] opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear that in defending a restriction as sufficiently tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449 (Kennedy, J., concurring). "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450.

Courts have applied similar reasoning in the Second Amendment context. For instance, in *Heller III*, 801 F.3d at 280, the D.C. Circuit struck down the District of Columbia's prohibition on registering more than one pistol per month. The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more

---

[6] *See, e.g.*, *Joelner v. Village of Washington Park*, 378 F.3d 613, 624 n.7 (7th Cir. 2004); *Center for Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1161 (9th Cir. 2003).

gun accidents, more gun suicides, and more gun crimes." *Id.* But the court rejected that simplistic syllogism, explaining that "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home," and so it simply cannot be right. *Id.*; *see also Grace*, 187 F. Supp. 3d at 148 (reasoning that "it is not a permissible strategy to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right" (quotation marks omitted)). In other words, the government may not adopt a law with the design and direct effect of limiting the quantity of conduct protected by the Second Amendment.

But that is precisely what Defendants have done here. Their restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. Nor are they aimed at keeping arms out of the hands of those likely to misuse them. No, their purpose and effect is simply to *limit the number of arms borne in public*, and to the extent this leads to a reduction of gun crime, that is only a byproduct of this suppression of the quantity of core Second Amendment conduct. As the D.C. Circuit concluded, limits like Defendants' "proper cause" restriction "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

38

2.      Even if this objection is set aside, the heightened need requirement still flunks intermediate scrutiny, and *Kachalsky* was still wrong to uphold it. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," the available data do not provide "more than merely a rational basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50. Yet "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists in favor of gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders

. . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that is the proposition Defendants would need to support with "substantial evidence," *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997), for their ban to survive intermediate scrutiny. The debate over firearms regulation is so ridden with strife that statisticians, criminologists, and public health researchers often sound less like objective social scientists than zealous advocates. It is important to keep in mind, therefore, that not all articles on firearms regulation are created equal. The most persuasive studies are those that are conducted by respected, independent groups and that systematically review the entire body of firearms social science. For instance, in 2004, the National Academy of Sciences' National Research Council ("NRC") conducted an exhaustive review of the entire body of social-scientific literature on firearms regulation in an effort to determine what inferences could be safely drawn from the current research. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ. And in 2013 the NRC more generally

40

concluded that "whether gun restrictions reduce firearm-related violence is an unresolved issue." INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 44 (2013), http://goo.gl/oO6oRp.

Similarly, in 2003 the Centers for Disease Control ("CDC") convened an independent Task Force to conduct "a systematic review of scientific evidence regarding the effectiveness of firearms laws in preventing violence, including violent crimes, suicide, and unintentional injury." CDC, MORBIDITY & MORTALITY WEEKLY REPORT VOL. 52, FIRST REPORTS EVALUATING THE EFFECTIVENESS OF STRATEGIES FOR PREVENTING VIOLENCE: FIREARMS LAWS 11 (Oct. 3, 2003), http://goo.gl/VqWAVM. The CDC Task Force also concluded that the data were insufficient to support the hypothesis "that the presence of more firearms" being carried in public by licensed citizens "increases rates of unintended and intended injury in interpersonal confrontations." Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53 (2005), http://goo.gl/zOpJFL; *see also* Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, 228 J. AM. C. SURGEONS 1 (2019) (finding no statistically-significant association between adoption of more permissive firearm carry laws and rates of homicide or other violent crime).

*Kachalsky*'s cursory discussion of whether New York's "proper cause" requirement actually advances its public-safety justification fell far short of the Court's duty, under intermediate scrutiny, to independently scrutinize the State's assertions that the challenged restriction substantially serves its claimed goal. The sum total of the "evidence" discussed by *Kachalsky* in purportedly conducting intermediate scrutiny was confined to: (1) naked assertions about "the dangers inherent in the carrying of handguns in public" that were "made one-hundred years ago" by New York's legislature, 701 F.3d at 97, and (2) unnamed "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death," *id.* at 99, that New York submitted in its briefing— studies which the Court did not feel the need to discuss or *even specifically identify*. But a law that "imposes current burdens and must be justified by current needs," *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 536 (2013)—not by assumptions a legislature made over a hundred years ago. And merely invoking the fact that the State "submitted studies and data" supporting its law in its briefing, *with no actual analysis of those studies or data*, hardly discharges the Court's duty to "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on substantial evidence." *Kachalsky*, 701 F.3d at 97, 99.

