# 19-156

## United States Court of Appeals for the Second Circuit

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ROBERT NASH, BRANDON KOCH,

*Plaintiffs-Appellants,*

v.

GEORGE P. BEACH, II, in his official capacity as Superintendent of the New York State Police, RICHARD J. MCNALLY, JR., in his official capacity as Justice of the New York Supreme Court, Third Judicial District, and Licensing Officer for Rensselaer County,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Northern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
*Solicitor General*
ANDREA OSER
*Deputy Solicitor General*
JENNIFER L. CLARK
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees
The Capitol
Albany, New York 12224
(518) 776-2024

Dated: April 24, 2019

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............ iii

PRELIMINARY STATEMENT ............ 1

QUESTION PRESENTED ............ 3

STATEMENT OF THE CASE ............ 4

A. New York's Longstanding History of Closely Restricting the Public Carrying of Concealed and Concealable Weapons ............ 4

B. New York's Present-Day Handgun Licensing Law ............ 8

C. This Action and the Decision Below ............ 11

STANDARD OF REVIEW ............ 13

SUMMARY OF ARGUMENT ............ 14

ARGUMENT ............ 15

POINT I

THIS COURT'S *KACHALSKY* DECISION COMPELS AFFIRMANCE ............ 15

POINT II

THE COURT'S DECISION IN *KACHALSKY* IS BUTTRESSED BY ADDITIONAL HISTORICAL EVIDENCE, RECENT EMPIRICAL STUDIES, AND SUBSEQUENT SISTER CIRCUIT PRECEDENT ............ 18

A. Additional Historical Evidence Further Buttresses the *Kachalsky* Court's Decision to Analyze the Proper Cause Requirement under Intermediate Scrutiny. ............ 19

**Page**

B. Recent Empirical Evidence Reinforces the *Kachalsky* Court's Conclusion that the Proper Cause Requirement Satisfies Intermediate Scrutiny. .......... 32

C. Multiple Sister Circuits to Consider Analogous Provisions Have Since Adopted This Court's Holding in *Kachalsky*. ...... 38

POINT III

NYSRPA LACKS STANDING TO SUE .......... 42

CONCLUSION .......... 45

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Andrews v. State*,
50 Tenn. 165 (1871) .......... 26

*Bando v. Sullivan*,
290 A.D.2d 691 (3d Dep't 2002) .......... 10

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) .......... 43, 44

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... passim

*Drake v. Filko*,
724 F.3d 426 (3d Cir. 2013) .......... passim

*Elias v. Rolling Stone LLC*,
872 F.3d 97 (2d Cir. 2017) .......... 13

*English v. State*,
35 Tex. 473 (1871) .......... 28

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .......... passim

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012) .......... passim

*Klenosky v. New York City Police Dep't*,
75 A.D.2d 793 (1st Dep't 1980) .......... 10

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) .......... 17

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......... 25, 28

**Cases** **Page(s)**

*MFS Secs. Corp. v. New York Stock Exch., Inc.*,
277 F.3d 613 (2d Cir. 2002) .......... 13

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) .......... 34, 40, 41

*National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
700 F.3d 185 (5th Cir. 2012) .......... 20, 21, 24

*New York State Citizens' Coal. for Children v. Velez*,
629 F. App'x 92 (2d Cir. 2015) .......... 43

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
883 F.3d 45 (2d Cir. 2018) .......... 14

*Nnebe v. Daus*,
644 F.3d 147 (2d Cir. 2011) .......... 43

*O'Connor v. Scarpino*,
83 N.Y.2d 919 (1994) .......... 10

*People ex rel. Darling v. Warden of City Prison*,
154 A.D. 413 (1st Dep't 1913) .......... 5

*Peruta v. County of San Diego*,
824 F.3d 919 (9th Cir. 2016) .......... 20, 27

*Peterson v. Martinez*,
707 F.3d 1197 (10th Cir. 2013) .......... 20

*Robertson v. Baldwin*,
165 U.S. 275 (1897) .......... 19

*Schall v. Martin*,
467 U.S. 253 (1984) .......... 32

*Snell v. Suffolk Cnty.*,
782 F.2d 1094 (2d Cir. 1986) .......... 35

**Cases** **Page(s)**

*State v. Barnett*,
34 W. Va. 74 (1890) .......... 26

*State v. Duke*,
42 Tex. 455 (1874) .......... 28

*State v. Workman*,
35 W. Va. 367 (1891) .......... 29

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) .......... 37

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 32

*United States v. Wilkerson*,
361 F.3d 717 (2d Cir. 2004) .......... 17

*Woollard v. Gallagher*,
712 F.3d 865 (4th Cir. 2013) .......... 38, 39, 40

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) .......... 29, 41

**Constitution**

U.S. Const. amend. II .......... 30

**Statutes**

*New York*

Ch. 676, 1881 N.Y. Laws (vol. 2) 103 .......... 5

Ch. 46, 1884 N.Y. Laws 44 .......... 5

Ch. 92, 1905 N.Y. Laws 129 .......... 5

Ch. 195, 1911 N.Y. Laws 442 .......... 6

**Statutes** **Page(s)**

*New York (cont'd)*

Ch. 608, 1913 N.Y. Laws 1627 .................... 6

Penal Law
§ 265.00(3) .................... 8
§ 265.01(1) .................... 8
§ 265.03(3) .................... 8
§ 265.20 .................... 8
§ 400.00 .................... 8, 9

*Other States*

Ch. 97, 1852 Del. Laws 330 .................... 24

1861 Ga. Laws 859 .................... 27

No. 6, 1692 Mass. Laws 12 .................... 24

Ch. 134, 1836 Mass. Laws 748 .................... 25

Ch. 76, 1821 Me. Laws 285 .................... 24

Ch. 169, 1841 Me. Laws 707 .................... 25

Ch. 162, 1846 Mich. Laws 690 .................... 25

Ch. 112, 1851 Minn. Laws 526 .................... 25

1699 N.H. Laws 1 .................... 24

Ch. 9, 1686 N.J. Laws 289 .................... 24

Ch. 3, 1792 N.C. Laws 60 .................... 24

Ch. 16, 1853 Or. Laws 218 .................... 25

1861 Pa. Laws 248 .................... 25

Ch. 22, 1801 Tenn. Laws 259 .................... 24

**Statutes** **Page(s)**

*Other States (cont'd)*

Art. 6512, 1871 Tex. Laws 1322 ... 28

Ch. 21, 1786 Va. Laws 33 ... 24

Ch. 14, 1847 Va. Laws 127 ... 25, 29

Ch. 153, 1870 W. Va. Laws 702 ... 25, 29

1838 Wis. Laws 378 ... 25

*Great Britain*

2 Edw. III, ch. 3 (1328) ... 4, 21

7 Ric. II, ch. 13 (1383) ... 21

20 Ric. II, ch. 1 (1396-97) ... 21

Bill of Rights, 1 W. & M. sess. 2, ch. 2 (1689) ... 22

**Miscellaneous Authorities**

Bishop, Joel Prentiss, *Commentaries on the Criminal Law*, vol. 1 (1865) ... 23

Blackstone, William, *Commentaries on the Laws of England* vol. 4 (1769) ... 4, 23