The lack of evidence that a law such as New York's advances public safety should not be surprising, because violent criminals will continue to carry guns in

public regardless, leaving law-abiding citizens defenseless when confronted with criminal violence. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Accordingly, instead of focusing on the special need requirement's (likely nonexistent) effect on hardened criminals, a realistic assessment of that limit's potential costs and benefits must instead look at those persons "for whom the provision is an actual rather than an irrelevant restriction." *Hellerstedt*, 136 S. Ct. at 2320 (brackets omitted). Here, that class is comprised of those persons who pass all of the State's eligibility restrictions (lack of criminal history, substance abuse, etc.).

43

N.Y. PENAL LAW § 400.00(1). It is no surprise, given all of these criteria—which, again, Plaintiffs do not challenge—that data from other states indicate that carry license holders as a group are "much more law-abiding than the general population." David B. Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L. REV. 515, 572 (2009); *id.* at 564–70 (discussing government data from Minnesota, Michigan, Ohio, Louisiana, Texas, and Florida); *see also* H. STERLING BURNETT, NATIONAL CENTER FOR POLICY ANALYSIS, TEXAS CONCEALED HANDGUN CARRIERS: LAW-ABIDING PUBLIC BENEFACTORS 1 (2000), https://goo.gl/7MvkD9 (finding that concealed-carry license holders in Texas have "arrest rates far lower than the general population for every category of crime"); FLORIDA DEP'T OF AGRIC. & CONSUMER SERVS., DIVISION OF LICENSING, CONCEALED WEAPON OR FIREARM LICENSE SUMMARY REPORT, OCT. 1, 1987–FEB. 28, 2019, http://goo.gl/yFzIwv (finding that since 1987, Florida has revoked less than 0.5% of the concealed-carry licenses it has issued for any reason, with the vast majority of those revocations having nothing to do with misuse of a firearm).

It is these highly law-abiding individuals who are prevented from carrying firearms by the "proper cause" limit. And that has very real public-safety *costs*— costs that New York entirely ignores. Although the number of defensive gun uses is difficult to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million

[defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103; *see also* Gary Kleck, *What do CDC's Surveys Say About the Frequency of Defensive Gun Uses?* (July 11, 2018), https://goo.gl/nu1NiW. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). What is more, "[a]lmost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million, in the context of about 300,000 violent crimes involving firearms in 2008." INSTITUTE OF MEDICINE AND NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (2013), http://goo.gl/oO6oRp (citation omitted).

Depriving law-abiding citizens of the right to carry firearms also may embolden criminals to commit additional crimes. "[Q]uite apart from their effects in

disrupting crimes that have already been initiated, gun carrying among prospective victims may discourage some crimes from being attempted in the first place, due to criminals anticipating greater risks of injury to themselves and lower rates of success completing the crimes." Kleck & Gertz, *Carrying Guns for Protection*, *supra*, at 195. In other words, "knowing that many law-abiding citizens are walking the streets armed may make criminals timid." *Moore*, 702 F.3d at 937.

Accordingly, while restricting the carrying of firearms to a favored few is unlikely to prevent *criminals* from engaging in that conduct, it does mean that many *law-abiding citizens* will not be able to use firearms defensively outside the home. Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "proper cause" requirement cannot be shown to benefit the public safety—but it may well harm it.

3.     Finally, even if New York's "proper cause" requirement did advance public safety—and, as explained above, it does not—that restriction independently fails heightened scrutiny because it is not properly tailored to the government's asserted goals. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) (quotation marks omitted).

Here, there is an utter lack of fit between the State's restrictions and its purported objective of public safety.

After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This limitation will neither make it less likely that those who meet the [proper cause] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake v. Filko*, 724 F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting).