Branas, Charles C., et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034 (2009) ... 36

Charles, Patrick J., *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1 (2012) ... 22

Charles, Patrick J., *The Second Amendment in Historiographical Crisis*, 39 Fordham Urb. L.J. 1727 (2012) ... 21

**Miscellaneous Authorities** **Page(s)**

*City Intelligence*, Boston Courier (Boston, Mass.), Mar. 7, 1853 .......... 25

*City Items*, Richmond Whig & Advertiser (Richmond, Va.), Sept. 25, 1860 .......... 25

Cornell, Saul, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & Contemp. Probs. 11 (2017) .......... 23

Crifasi, Cassandra K., et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urban Health 383 (2018) .......... 36

Donahue, John J., et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis* (Nat'l Bureau of Econ. Research, Working Paper No. 23510, 2018), *available at* https://www.nber.org/papers/w23510 .......... 35

Dunlap, John A., *The New-York Justice* (1815) .......... 5, 24

Ewing, James, *A Treatise on the Office & Duty of a Justice of the Peace* (1805) .......... 25

Gardiner, Robert, *The Compleat Constable* (1692) .......... 23

Hawkins, William, *A Treatise of the Pleas of the Crown* (1716) .......... 23

Hemenway, David, & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventative Med. 22 (2015) .......... 37

Keble, Joseph, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* (1683) .......... 22

N.Y. Senate Debate on S. 3409 (June 2, 1987) .......... 8

Niles, John M., *The Connecticut Civil Officer* (1823) .......... 24

*Recorder's Court*, Morning Oregonian (Portland, Or.), Aug. 6, 1867 .......... 25-26

**Miscellaneous Authorities** **Page(s)**

*Revolver Killings Fast Increasing*, N.Y. Times, Jan. 30, 1911 ....... 5, 6, 33

Ruben, Eric M., & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (2015) .......... 28

Siegel, Michael, et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017) .......... 36

State of New York, *Report of the New York State Joint Legislative Committee on Firearms & Ammunition*, Doc. No. 6 (1965) .......... 7

## PRELIMINARY STATEMENT

Plaintiffs concede that the United States District Court for the Northern District of New York (Sannes, J.) properly dismissed their complaint under 42 U.S.C. § 1983 as controlled by this Court's 2012 decision in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). In *Kachalsky,* the Court rejected a Second Amendment challenge to New York's requirement that persons seeking an unrestricted license to carry a concealed handgun in public demonstrate "proper cause" for the issuance of such a license. Plaintiffs nonetheless argue that *Kachalsky* "is deeply flawed, and it should be overturned at the first opportunity by a court competent to do so." (Br. at 2.) Plaintiffs are mistaken. Not only was *Kachalsky* well reasoned and correct when decided, but its analysis is buttressed by additional historical and empirical evidence, and has rightly been widely adopted by sister circuits. The Court should therefore not simply adhere to, but reaffirm, its holding in *Kachalsky*.

New York has conditioned the issuance of an unrestricted license to carry a concealed firearm in public on a showing of "proper cause" for over a hundred years, since the Sullivan Law—passed in 1911 and amended in 1913—was put in place to stem the rising tide of gun violence in the

State. And New York's regulation of concealed firearms stretches back farther. Like many States in this Nation, New York has a longstanding tradition of regulating the use of firearms—and, especially, concealed firearms carried in public—that dates back centuries and draws on pre-existing English laws tightly restricting the public carrying of firearms.

Recognizing this history, the *Kachalsky* Court upheld New York's proper cause requirement. The Court found that the requirement fits comfortably within the bounds of the Second Amendment, because it does not burden the core Second Amendment activity identified by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008): handgun possession in the home. The Court thus applied intermediate scrutiny and rightly determined that the proper cause requirement is substantially related to the State's important interest in public safety and crime prevention. When the New York Legislature passed and then amended the Sullivan Law, it reasonably relied on evidence that regulating the public carrying of firearms would further public safety. And because empirical evidence since that time has only further buttressed that conclusion, the New York Legislature has seen fit to maintain the proper cause requirement.

In the intervening years since this Court issued its opinion in *Kachalsky*, the overwhelming majority of sister circuits have followed its reasoning and reached the same conclusion when considering other jurisdictions' similar "proper cause" requirements for public carry. The First, Third, Fourth, and Ninth Circuits have all upheld analogous requirements; only the D.C. Circuit has invalidated a facially similar one.

This Court correctly held in *Kachalsky* that New York's proper cause requirement is constitutional. Because plaintiffs present no meritorious basis on which to cast aside the well-reasoned, widely followed precedent of this Court, the decision below should be affirmed and the complaint dismissed.

## QUESTION PRESENTED

Did the district court properly dismiss the complaint as controlled by this Court's decision in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), which upheld New York's requirement that persons seeking an unrestricted license to carry a concealed handgun in public have "proper cause" for such license?

## STATEMENT OF THE CASE

### A. New York's Longstanding History of Closely Restricting the Public Carrying of Concealed and Concealable Weapons

Like many States, New York has long exercised localized control to regulate the carrying of concealable firearms in public spaces, with the goal of protecting the public from the inherent dangers that firearms pose. This tradition of regulation stems from English law—the 1328 Statute of Northampton proclaimed that "no Man" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. III, ch. 3 (1328). And this prohibition in English law persisted for centuries. For example, in 1769, William Blackstone wrote that "[t]he offense of riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769). New York incorporated the Statute of Northampton into its common law and prohibited "a man to arm himself with dangerous and unusual weapons,

in such manner as will naturally cause terror to the people." John A. Dunlap, *The New-York Justice* 8 (1815).

In the 19th century, "New York heavily regulated the carrying of concealable firearms." *Kachalsky v. County of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012). In 1881, New York prohibited the concealed carrying of "any kind of fire-arms, being loaded or partly loaded." 1881 N.Y. Laws (vol. 2) 103, ch. 676 § 412. In 1884, it instituted a statewide licensing requirement for minors carrying weapons in public. 1884 N.Y. Laws 44, 47, ch. 46 § 8. And in 1905, it expanded its statewide licensing requirement to cover all persons carrying "any pistol, revolver or other firearm." 1905 N.Y. Laws 129, 129-30, ch. 92 § 2.

After a 1911 New York Coroner's Office Report detailed a marked increase in shooting homicides and suicides committed with concealable firearms, the Legislature sought to craft a permitting scheme to stem the rise in violent crime associated with that type of weaponry. *See People ex rel. Darling v. Warden of City Prison*, 154 A.D. 413, 423 (1st Dep't 1913); *Revolver Killings Fast Increasing*, N.Y. Times, Jan. 30, 1911, at 4 (citing New York Coroner's Office Report). The result of that effort was the enactment in 1911 of the Sullivan Law, which required a license to

possess "any pistol, revolver or other firearm of a size which may be concealed upon the person." 1911 N.Y. Laws 442, 443, ch. 195 § 1 (codifying former N.Y. Penal Law § 1897 ¶ 3).