This disconnect points to another problem under *McCullen*—under intermediate scrutiny "the government must demonstrate that alternative measures that [would] burden substantially less [protected conduct] *would fail* to achieve the government's interests." 134 S. Ct. at 2540 (emphasis added). Here, there are myriad alternatives New York could try or already employs that actually *are* targeted at the problem of handguns being carried by those likely to misuse them rather than simply seeking to suppress the exercise of the right. These alternatives include a "shall issue" licensing system, along the lines used by the vast majority of the States, that requires the issuance of a license to citizens that meet objective criteria, a training requirement, and a prohibition on carrying by individuals with a demonstrated propensity to violence (such as violent criminals). As explained above, the State

47

cannot show that these alternatives would fail to advance its interests to a similar extent as its "proper cause" requirement.

Plaintiffs are not arguing for a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Rather, Plaintiffs are arguing for the right of vetted, law-abiding citizens to carry "the quintessential self-defense weapon" in the manner of New York's choosing for the "core lawful purpose of self-defense." *Id*. at 629, 630. If the right to bear arms does not protect this conduct, it might as well not be in the Constitution.

## CONCLUSION

For the foregoing reasons, the district court's opinion and order should be reversed by a court competent to do so.

Dated: March 20, 2019                    Respectfully submitted,

                                         s/ David H. Thompson
                                         David H. Thompson
Kathleen McCaffrey Baynes                Peter A. Patterson
KATHLEEN MCCAFFREY                       John D. Ohlendorf
  BAYNES, ESQ., PLLC                     COOPER & KIRK, PLLC
1826 Western Avenue                      1523 New Hampshire Ave., N.W.
Albany, NY 12203                         Washington, D.C. 20036
(518) 641-0401                           (202) 220-9600
(518) 449-4798 (fax)                     dthompson@cooperkirk.com
kmb@kmbaynes.com

*Counsel for Plaintiffs-Appellants*

48

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(A) because this brief contains 11,892 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: March 20, 2019

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# STATUTORY ADDENDUM

**N.Y. PENAL LAW § 265.00. Definitions.**

As used in this article and in article four hundred, the following terms shall mean and include:

> . . .

>> 3. "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches; or (e) an assault weapon. . . . Firearm does not include an antique firearm.

> . . .

**N.Y. PENAL LAW § 265.01. Criminal possession of a weapon in the fourth degree.**

A person is guilty of criminal possession of a weapon in the fourth degree when:

> (1) He or she possesses any firearm . . . .

> . . .

Criminal possession of a weapon in the fourth degree is a class A misdemeanor.

**N.Y. PENAL LAW § 265.20. Exemptions.**

a.  [S]ection[ ] 265.01 . . . shall not apply to:

> 1. Possession of any of the weapons, instruments, appliances or substances specified in section[ ] 265.01 . . . by the following:

(a) Persons in the military service of the state of New York when duly authorized by regulations issued by the adjutant general to possess the same.

(b) Police officers as defined in subdivision thirty-four of section 1.20 of the criminal procedure law.

(c) Peace officers as defined by section 2.10 of the criminal procedure law.

(d) Persons in the military or other service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess the same.

(e) Persons employed in fulfilling defense contracts with the government of the United States or agencies thereof when possession of the same is necessary for manufacture, transport, installation and testing under the requirements of such contract.

. . .

3. Possession of a pistol or revolver by a person to whom a license therefor has been issued as provided under section 400.00 . . . of this chapter . . . .

. . .

## N.Y. PENAL LAW § 400.00. Licenses to carry, possess, repair and dispose of firearms.

1. Eligibility. No license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant (a) twenty-one years of age or older, provided, however, that where such applicant has been honorably discharged from the United States army, navy, marine corps, air force or coast guard, or the national guard of the state of New York, no such age restriction shall apply; (b) of good moral character; (c) who has not been convicted anywhere of a felony or a serious offense or who is not the subject of an outstanding warrant of arrest issued upon the alleged commission of a felony or serious offense; (d) who is not a fugitive from justice; (e) who is not an unlawful user of or addicted to any controlled substance as defined in section 21 U.S.C. 802; (f) who being an alien (i) is not illegally or unlawfully in the United States or (ii) has not been