In 1913, the Legislature amended the Sullivan Law to establish statewide standards for issuing licenses to possess and carry concealable firearms. 1913 N.Y. Laws 1627, 1627-30, ch. 608. "[A]ny magistrate in this state, upon application therefor," could issue a license for home possession, provided "such magistrate is satisfied of the good moral character of the applicant, and provided that no other good cause exists for the denial of such application." *Id.* at 1629. The statute also authorized a magistrate to issue an unrestricted license for concealed carrying in public upon proof "of good moral character, and that *proper cause* exists for the issuance [of the license]." *Id.* (emphasis added). These requirements responded to the finding in the New York State Coroner's Report that a law prohibiting "a person having a revolver in his possession, either concealed or displayed, unless for some legitimate purpose" "would be the means of saving hundreds of lives." *Revolver Killings Fast Increasing*, *supra* (quoting New York Coroner's Office Report).

Over the course of the 20th century, New York maintained this licensing regime, including the requirement of "proper cause" for concealed public carry of firearms. Statutory amendments and recodifications through the years reiterated the importance of New York's licensing requirements to public safety—but never evinced a "general animus towards guns." *Kachalsky*, 701 F.3d at 97 n.22. As a 1965 legislative report observed, New York's framework was the culmination of a "careful balancing of the interests involved." *See* State of N.Y., *Report of the New York State Joint Legislative Committee on Firearms & Ammunition*, Doc. No. 6, at 12 (1965). After all: "Statutes governing firearms and weapons are not desirable as ends in themselves. Such legislation is valuable only as a means to the worthwhile end of preventing crimes of violence before they occur." *Id.* New York's framework was thus designed to "prevent crimes of violence before they can happen," yet still "preserve legitimate interests such as training for the national defense, the right of self defense and recreational pursuits." *Id.* Legislators voiced similar views during a 1987 floor debate about New York's licensing laws, linking the licensing regime with "public safety,"

crime prevention, and saving lives. *See* N.Y. Senate Debate on S. 3409, at 2,471-72 (June 2, 1987).

### B. New York's Present-Day Handgun Licensing Law

Under current New York law, a person who possesses an unlicensed handgun (or other designated firearm[1]), loaded or unloaded, in any location, is guilty of a misdemeanor, and a person who possesses an unlicensed loaded handgun (or other designated firearm) outside the home or place of business is guilty of a felony. N.Y. Penal Law §§ 265.01(1), 265.03(3). Licensed firearms, however, are exempted from these prohibitions. Penal Law § 265.20(a)(3).

Section 400.00 of the Penal Law lays out the standards for licensing firearms. It includes general requirements for all applicants, including, *inter alia*, certain age requirements, good moral character, the absence of convictions for "a felony or a serious offense," and more generally, that

---

[1] Under New York Penal Law, a "firearm" includes pistols and revolvers, shotguns with barrels less than 18 inches long, rifles with barrels less than 16 inches long, weapons made from a shotgun or rifle with an overall length of less than 26 inches, and assault weapons. Penal Law § 265.00(3). Accordingly, most long guns—which are inherently not easily concealable—are not subject to such licensing restrictions in New York.

the applicant be a person "concerning whom no good cause exists for denial of the license." Penal Law § 400.00(1). Plaintiffs do not challenge these general requirements in this suit.

Section 400.00(2) of the Penal Law delineates the types of firearm licenses available in the State. Licenses "shall be issued" to possess a registered handgun in the home or in a place of business by a merchant or storekeeper, and also "shall be issued" to possess, collect, and carry certain antique pistols. *Id.* § 400.00(2)(a), (b), (g). Licenses to carry a concealed handgun in public also "shall be issued" to certain state and city judges, and to those employed by a prison or jail or as a messenger for a banking institution or express company, while so employed. *Id.* § 400.00(2)(c), (d), (e).

Licenses to carry a concealed handgun in public also "shall be issued" to other persons "without regard to employment or place of possession" "when proper cause exists for the issuance thereof." *Id.* § 400.00(2)(f). It is this "proper cause" requirement that plaintiffs challenge here, and that this Court upheld in *Kachalsky*.

"Proper cause" is "not defined by the Penal Law, but New York State courts have defined the term to include carrying a handgun for

target practice, hunting, or self-defense." *Kachalsky*, 701 F.3d at 86. The New York Court of Appeals has held that when an applicant demonstrates "proper cause" for carrying a concealed handgun for specific purposes—*e.g.*, for target practice, hunting, or particular employment—a licensing officer may restrict that license "to the purposes that justified [its] issuance." *O'Connor v. Scarpino*, 83 N.Y.2d 919, 921 (1994). New York courts have also held that to obtain an unrestricted license to carry a concealed handgun in public, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Klenosky v. New York City Police Dep't*, 75 A.D.2d 793, 793 (1st Dep't 1980), *aff'd on op. below*, 53 N.Y.2d 685 (1981); *accord Bando v. Sullivan*, 290 A.D.2d 691, 693 (3d Dep't 2002). *See generally Kachalsky*, 701 F.3d at 86-87 (discussing these cases).

Applications for handgun licenses under section 400.00 are adjudicated by firearms licensing officers. If an application is denied, the applicant may obtain judicial review by filing a proceeding under article 78 of the New York Civil Practice Law and Rules.

### C. This Action and the Decision Below

Plaintiffs are the New York State Rifle & Pistol Association, Inc. (NYSRPA), Robert Nash, and Brandon Koch. They argue that the Second Amendment prohibits New York from requiring an applicant to demonstrate "proper cause" before receiving an unrestricted license to carry a concealed handgun in public. Plaintiffs conceded in their complaint that the outcome in this case is controlled by the Court's 2012 decision in *Kachalsky* upholding the proper cause requirement of section 400.00(2)(f), but nevertheless filed this suit and argue that *Kachalsky* "was wrongly decided." (JA9.)

Defendant Richard N. McNally, Jr., the Licensing Officer for Rensselaer County, issued plaintiffs Nash and Koch licenses to carry concealed handguns in public for purposes of hunting and target shooting. Plaintiffs Nash and Koch, however, seek unrestricted licenses to carry concealed handguns in public, which they did not receive because they failed to demonstrate "proper cause" for such licenses. (JA13-16.) Neither Nash nor Koch alleged to have sought judicial review of those determinations by filing a petition under article 78 of the New York Civil Practice Law and Rules, and we can find no record of any such petitions.

Plaintiff NYSRPA alleges that the proper cause requirement is an "affront" to its mission (JA9), and that it has "at least one member who has had an application for a Handgun Carry License denied solely for failure to satisfy the 'proper cause' requirement" (JA16).