2

admitted to the United States under a nonimmigrant visa subject to the exception in 18 U.S.C. 922(y)(2); (g) who has not been discharged from the Armed Forces under dishonorable conditions; (h) who, having been a citizen of the United States, has not renounced his or her citizenship; (i) who has stated whether he or she has ever suffered any mental illness; (j) who has not been involuntarily committed to a facility under the jurisdiction of an office of the department of mental hygiene pursuant to article nine or fifteen of the mental hygiene law, article seven hundred thirty or section 330.20 of the criminal procedure law, section four hundred two or five hundred eight of the correction law, section 322.2 or 353.4 of the family court act, or has not been civilly confined in a secure treatment facility pursuant to article ten of the mental hygiene law; (k) who has not had a license revoked or who is not under a suspension or ineligibility order issued pursuant to the provisions of section 530.14 of the criminal procedure law or section eight hundred forty-two-a of the family court act; (l) in the county of Westchester, who has successfully completed a firearms safety course and test as evidenced by a certificate of completion issued in his or her name and endorsed and affirmed under the penalties of perjury by a duly authorized instructor, except that: (i) persons who are honorably discharged from the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York, and produce evidence of official qualification in firearms during the term of service are not required to have completed those hours of a firearms safety course pertaining to the safe use, carrying, possession, maintenance and storage of a firearm; and (ii) persons who were licensed to possess a pistol or revolver prior to the effective date of this paragraph are not required to have completed a firearms safety course and test; (m) who has not had a guardian appointed for him or her pursuant to any provision of state law, based on a determination that as a result of marked subnormal intelligence, mental illness, incapacity, condition or disease, he or she lacks the mental capacity to contract or manage his or her own affairs; and (n) concerning whom no good cause exists for the denial of the license. . . .

2. Types of licenses. . . . A license for a pistol or revolver, other than an assault weapon or a disguised gun, shall be issued to (a) have and possess in his dwelling by a householder; (b) have and possess in his place of business by a merchant or storekeeper; (c) have and carry concealed while so employed by a messenger employed by a banking institution or express company; (d) have and carry concealed by a justice of the supreme court in the first or second judicial departments, or by a judge of the New York city civil court or the New York city criminal court; (e) have and carry concealed while so employed by a regular

3

employee of an institution of the state, or of any county, city, town or village, under control of a commissioner of correction of the city or any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted or accused of crime or held as witnesses in criminal cases, provided that application is made therefor by such commissioner, warden, superintendent or head keeper; (f) have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof . . . .

3.    (a) Applications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his or her principal place of business as merchant or storekeeper; and, in the case of a license as gunsmith or dealer in firearms, to the licensing officer where such place of business is located. Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police. An application shall state the full name, date of birth, residence, present occupation of each person or individual signing the same, whether or not he or she is a citizen of the United States, whether or not he or she complies with each requirement for eligibility specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application. An application shall be signed and verified by the applicant. Each individual signing an application shall submit one photograph of himself or herself and a duplicate for each required copy of the application. Such photographs shall have been taken within thirty days prior to filing the application. . . .

      . . .

4.    Investigation. Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made, including but not limited to such records as may be accessible to the division of state police or division of criminal justice services pursuant to section 400.02 of this article. For that purpose, the records of the appropriate office of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority. In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each individual by whom the application is signed and verified. Two copies

4

of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation . . . . When completed, one standard card shall be forwarded to and retained by the division of criminal justice services in the executive department, at Albany. A search of the files of such division and written notification of the results of the search to the investigating officer shall be made without unnecessary delay. Thereafter, such division shall notify the licensing officer and the executive department, division of state police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to that bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority. Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. No such fingerprints may be inspected by any person other than a peace officer, who is acting pursuant to his special duties, or a police officer, except on order of a judge or justice of a court of record either upon notice to the licensee or without notice, as the judge or justice may deem appropriate. Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

4-a.  Processing of license applications. Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority. Such delay may only be for good cause and with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for.