Plaintiffs seek, *inter alia*, a declaration that the proper cause requirement violates the Second and Fourteenth Amendments and an injunction enjoining its enforcement. (JA17-18.)

Defendants moved to dismiss, arguing that this Court's *Kachalsky* decision controls. Defendants also argued that plaintiff NYSRPA lacks standing, because the complaint fails to assert any injury sustained by the organization.

In a Memorandum-Decision and Order, the United States District Court for the Northern District of New York (Sannes, J.) dismissed the complaint. (JA19-27.) The district court noted that in *Kachalsky*, this Court expressly rejected a Second Amendment challenge to New York's "proper cause" requirement to obtain a license to carry a concealed handgun in public. (JA25.) The court further noted that "the Second Circuit has expressly reaffirmed its reasoning in *Kachalsky*" as recently as 2018. (JA26.) The district court recognized that plaintiffs' argument in this case

"is virtually identical to that in *Kachalsky*" and, because the district court "is required to follow the binding precedents set by the Second Circuit," the court dismissed the complaint with prejudice. (JA26-27.) It did not address the merits of defendants' standing argument. (JA24.)

This appeal followed. (JA30.)[2]

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quotation marks omitted). This Court reviews *de novo* a district court's dismissal of an action for failure to state a claim, and it may "affirm on any ground appearing in the record below." *MFS Secs. Corp. v. New York Stock Exch., Inc.*, 277 F.3d 613, 617 (2d Cir. 2002).

[2] *Libertarian Party of Erie County v. Cuomo*, 18-386, which is currently pending before this Court, is unrelated to this case but raises, among other issues, the same legal issue presented here. As here, the plaintiffs-appellants in *Libertarian Party* argue that the proper cause requirement of section 400.00(2)(f) is unconstitutional. Oral argument was heard in that matter on February 20, 2019.

## SUMMARY OF ARGUMENT

*Kachalsky* is a well-reasoned opinion that not only remains good law, but is buttressed by additional historical research, recent empirical evidence, and widespread agreement among sister circuits. Accordingly, this Court should reaffirm its decision in *Kachalsky* and affirm the district court's judgment dismissing this action.

To be sure, the United States Supreme Court has granted certiorari to consider the Second Amendment issue presented in *New York State Rifle & Pistol Association, Inc. v. City of New York*, 883 F.3d 45 (2d Cir. 2018). *See* 139 S. Ct. 939 (2019). At issue there is the constitutionality of New York City's ban on transporting a licensed, locked, and unloaded handgun from a point within city limits to a home or shooting range outside city limits. To assure that the Court's decision here properly accounts for any decision rendered by the Supreme Court in the New York City case, we suggest that the Court both schedule oral argument in this case only after final Supreme Court action in the New York City case and also give the parties an opportunity to submit supplemental

papers on the effect, if any, of any such final Supreme Court action on this case.[3]

## ARGUMENT

## POINT I

### THIS COURT'S *KACHALSKY* DECISION COMPELS AFFIRMANCE

As plaintiffs concede (Br. at 2), this Court's 2012 decision in *Kachalsky* compels a judgment affirming the district court and dismissing plaintiffs' complaint.

In *Kachalsky*, this Court upheld New York's requirement that an applicant demonstrate proper cause to obtain a license to carry a concealed handgun in public. 701 F.3d at 100-01. In so doing, the Court considered and rejected the central assertion plaintiffs put forth in their brief here: that the Supreme Court's interpretation of the Second Amendment in *Heller* renders New York's proper cause requirement unconstitutional. *See id.* at 93-94.

---

[3] It is now unclear whether the Supreme Court case will proceed. On April 12, 2019, respondents alerted the Supreme Court to a proposed New York City rulemaking that would eliminate the challenged ban and sought abeyance of the briefing schedule pending final action on the proposed rule.

The *Kachalsky* Court reviewed our Nation's extensive history of localized governmental regulation of the public carrying of firearms and concluded that "[t]here is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety." *Id.* at 94-96*; see also id.* at 90-91 (recounting 19th-century state restrictions on the public carrying of handguns). Unlike D.C.'s total ban on handgun possession in the home that was struck down as ahistorical and unconstitutional in *Heller*, "New York's restriction on firearm possession in public has a number of close and longstanding cousins." *Id.* at 91. Thus, while the *Kachalsky* Court proceeded on the assumption that the Second Amendment "must have *some* application" in the context of public possession of firearms, *id.* at 89, the Court determined that enshrined within the Second Amendment was a substantial role for state regulation of the carrying of firearms in public, *id.* at 96.

In light of this longstanding history and the fact that the licensing scheme did not infringe "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"—an interest the *Heller* Court described as "elevate[d] above all other [Second Amendment] interests," 554 U.S. at 635—the *Kachalsky* Court analyzed the proper cause

requirement under intermediate scrutiny. 701 F.3d at 96-97. And the Court concluded that the requirement is substantially related to the important governmental interest of furthering public safety and preventing gun violence. The Court explained that the New York Legislature reasonably and rightly relied on evidence that such regulations would, on balance, increase law enforcement's ability to prevent violent crime and save lives. *Id.* at 97-98. The Court also noted that New York's decision not to ban entirely the concealed public carry of firearms, but instead to limit the issuance of unrestricted public carry licenses to individuals with an actual and articulable reason to carry, furthered public safety while also not restricting more activity than was reasonably necessary. *Id.* at 98.

This Court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of [this] Court or by the Supreme Court," *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004), or called into question by "an intervening Supreme Court decision," *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Plaintiffs correctly concede (Br. at 2) that there has been no en banc panel or Supreme Court decision overruling *Kachalsky*, and

that there is no relevant intervening Supreme Court decision calling it into question. Accordingly, the Court should affirm the district court's judgment dismissing the complaint.

## POINT II

### THE COURT'S DECISION IN *KACHALSKY* IS BUTTRESSED BY ADDITIONAL HISTORICAL EVIDENCE, RECENT EMPIRICAL STUDIES, AND SUBSEQUENT SISTER CIRCUIT PRECEDENT

*Kachalsky* was correctly decided on the basis of the information that the Court had before it. Its holding is only further buttressed by additional historical evidence, more recent empirical studies, and subsequent harmonious caselaw from the overwhelming majority of sister circuits to consider provisions analogous to New York's proper cause requirement. The Court should therefore reaffirm its holding in *Kachalsky*.[4]

---

[4] Indeed, this Court recently reaffirmed its holding in *Kachalsky,* albeit in the context of analyzing the very different transport regulations at issue in the New York City case currently before the Supreme Court. See *supra* at 14. Should the Court consider revisiting its holding in *Kachalsky* now, appellees urge the Court first to return the matter to the district court for discovery and an opportunity to develop the record on matters such as expert opinions regarding the history of regulating the public carrying of firearms and the empirical evidence supporting the

### A. Additional Historical Evidence Further Buttresses the *Kachalsky* Court's Decision to Analyze the Proper Cause Requirement under Intermediate Scrutiny.