4-b.  Westchester county firearms safety course certificate. In the county of Westchester, at the time of application, the licensing officer to which the license application is made shall provide a copy of the safety course booklet to each license applicant. Before such license is issued, such licensing officer shall require that the applicant submit a certificate of successful completion of a firearms safety course and test issued in his or her name and endorsed and affirmed under the penalties of perjury by a duly authorized instructor.

5

5.  Filing of approved applications. (a) The application for any license, if granted, shall be filed by the licensing officer with the clerk of the county of issuance, except that in the city of New York and, in the counties of Nassau and Suffolk, the licensing officer shall designate the place of filing in the appropriate division, bureau or unit of the police department thereof, and in the county of Suffolk the county clerk is hereby authorized to transfer all records or applications relating to firearms to the licensing authority of that county. . . . Upon application by a licensee who has changed his place of residence such records or applications shall be transferred to the appropriate officer at the licensee's new place of residence. A duplicate copy of such application shall be filed by the licensing officer in the executive department, division of state police, Albany, within ten days after issuance of the license. . . .

    . . .

6.  License: validity. Any license issued pursuant to this section shall be valid notwithstanding the provisions of any local law or ordinance. No license shall be transferable to any other person or premises. A license to carry or possess a pistol or revolver, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. . . .

7.  License: form. Any license issued pursuant to this section shall, except in the city of New York, be approved as to form by the superintendent of state police. A license to carry or possess a pistol or revolver shall have attached the licensee's photograph, and a coupon which shall be removed and retained by any person disposing of a firearm to the licensee. Such license shall specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark, and shall indicate whether issued to carry on the person or possess on the premises, and if on the premises shall also specify the place where the licensee shall possess the same. If such license is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant. Any license as gunsmith or dealer in firearms shall mention and describe the premises for which it is issued and shall be valid only for such premises.

8.  License: exhibition and display. Every licensee while carrying a pistol or revolver shall have on his or her person a license to carry the same. Every

person licensed to possess a pistol or revolver on particular premises shall have the license for the same on such premises. Upon demand, the license shall be exhibited for inspection to any peace officer, who is acting pursuant to his or her special duties, or police officer. . . . Failure of any licensee to so exhibit or display his or her license, as the case may be, shall be presumptive evidence that he or she is not duly licensed.

9.  License: amendment. Elsewhere than in the city of New York, a person licensed to carry or possess a pistol or revolver may apply at any time to his or her licensing officer for amendment of his or her license to include one or more such weapons or to cancel weapons held under license. If granted, a record of the amendment describing the weapons involved shall be filed by the licensing officer in the executive department, division of state police, Albany. The superintendent of state police may authorize that such amendment be completed and transmitted to the state police in electronic form. Notification of any change of residence shall be made in writing by any licensee within ten days after such change occurs, and a record of such change shall be inscribed by such licensee on the reverse side of his or her license. Elsewhere than in the city of New York, and in the counties of Nassau and Suffolk, such notification shall be made to the executive department, division of state police, Albany, and in the city of New York to the police commissioner of that city, and in the county of Nassau to the police commissioner of that county, and in the county of Suffolk to the licensing officer of that county, who shall, within ten days after such notification shall be received by him or her, give notice in writing of such change to the executive department, division of state police, at Albany.

10. License: expiration, certification and renewal. (a) Any license for gunsmith or dealer in firearms and, in the city of New York, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire not more than three years after the date of issuance. In the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not limited to expire on an earlier date fixed in the license, shall expire not more than five years after the date of issuance; however, in the county of Westchester, any such license shall be certified prior to the first day of April, two thousand, in accordance with a schedule to be contained in regulations promulgated by the commissioner of the division of criminal justice services, and every such license shall be recertified every five years thereafter. For purposes of this