In *Kachalsky*, the Court properly concluded that the "historical prevalence of the regulation of firearms in public," 701 F.3d at 96, supports the conclusion that New York's proper cause requirement should be analyzed under intermediate scrutiny, if the requirement implicates the Second Amendment, *id.* at 93-96. The Court's conclusion is well supported by the historical analysis recounted in its opinion. That conclusion is buttressed by additional historical evidence demonstrating that New York's proper cause requirement is part of a longstanding tradition of local governmental regulation of the public carrying of firearms. Indeed, the tradition is sufficiently entrenched to establish that New York's requirement does not even implicate the Second Amendment.[5] But the tradition at least establishes New York's

---

link between laws regulating the public carrying of firearms and increased public safety.

[5] In 1897, the Supreme Court described a "well-recognized exception[]" to the Second Amendment's guarantees: that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897). Then in *Heller,* the Supreme Court recognized that "the

requirement as a "presumptively lawful regulatory measure[]." *Heller*, 554 U.S. at 626-27 & n.26. To the extent plaintiffs find regional variations in that tradition, they only reinforce the notion that our Nation has always given States and localities the flexibility they need to tailor their regulation of the public carrying of firearms to the particular circumstances of their jurisdictions.

New York's proper cause requirement "has been the law in New York since 1913," a fact this Court recognized as sufficient to make it a "longstanding" regulation. *Kachalsky*, 701 F.3d at 90 n.11 As the Fifth Circuit has observed, "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012). "After all,

---

majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. And since *Heller,* several federal courts of appeals have concluded that "the Second Amendment does not confer a right to carry concealed weapons." *Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013); *see also Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc) (holding same); *Drake v. Filko*, 724 F.3d 426, 429-30 (3d Cir. 2013) (holding same, and finding alternatively that analogous restriction on public carry satisfies intermediate scrutiny).

*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid–20th century vintage." *Id.*; *see also Drake v. Filko*, 724 F.3d 426, 432-34 (3d Cir. 2013) (because it dates back to 1924, New Jersey's "justifiable need" standard for obtaining license to carry a concealed firearm in public is "longstanding" and thus "presumptively lawful").

Close regulation in this State and around the country of the carrying of concealed firearms long pre-dates New York's Sullivan Law and finds its genesis in early English law.

The Statute of Northampton, enacted in England in 1328, provided that no person could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. III, ch. 3 (1328). This early English statute "was strictly enforced as a prohibition on going armed in public." Patrick J. Charles, *The Second Amendment in Historiographical Crisis*, 39 Fordham Urb. L.J. 1727, 1804 (2012). And the statute's prohibition was reauthorized in subsequent years. *See, e.g.*, 7 Ric. II, ch. 13 (1383); 20 Ric. II, ch. 1 (1396-97). Indeed, throughout the late 16th century, Queen Elizabeth I repeatedly called for strict enforcement of the Statute of

Northampton, because the carrying of "Daggers, Pistols, and such like" "secretly" and in the "open" led "to the terrour of all people professing to travel and live peaceably." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 21-22 (2012).[6] And in 1683, English law enforcement personnel were instructed to "[a]rrest all such persons as they shall find to carry Dag[ger]s or Pistols" in public. Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* 224 (1683).

When England codified its Bill of Rights in 1689—a codification that included the provision that subjects "may have arms for their defence suitable to their conditions, and *as allowed by law*," Bill of Rights, 1 W. & M. sess. 2, ch. 2 (1689) (emphasis added)—the restrictions of the Statute of Northampton were retained.[7] Thus, in 1769, Blackstone wrote

---

[6] Plaintiffs mistakenly argue (Br. at 29) that, historically, regulation of the carrying of firearms in public related only to the carrying of *concealed* arms and operated "against the background of freely allowing the open carrying of arms." English law belies this argument and, as discussed in more detail below, see *infra* at 27-29, only a minority of localities in the antebellum South prohibited concealed carrying of arms but permitted open carrying of arms.

[7] As the Supreme Court has recognized, this provision of the English Bill of Rights "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593.

that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 Blackstone, *Commentaries*, *supra*, 148-49; *see also* Robert Gardiner, *The Compleat Constable* 18 (1692) (constables shall arrest "such persons as ride or go offensively arm'd . . . by day or by night" or who "wear or carry any Daggers, Guns or Pistols").[8]

Meanwhile, the American colonies had been incorporating into their own laws the longstanding English tradition of closely regulating

---

[8] Plaintiffs mistakenly argue (Br. at 22-23) that a handgun would not have been considered a dangerous or unusual weapon, even in the context of public carriage. But "firearms [were] quintessential offensive weapons in the eyes of the law" at the time. Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & Contemp. Probs. 11, 20 (2017) (citing 1764 dictionary defining "gun" and "fire-arm" as "a weapon of offense"). The terms "dangerous or unusual" and "offensive" weapons "all describe the same principle," and prohibitions on such weapons were all "aimed to achieve the same goal: limit armed travel in public, particularly in populous areas." *Id.* at 20-21; *see also* 1 William Hawkins, *A Treatise of the Pleas of the Crown* 664-65 (1716) ("guns, pistols, daggers, and instruments of war" are "offensive weapons"); 1 Joel Prentiss Bishop, *Commentaries on the Criminal Law* 188 (1865) (same); 1836 Mass. Laws 748, 750 ch. 134, § 16 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . .").

the public carry of firearms, including pistols. Multiple colonies, and then States, did so before the Second Amendment was ratified in 1791.[9] This fact shows that "when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *National Rifle Ass'n of Am.*, 700 F.3d at 200. The trend continued after the Second Amendment's ratification, either by statute[10] or by common law.[11] And, like the English tradition, the restrictions in these laws on the carrying of weapons in public applied regardless of whether the individual brandished a firearm in a threatening matter or committed any other "particular act of violence."

---

[9] *See* 1686 N.J. Laws 289, 289-90, ch. 9 (prohibiting most persons from "rid[ing] or go[ing] armed with sword, pistol, or dagger"); 1692 Mass. Laws 12, no. 6 (making it a crime to "ride or go armed Offensively before any of Their Majesties Justices, or other [of] Their Officers or Ministers doing their Office, or elsewhere"); 1699 N.H. Laws 1 (imposing similar prohibition); 1786 Va. Laws 33, ch. 21 (same).

[10] *See, e.g.*, 1792 N.C. Laws 60, 61, ch. 3; 1801 Tenn. Laws 259, 260-61, ch. 22 § 6; 1821 Me. Laws 285, ch. 76 § 1; 1852 Del. Laws 330, 333, ch. 97 § 13.

[11] *See, e.g.,* Dunlap, *supra*, at 8 (prohibiting "a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people"); John M. Niles, *The Connecticut Civil Officer* 146 (1823) ("go[ing] armed offensively" causes "terror of the people" and is punishable).

James Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805).