7

section certification shall mean that the licensee shall provide to the licensing officer the following information only: current name, date of birth, current address, and the make, model, caliber and serial number of all firearms currently possessed. Such certification information shall be filed by the licensing officer in the same manner as an amendment. Elsewhere than in the city of New York and the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section or prior to the first day of July, nineteen hundred sixty-three and not previously revoked or cancelled, shall be in force and effect until revoked as herein provided. Any license not previously cancelled or revoked shall remain in full force and effect for thirty days beyond the stated expiration date on such license. Any application to renew a license that has not previously expired, been revoked or cancelled shall thereby extend the term of the license until disposition of the application by the licensing officer. In the case of a license for gunsmith or dealer in firearms, in counties having a population of less than two hundred thousand inhabitants, photographs and fingerprints shall be submitted on original applications and upon renewal thereafter only at six year intervals. Upon satisfactory proof that a currently valid original license has been despoiled, lost or otherwise removed from the possession of the licensee and upon application containing an additional photograph of the licensee, the licensing officer shall issue a duplicate license.

(b) All licensees shall be recertified to the division of state police every five years thereafter. . . . Such recertification shall be in a form as approved by the superintendent of state police, which shall request the license holder's name, date of birth, gender, race, residential address, social security number, firearms possessed by such license holder, email address at the option of the license holder and an affirmation that such license holder is not prohibited from possessing firearms. The form may be in an electronic form if so designated by the superintendent of state police. Failure to recertify shall act as a revocation of such license. If the New York state police discover as a result of the recertification process that a licensee failed to provide a change of address, the New York state police shall not require the licensing officer to revoke such license.

11.   License: revocation and suspension. (a) The conviction of a licensee anywhere of a felony or serious offense or a licensee at any time becoming ineligible to obtain a license under this section shall operate as a revocation of the license. A license may be revoked or suspended as provided for in section 530.14 of the criminal procedure law or section eight hundred forty-two-a of the family court

8

act. Except for a license issued pursuant to section 400.01 of this article, a license may be revoked and cancelled at any time in the city of New York, and in the counties of Nassau and Suffolk, by the licensing officer, and elsewhere than in the city of New York by any judge or justice of a court of record . . . . The official revoking a license shall give written notice thereof without unnecessary delay to the executive department, division of state police, Albany, and shall also notify immediately the duly constituted police authorities of the locality.

(b) Whenever the director of community services or his or her designee makes a report pursuant to section 9.46 of the mental hygiene law, the division of criminal justice services shall convey such information, whenever it determines that the person named in the report possesses a license issued pursuant to this section, to the appropriate licensing official, who shall issue an order suspending or revoking such license.

(c) In any instance in which a person's license is suspended or revoked under paragraph (a) or (b) of this subdivision, such person shall surrender such license to the appropriate licensing official and any and all firearms, rifles, or shotguns owned or possessed by such person shall be surrendered to an appropriate law enforcement agency as provided in subparagraph (f) of paragraph one of subdivision a of section 265.20 of this chapter. In the event such license, firearm, shotgun, or rifle is not surrendered, such items shall be removed and declared a nuisance and any police officer or peace officer acting pursuant to his or her special duties is authorized to remove any and all such weapons.

. . .

14. Fees. In the city of New York and the county of Nassau, the annual license fee shall be twenty-five dollars for gunsmiths and fifty dollars for dealers in firearms. In such city, the city council and in the county of Nassau the Board of Supervisors shall fix the fee to be charged for a license to carry or possess a pistol or revolver and provide for the disposition of such fees. Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees: for each license to carry or possess a pistol or revolver, not less than three dollars nor more than ten dollars as may be determined by the legislative body of the county; for each amendment thereto, three dollars, and five dollars in the county of Suffolk; and for each license issued to a gunsmith or dealer in firearms, ten dollars. The fee for a duplicate license shall be five dollars. The fee for processing a license transfer between counties shall be five dollars. . . .

15. Any violation by any person of any provision of this section is a class A misdemeanor.

. . .

17. Applicability of section. The provisions of article two hundred sixty-five of this chapter relating to illegal possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section. In addition, the provisions of such article two hundred sixty-five of this chapter shall not apply to the possession of a firearm in a place not authorized by law, by a person who holds an otherwise valid license or possession of a firearm by a person within a one year period after the stated expiration date of an otherwise valid license which has not been previously cancelled or revoked shall only be punishable as a class A misdemeanor pursuant to this section.