Throughout much of the 19th century, and thus including the period leading up to the 1868 ratification of the Fourteenth Amendment—which we now know made the Second Amendment applicable to the States, *McDonald v. City of Chicago,* 561 U.S. 742 (2010)—many States modified their longstanding prohibitions on the public carry of firearms to except those with "reasonable cause to fear an assault or other injury, violence to his person, or to his family or property."[12] Individuals lacking the requisite reasonable cause, however, remained prohibited from carrying a firearm in public. *See, e.g.*, *City Intelligence*, Boston Courier (Boston, Mass.), Mar. 7, 1853, at 4 (reporting charge for "carrying a concealed weapon," a "loaded pistol"); *City Items*, Richmond Whig & Advertiser (Richmond, Va.), Sept. 25, 1860, at 3 (reporting person "arraigned" for charge of "carrying a concealed weapon"); *Recorder's*

---

[12] 1836 Mass. Laws 748, 750, ch. 134 § 16; *see also* 1838 Wis. Laws 378, 381, § 16; 1841 Me. Laws 707, 709, ch. 169 § 16; 1846 Mich. Laws 690, 692, ch. 162 § 16; 1847 Va. Laws 127, 129, ch. 14 § 16; 1851 Minn. Laws 526, 528, ch. 112 § 18; 1853 Or. Laws 218, 220, ch. 16 § 17; 1861 Pa. Laws 248, 250, § 6; 1870 W. Va. Laws 702, 703, ch. 153 § 8.

*Court*, Morning Oregonian (Portland, Or.), Aug. 6, 1867, at 4 (reporting sentence of "two days in jail" for "carrying a concealed weapon").

Moreover, available caselaw from 19th-century courts indicates uniform approval of these continuing restrictions. The Supreme Court of Appeals of West Virginia, for example, upheld the conviction of a man for "unlawfully carrying a revolver" in public because the evidence was "not sufficient to establish good cause on the part of the defendant to fear death or harm." *State v. Barnett*, 34 W. Va. 74, 77-78 (1890); *see also id.* (noting that overturning defendant's conviction would "rob this useful statute of the beneficial effect it was intended to accomplish in the preservation of life and the public peace"). The Supreme Court of Tennessee deemed a prohibition in that state "too broad" because it lacked an exception for instances in which arms "were worn *bona fide* to ward off or meet imminent and threatened danger to life or limb, or great bodily harm." *Andrews v. State*, 50 Tenn. 165, 191 (1871); *see also id.* at 181-82 (disavowing a citizen's right to carry arms "at all times and under all circumstances" and noting that the right "is limited by the duties and proprieties of social life"). Indeed, the Supreme Court expressly recognized in *Heller* that "the majority of the 19th-century courts to

consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller,* 554 U.S. at 626.[13]

The 19th century was also a time of regional variation respecting regulation of the carrying of firearms in public. While many States restricted such carrying, with narrow exceptions for those with sufficient reasonable cause, a minority of States—all in the South—allowed the *open* carrying of firearms in public for white citizens. *See, e.g.*, 1861 Ga. Laws 859, pt. 4, tit. 1 § 4413. As Justice Thomas explained, this regional variation is largely attributed to the perceived need among white citizens to have firearms at the ready in case of a rebellion by black slaves: "[I]t is difficult to overstate the extent to which fear of a slave uprising gripped

---

[13] As the Ninth Circuit has observed:

> With the exception of *Bliss [v. Commonwealth*, 12 Ky. 90 (1822)], those pre-Civil War state courts that considered the question *all* upheld prohibitions against concealed weapons. . . . Moreover, the two-to-one *Bliss* decision did not last. *Bliss* was decided in 1822; a state constitutional amendment was adopted in 1849 to overturn Bliss; the legislature then passed a statute in 1854 outlawing concealed weapons.

*Peruta*, 824 F.3d at 936. In *Kachalsky*, this Court cited *Bliss* as an example of States "disagree[ing] as to the scope of the right to bear arms." 701 F.3d at 91.

slaveholders and dictated the acts of Southern legislatures." *McDonald*, 561 U.S. at 844 (Thomas, J., concurring); *see also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 128 (2015) (outlining the "social and legal atmosphere unique to the South" at this time).

Even within the antebellum South, however, public carry, open or otherwise, was not uniformly permitted. Some southern States had laws that, like the New York law challenged here, prohibited the carrying of firearms in public, absent reasonable cause to fear assault. For example, Texas prohibited "carrying on or about" one's person pistols and other weapons absent "reasonable grounds for fearing" an "immediate and pressing" attack. *See* 1871 Tex. Laws 1322, art. 6512. That law was twice upheld by the Texas Supreme Court, which noted that the law "undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service." *State v. Duke*, 42 Tex. 455, 459 (1874); *see also English v. State*, 35 Tex. 473, 478-79 (1871) (characterizing as "little short of ridiculous"

claim that a pistol could be carried without regulation "where ladies and gentlemen are congregated together"). Virginia and West Virginia adopted similar good cause requirements. *See* 1847 Va. Laws 127, 129, ch. 14 § 16; 1870 W. Va. Laws 702, 703, ch. 153 § 8; *see also State v. Workman*, 35 W. Va. 367 (1891) (upholding West Virginia law).

In seeking to paint a different picture of historical regulation of the public carrying of firearms, plaintiffs rely heavily on the D.C. Circuit's historical analysis in *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017). That analysis is fundamentally flawed, however, because it assumes that practices in some antebellum Southern States reflected a national consensus at the time about the implications of the Second Amendment for the public carrying of firearms, and it ignores variations even among those Southern States. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) (criticizing *Wrenn* on these grounds), *petition for cert. filed* (Apr. 1, 2019) (No. 18-1272). This Court rightly rejected that flawed historical analysis in *Kachalsky*, when it noted that "[h]istory and tradition do not speak with one voice here." 701 F.3d at 91. The more comprehensive historical analysis set forth above provides yet stronger

ground to recognize our Nation's history of local variation when it comes to the regulation of carrying firearms in public.

Plaintiffs nonetheless argue (Br. at 12) that hundreds of years of laws tightly restricting the public carrying of firearms should be ignored because the text of the Second Amendment protects the right to "keep *and bear* Arms." U.S. Const. amend. II (emphasis added). That the Amendment references a right to "bear" arms does not prove plaintiffs' claim. Even assuming that the Second Amendment confers a right of some kind to carry in public (as opposed to a right not just to keep, but to use, arms in specified locations), "the right secured by the Second Amendment is not unlimited." *Heller,* 554 U.S. at 626-67. To the contrary, the Second Amendment leaves ample room for "presumptively lawful regulatory measures" and "longstanding prohibitions." *Id.* Plaintiffs' argument thus amounts to no more than an assertion that the Second Amendment is not limited strictly to the home. This is the very assertion that this Court assumed to be true for the purposes of its analysis in *Kachalsky*. 701 F.3d at 89. It therefore does not aid plaintiffs here.

There is, then, a longstanding tradition stretching back to England and running through the founding of this Nation and the 19th and 20th

centuries, of restricting public carry, with narrow good cause exceptions for reasonable and specific self-defense needs. The regional variation revealed in this historical analysis does not undermine this tradition; rather, it reinforces the notion that ample room for localized discretion by States regulating public carry of firearms is built into our Nation's history. On this basis, the *Kachalsky* Court correctly determined that, "while the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public." 701 F.3d at 96. Given that "our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public," the Court correctly concluded that, even assuming New York's proper cause requirement implicates the Second Amendment, the requirement should be analyzed under intermediate scrutiny. *Id.*

### B. Recent Empirical Evidence Reinforces the *Kachalsky* Court's Conclusion that the Proper Cause Requirement Satisfies Intermediate Scrutiny.

As the *Kachalsky* Court rightly explained, New York's proper cause requirement satisfies intermediate scrutiny because "it is substantially related to the achievement of an important governmental interest."[14] 701 F.3d at 96-97. Plaintiffs in this case do not contest the *Kachalsky* Court's conclusion that the government has at minimum substantial governmental interests in public safety and crime prevention. *Id*. Indeed, those interests are compelling. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 749, 755 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984). And the Court should reaffirm the *Kachalsky* Court's conclusion that New York's proper cause requirement is substantially related to that interest, because it does not burden more conduct than reasonably necessary.

---

[14] Plaintiffs erroneously rely on First Amendment doctrine (Br. at 33-34, 36-38). In *Kachalsky,* this Court squarely rejected plaintiffs' attempt to import First Amendment principles wholesale into Second Amendment jurisprudence as a "crude comparison" evincing "a misunderstanding of the Second Amendment." *Kachalsky*, 701 F.3d at 99-100; *see also id.* at 91. Plaintiffs in this case present no new argument or intervening caselaw that would alter that assessment. Plaintiffs' argument is further flawed because it misconstrues the Legislature's policy choices. The "purpose and effect" (Br. at 37) of the proper cause

New York's proper cause requirement does not infringe at all on what the Supreme Court in *Heller* recognized as the core Second Amendment right of a law-abiding citizen to keep arms in the home for the purpose of self defense; it applies only outside the home (or place of business). In limiting the ability of individuals to carry concealed firearms in public, the Legislature that enacted New York's law sought to respond to the finding of the New York State Coroner that a law prohibiting "a person having a revolver in his possession, either concealed or displayed, unless for some legitimate purpose" "would be the means of saving hundreds of lives," *Revolver Killings Fast Increasing*, *supra* (quoting New York Coroner's Office Report). At the same time, however, New York's law does not result in a total ban on the public carrying of firearms, like the regime found unconstitutional by the

provision is not simply to reduce the overall number of guns carried in the public sphere, but to increase public safety by restricting the number of individuals licensed to carry arms in public to those that have a particular need. See *supra* at 7 (describing legislative history). This Court recognized the difference between the strawman rationale for the law plaintiffs present here and the Legislature's actual policy analysis when it admonished that the proper cause provision was not equivalent to a scheme "limiting handgun possession to every tenth citizen." *Kachalsky*, 701 F.3d at 98.

Seventh Circuit. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Rather, New York's law seeks to strike a "careful balancing of the interests involved," *Kachalsky,* 701 F.3d at 97 n.22 (citing Report of the N.Y. State Joint Legislative Comm'n on Firearms & Ammunition, Doc. No. 6, at 12 (1965)), by requiring licensing officials to permit public carry for those with "proper cause," meaning those who wish to hunt or engage in target practice, those whose employment the Legislature found gave rise to a special need, or those with a non-speculative need for self defense. The *Kachalsky* Court thus properly found that the law is substantially related to the State's important public safety interest. 701 F.3d at 97-99.

Plaintiffs nonetheless argue (Br. at 42) that because New York's proper cause requirement imposes current burdens, it must be justified by current needs. But as the *Kachalsky* Court explained, the New York Legislature has in fact reconsidered the State's handgun licensing scheme over the years, and it has made the reasoned policy judgment to retain it. *See* 701 F.3d at 97-98 & nn.22 & 23.

Moreover, empirical studies conducted since this Court's decision in *Kachalsky* continue to support the judgment of the New York Legislature

to maintain the good cause requirement as a measure substantially related to its public safety goals.[15]

A recent study determined that violent crime in a State rises when that State adopts a "right-to-carry" concealed handgun law that does not require applicants to demonstrate proper cause—precisely the policy plaintiffs argue New York is compelled to adopt. *See* John J. Donahue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis* 42 (Nat'l Bureau of Econ. Research, Working Paper No. 23510, 2018), *available at* https://www.nber.org/papers/w23510. Specifically, the two statistical models run in the study each determined that a shift in policy away from proper cause requirements is associated with 13% to 15% higher aggregate rates of violent crime ten years after adoption. The study's authors found "not even the slightest hint in the data that [right-to-carry] laws reduce violent crime." *Id.* The study uses comprehensive data from 33 States from 1977 through 2014. *Id.* at 27.

---

[15] The Court may properly take judicial notice of "studies and data" in assessing plaintiffs' claim. *Kachalsky*, 701 F.3d at 97-99; *see also, e.g.*, *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1105-06 (2d Cir. 1986) (holding that social science studies can be reviewed by courts as "legislative facts").

These results are in line with other recent studies of the correlation between state regulation of guns in public and violent crime. From 1991 to 2015, States with right-to-carry laws had, on average, 10.6% higher rates of handgun homicide than States like New York that require a proper cause for carrying handguns in public. Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923, 1923-29 (2017). Particularly in densely populated urban counties, right-to-carry laws are associated with increased firearm homicides, while stricter gun licensing regulations are associated with a 14% reduction in such homicides. Cassandra K. Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urban Health 383, 383-90 (2018).

Relatedly, multiple studies also severely undermine the assertion that carrying a gun decreases one's likelihood of being the victim of a crime. Indeed, those carrying a gun are five times more likely to be shot in the course of an assault than are assault victims not wielding a gun, Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2034-2040 (2009), and carrying a gun for self-defense purposes does not reduce the carrier's risk

of injury, David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventative Med. 22, 22-27 (2015).

Plaintiffs provide this Court with contrary studies that purport to undermine the New York Legislature's policy judgment to retain the proper cause requirement. But the Legislature is the body best-suited to sift through any such conflicting data and make predictive judgments about how best to serve public safety. And as the Supreme Court has admonished, the policy judgments of legislative bodies are afforded considerable deference. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997); *see also Gould,* 907 F.3d at 659 (relying on such deference in upholding Massachusetts's analogous licensing scheme). The Court should thus defer to the reasoned judgment of the New York Legislature that its proper cause requirement reasonably furthers the State's important interest in public safety and crime prevention.

### C. Multiple Sister Circuits to Consider Analogous Provisions Have Since Adopted This Court's Holding in *Kachalsky*.

Further demonstrating that this Court should reaffirm its holding in *Kachalsky*, multiple sister circuits have conducted their own analyses of the relevant historical traditions and empirical support, and have concluded that other States' analogous proper cause requirements pass intermediate scrutiny.

The First, Third, and Fourth Circuits have all considered laws that impose restrictions analogous to New York's proper cause requirement, and they have upheld those laws. *See Gould*, 907 F.3d 659 (upholding Massachusetts "good reason" law); *Drake*, 724 F.3d 426 (upholding New Jersey "justifiable need" law); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (upholding Maryland "good and substantial reason" law). Like *Kachalsky*, these sister circuits adopted a two-step approach for their analyses. Under that approach, the court "first asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Gould*, 907 F.3d at 668-69. "This is a backward-looking inquiry, which seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification." *Id.* (internal quotation omitted). If the

challenged law "burdens conduct falling within the scope of the Second Amendment, the court then must determine what level of scrutiny is appropriate and must proceed to determine whether the challenged law survives that level of scrutiny." *Id.* at 669 (citing *Drake*, 724 F.3d at 429; *Woollard*, 712 F.3d at 875).

These circuits further assumed, as did this Court in *Kachalsky*, that, absent specific guidance from the Supreme Court, the Second Amendment covers carrying a handgun beyond the home to some extent, *see Gould*, 907 F.3d at 670, but also that history reveals that the activity falls beyond the "core right protected by the Second Amendment," as described in *Heller*: "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Gould*, 907 F.3d at 672 (quoting *Heller*, 554 U.S. at 635); *see also Drake*, 724 F.3d at 435; *Woollard*, 712 F.3d at 876.

Accordingly, these circuits agreed that "intermediate scrutiny is the appropriate test for evaluating firearms regulations that burden conduct falling outside the core of the Second Amendment," like New York's proper cause law. *Gould*, 907 F.3d at 672 (collecting cases applying intermediate scrutiny). In applying intermediate scrutiny, these courts

determined that such laws substantially promote the important government interest of furthering public safety, while likewise burdening "no more conduct than is reasonably necessary." *Id.* at 674; *see also Drake*, 724 F.3d at 436; *Woollard*, 712 F.3d at 878. They recognized that deference to legislative decisionmaking "should not be confused with blind allegiance." *Gould*, 907 F.3d at 673-74. And they reasoned that deference to the legislative bodies that adopted the subject requirements was appropriate because those requirements struck a reasonable balance between the documented threat to public safety imposed by public carry and an individual's heightened need to carry firearms for self-defense, while also allowing local licensing authorities to decide on a case-by-case basis the appropriate balancing in each case. *See Gould*, 907 F.3d at 674; *Drake*, 724 F.3d at 439; *Woollard*, 712 F.3d at 881.

Accordingly, this Court should reaffirm *Kachalsky* for the additional reason that the wisdom of its analysis has been borne out by sister circuits considering identical challenges to analogous laws.

In urging this Court to cast aside its *Kachalsky* decision, plaintiffs rely heavily on the Seventh Circuit's opinion in *Moore v. Madigan*,

702 F.3d 933, and the D.C. Circuit's opinion in *Wrenn v. District of Columbia*, 864 F.3d 650. Both cases are distinguishable.

*Moore*, as other circuits have recognized, involved "a flat ban on carrying ready-to-use guns outside the home," 702 F.3d at 940, and therefore is inapposite to the question presented here. *See Gould*, 907 F.3d at 674 ("The Illinois ban on public carriage struck down by the Seventh Circuit did not give the slightest recognition to the heightened need of some individuals to arm themselves for self-protection[]."). The *Moore* Court expressly recognized that, in contrast, "[t]he New York gun law upheld in *Kachalsky*" "is less restrictive than Illinois's law." *Moore*, 702 F.3d at 941.

*Wrenn* involved a good cause provision more stringent than that at issue here, requiring "'evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life.'" 864 F.3d at 655 (quoting applicable statute). Indeed, under the implementing regulation, applicants must "'allege, in writing, serious threats of death or serious bodily harm, any attacks on [their] person, or any theft of property from [their] person.'" *Id.* at 656 (quoting applicable regulation). Contrastingly, and as *Kachalsky* made clear, New York's proper cause

requirement is designed simply to make sure that the applicant's need for self-defense is non-speculative. *See Kachalsky*, 701 F.3d at 98-99.

This Court need not follow *Wrenn*'s analysis for two other reasons. As discussed above at page 29, *Wrenn*'s mistaken historical analysis represents an outlier view unsupported by all of the other circuits to have considered this Nation's tradition of closely regulating concealed carry of firearms in public. *See Gould*, 907 F.3d at 669 (*Wrenn*'s focus on "historical data derived from the antebellum South" is "unconvincing"); *id*. at 671 (pointing out that *Wrenn* "was reached by a divided panel over a cogent dissent"). Further, the *Wrenn* decision presents no new arguments that were not already considered and rejected by this Court in *Kachalsky*.

## POINT III

### NYSRPA LACKS STANDING TO SUE

As to NYSRPA, the complaint was properly dismissed in any event because the entity lacks standing. The organization alleges in its complaint that "at least one member" of NYSRPA was denied a license to carry a concealed firearm in public for failing to satisfy the proper cause requirement. (JA16.) The organization additionally alleges that New York's proper cause requirement for an unrestricted license to carry a

firearm in public is "a direct affront to NYSRPA's central mission," which is "to support and defend the right of New York residents to keep and bear arms." (JA9.) Neither allegation supports NYSRPA's standing to bring this § 1983 suit.

NYSRPA cannot acquire standing through its members, because "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," which safeguards rights "'personal to those purportedly injured.'" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)); *see also New York State Citizens' Coal. for Children v. Velez*, 629 F. App'x 92, 93-94 (2d Cir. 2015) (summary order).

And NYSRPA's additional allegation that New York's firearms regulations are an "affront" to its values is insufficient to establish organizational standing. To establish organizational standing, NYSRPA bore the burden to show "(i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to enforcement of the [statute]; and (iii) that a favorable decision would redress its injuries." *Centro de la*

*Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (additional citations omitted). While this Court and the Supreme Court have recognized that the "injury in fact" requirement may be met by a demonstration that an organization was "perceptibly impaired" by defendant's actions, *see Centro de la Comunidad Hispana*, 868 F.3d at 110, that requirement is not met with a mere proclamation of personal offense.

## CONCLUSION

This Court should affirm the district court's order dismissing plaintiffs' complaint. This Court's well-reasoned opinion in *Kachalsky* is correct, and should be reaffirmed.

Dated: Albany, New York
April 24, 2019

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for
Defendants-Appellees

By: /s/ Jennifer L. Clark
JENNIFER L. CLARK
Assistant Solicitor General

The Capitol
Albany, NY 12224
(518) 776-2024

BARBARA D. UNDERWOOD
*Solicitor General*
ANDREA OSER
*Deputy Solicitor General*
JENNIFER L. CLARK
*Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,970 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

/s/ Oren L. Zeve