# 19-156

## United States Court of Appeals
*for the*
## Second Circuit

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., ROBERT NASH, and BRANDON KOCH,

*Plaintiffs-Appellants*,

v.

GEORGE P. BEACH II, in his official capacity as Superintendent of the New York State Police, and RICHARD J. MCNALLY, JR., in his official capacity as Justice of the New York Supreme Court, Third Judicial District, and Licensing Officer for Rensselaer County,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK (No. 1:18-cv-134-BKS-ATB)

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., ROBERT NASH, AND BRANDON KOCH**

Kathleen McCaffrey Baynes
KATHLEEN MCCAFFREY BAYNES, ESQ., PLLC
1826 Western Avenue
Albany, New York 12203
(518) 641-0401
(518) 449-4798 (fax)
kmb@kmbaynes.com

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ........................................................................................1

SUMMARY OF THE ARGUMENT ................................................................3

ARGUMENT ...............................................................................................5

I. New York's "proper cause" requirement is unconstitutional under the Second Amendment. .........................................................................5

a. The historical record conclusively shows that the challenged law infringes conduct that lies at the core of the Second Amendment's scope. ..........................................................................................5

b. New York's "proper cause" requirement is categorically unconstitutional under *Heller*. ..........................................................17

c. New York's "proper cause" requirement cannot survive even intermediate scrutiny. ...........................................................19

II. New York State Rifle & Pistol Association has associational standing. ......26

CONCLUSION ..........................................................................................28

# TABLE OF AUTHORITIES

**Cases** **Page**

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ..........................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................1, 8, 9, 11, 16, 17

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ....................................................16, 19

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016)................19, 20

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)................27

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...........1, 16, 18, 26

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ......................................................26

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................20

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .........................................................27

*Northeast. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656 (1993)...................................................................................27

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)...................................................10, 12

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................19

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ..........................................10

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................27

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .................15, 17, 18

**Statutes**

1905 N.J. Laws 324.....................................................................................................6

1866 N.Y. Laws 1523, ch. 716, § 1 ............................................................................6

1864 Pa. Laws 823, § 1 ...............................................................................................6

1859 Ohio Laws 56, § 1 ..............................................................................................6

1836 Mass. Laws 748, ch. 134, § 16.....................................................................14, 15

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ..................................................7

1831 Ind. Acts 192, § 58 ..............................................................................................6

1 W. & M., c. 2, § 7 (1689)..........................................................................................9

**Other**

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds., 1905) .....................13

1 BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) ............................11

4 BLACKSTONE COMMENTARIES ..........................................................................10, 14

Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (2009) ..............................22, 23

KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 (2003)..........................9

Cassandra K. Crifasi, et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URBAN HEALTH 383 (2018) ......................................22

John J. Donohue et al., Right-to-Carry Laws and Violent Crime (Nat'l Bureau of Econ. Research, Working Paper No. 23510, 2018) .....................................21

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906).......7

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005) .....................21

Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, 228 J. AM. C. SURGEONS 1 (2019) ....................................................................22

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) .........10, 11

JOHN HAYWOOD, THE DUTY AND OFFICE OF JUSTICES OF THE PEACE, AND OF SHERIFFS, CORONERS, CONSTABLES (1800) .....................................................12

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 PREVENTATIVE MED. 22 (2015).................................................24

1 THE WORKS OF THOMAS JEFFERSON (letter of Aug. 19, 1785) (H. A. Washington ed., 1884)..........................................................................13

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) ..................................9, 10

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005)...............................................................20, 21, 24

Charles D. Philips et al., *When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001-2009*, 103 AM. J. PUB. HEALTH 86 (2013) ........................................24

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825)........................................................................................11

Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017)..............................................................................................22

Violence Policy Center, *License to Kill IV: More Guns, More Crime* (June 2002), https://bit.ly/2ZR4uxe..................................................23

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .........12

## INTRODUCTION

"The very enumeration" of a Constitutional right "takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008). If New York enacted a licensing regime requiring citizens to demonstrate a "proper cause" before speaking in public, such a regime surely could not withstand scrutiny under the First Amendment on the theory that those who *really needed* to speak could do so, if the State concluded that their need for First-Amendment expression was "non-speculative." Brief for Appellees 41–42 (Apr. 24, 2019), Doc. 46 ("Appellees' Br."). No, this Court would recognize that the State had effectively enacted a *ban* on political speech by *ordinary* citizens, and it would strike the ban down. The restrictions on the Second Amendment conduct at issue in this case are no different, and they deserve the same fate.

As Appellants acknowledged below, we concede that this result is inconsistent with this Court's decision in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), but *Kachalsky*, we respectfully submit, was wrongly decided. It should therefore be overturned at the earliest possible opportunity. New York resists this conclusion, asserting that "[n]ot only was *Kachalsky* well reasoned and correct when decided, but its analysis is buttressed by additional historical and empirical evidence,

and has rightly been widely adopted by sister circuits." Appellees' Br. 1. The State is wrong on every score.

The historical evidence it cites in fact *confirms* that the Second Amendment right, as understood at the Founding and throughout most of our Nation's history, protects the right of ordinary citizens to bear arms outside the home for self-defense. Far from buttressing *Kachalsky*'s conclusory determination that New York's "proper cause" requirement reduces the risk of violent crime, recent empirical evidence has continued to conclude that there is no causal link between these types of licensing limits and public safety. And the most notable development in this Court's sister circuits, since *Kachalsky*, is the D.C. Circuit's decision in *Wrenn*, which held categorically unconstitutional a District of Columbia law materially identical to New York's and persuasively refuted each of the premises supporting *Kachalsky*'s contrary holding.

Under the normal ground-rules of constitutional law, Appellees' "proper cause" restriction simply could not stand. New York could not strip typical citizens of their Fourth Amendment right against unreasonable searches so long as it made the "predictive judgment" that such a law would "best . . . serve public safety." Appellees' Br. 37. Nor could it require licenses for religious worship on the theory that some religions advocate violence and the State thus must "str[ike] a reasonable balance between the documented threat to public safety" and the Constitution's

protection of religious liberty by limiting that freedom to those with a "heightened need" to worship. *Id.* at 40.

Appellees' efforts to similarly restrict the carrying of firearms for self-defense to a favored few must be struck down.

## SUMMARY OF THE ARGUMENT

I. The challenged "proper cause" restriction is unconstitutional under the Second Amendment.

a. The constitutional text and historical record show beyond any doubt that the Second Amendment protects the right to carry a firearm outside the home for self-defense. New York does not meaningfully dispute any of the extensive historical evidence of that proposition set forth in our opening brief. Instead, it relies on two pieces of historical evidence: the Statute of Northampton and 18th-century surety-style laws. But by the time of the Founding, Northampton was understood—both here and in England—to limit only the carrying of dangerous and unusual firearms, in such a way as to cause terror to law-abiding people. Moreover, the State wholly fails to come to grips with the Second Amendment's text, since it can provide no explanation of how a constitutional right to *bear* arms could have coexisted with broadly-adopted Northampton laws that, on its revisionist understanding, flatly banned the bearing of arms outside the home. The surety laws were also wholly unlike New York's regime: they applied only upon a citizen complaint of reasonable

fear of assault, they required only the posting of a modest "surety" or security deposit, and even then they did not apply if the citizen in question *himself* needed to carry firearms for self-defense.

b. Accordingly, New York's law limits conduct that lies at the very core of the Second Amendment right, as historically understood. And it functions as a *total ban* on the exercise of the right to carry arms for self-defense by *ordinary* citizens, who by definition cannot meet New York's requirement that they show a *special* need for self-defense. Under *Heller*, the "proper cause" restriction is thus categorically unconstitutional.

c. Even if the challenged law were not unconstitutional *per se*, it still fails constitutional scrutiny under the "tiers of scrutiny" approach utilized in *Kachalsky*. Rather than the intermediate scrutiny applied in that case, New York's law should be evaluated under strict scrutiny. But even under intermediate scrutiny, it cannot survive. Appellees utterly fail to rebut the empirical evidence presented in Appellants' opening brief. And the handful of social-science studies they cite do not justify New York's law, since they all *acknowledge* that there is no demonstrated causal link between restrictions on public carry and crime rates.

II. Appellants have standing to sue. There is no dispute that the individual appellant, Mr. Nash, has standing, and that suffices to allow the case to proceed. Moreover, while circuit precedent does foreclose associational appellant New York

State Rifle & Pistol Association's standing, this Court's associational-standing case law is flatly contrary to binding Supreme Court precedent, and it should be reversed at the earliest opportunity.

## ARGUMENT

### I. New York's "proper cause" requirement is unconstitutional under the Second Amendment.

#### a. The historical record conclusively shows that the challenged law infringes conduct that lies at the core of the Second Amendment's scope.

The historical evidence is clear: for centuries, both before and after the Founding, the right to keep and bear arms was understood to apply fully outside the home and to protect the core right to carry a firearm in public for self-defense. Our opening brief laid out in detail the historical evidence that the Second Amendment protects the right of law-abiding citizens to carry firearms outside the home for self-defense. New York does not meaningfully rebut that evidence. The State does not dispute, for example, that the right to armed self-defense was understood at the Founding to extend with equal force outside the home, that many Colonies and early States affirmatively *required* the carrying of firearms for self-defense in public, or that the Founders themselves routinely carried arms for self-protection when traveling in public.

New York does briefly address the early 18th-century cases holding that the government may not ban carrying firearms in public (as opposed to merely

regulating the *manner* of carrying, whether openly or concealed), seeking to cast those decisions as confined to "the antebellum South" and "largely attributed to the perceived need among white citizens to have firearms at the ready in case of a rebellion by black slaves," while States in the rest of the Nation "restricted such carrying." Appellees' Br. 27–28; *see also* Brief for *Amici Curiae* Professors of History & Law 12–13 (May 1, 2019), Doc. 63. That argument is flatly contrary to the historical record. Appellees admit that "[s]ome southern States had laws" indistinguishable from the restrictions adopted in the northern States. Appellees' Br. 28. Conversely, numerous *northern* States had laws—just like the ones Appellees incorrectly assert were limited to the South—that restricted only *concealed* carrying, while freely allowing open carry. *See, e.g.*, 1831 Ind. Acts 192, § 58, Supplemental Statutory Addendum 14 ("Add."); 1859 Ohio Laws 56, § 1, Add.23; 1864 Pa. Laws 823, § 1, Add.26; 1866 N.Y. Laws 1523, ch. 716, § 1, Add.29; 1905 N.J. Laws 324, Add.31. The assertion by New York's Amici that these concealed-carry laws were "a regional aberration adopted in only a handful of states" is, simply put, false. Brief for *Amici Curiae* Professors of History and Law, *supra*, at 17.

Appellees' "Southern State" argument thus collapses from both directions. New York can cite no primary-source evidence that the robust understanding of the right to bear arms held by 18th- and 19th-century Americans in both the North and South was motivated by racism. Instead, it relies entirely on the work of Saul

Cornell, a historian whose anti-Second Amendment work was cited extensively by the *dissent* in *Heller*, and Eric Ruben, a fellow at the anti-Second Amendment Brennan Center.

In fact, as shown in our opening brief, the historical restrictions that *actually did* represent an effort by southern States to disarm slaves and freedmen are directly analogous *to New York's proper-cause restriction*. It was *slaveholding Delaware* that banned any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832). And it was a number of post-bellum *Louisiana* cities that prohibited any freedman from "carry[ing] fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906). It is *these* "ask-permission-first" type bans on carrying firearms that provide the closest historical analogue to Appellees' restriction. New York astonishingly makes no attempt to answer this argument.

New York contends that these concealed-carry restrictions support its position in another way, by showing that "the Second Amendment does not confer a right to carry concealed weapons." Appellees' Br. 20 n.5. But Appellants' seek "to exercise their right to carry firearms outside the home," JA 07 (Compl.)—not to carry

firearms outside the home in a *particular manner*, whether concealed or openly. And they have sought to vindicate that right by challenging the "proper cause" limit on the only permit for publicly carrying a handgun that Appellees make available. The fact that New York has chosen, in an independent feature of the law not challenged here, to limit that permit to concealed carriage does not exempt the proper-cause requirement from constitutional scrutiny.

Instead of meaningfully grappling with the pages of historical analysis laid out in our opening brief, the State principally bases its argument on two types of historical laws: the medieval Statute of Northampton (and its American analogues), and the "surety-style" laws that began to be enacted in the mid-19th century. Neither provides any support for Appellees' historical claims.

Far from "a prohibition on going armed in public," Appellees' Br. 21; *see also* Brief for *Amici Curiae* Professors of History and Law, *supra*, at 12, the Statute of Northampton merely limited acting to terrify the public by carrying "dangerous and unusual" weapons or by carrying with evil intent. *Heller*, 554 U.S. at 627. It did not bar law-abiding citizens from carrying common arms. New York's misreading of Northampton has already been rejected by the Supreme Court in *Heller*. The supporters of the handgun ban in that case relied on an expansive understanding of Northampton, too. But the Court, citing Blackstone's discussion of Northampton, instead recognized that it only barred "the carrying of 'dangerous and unusual

weapons,' "—weapons that did not constitute "arms" within the meaning of the Second Amendment. *Id.* at 625, 627. By contrast, arms "in common use" for lawful purposes—the "arms protected by the Second Amendment"—were not subject to that statute. *Id.* at 623–24. *Heller* thus forecloses Appellees' reading of Northampton.

New York's understanding of Northampton also cannot be squared with the historical record. To begin, it is important to note that the Statute of Northampton was enacted *in 1328*, nearly two centuries before the Protestant reformation, and at a time when firearms were little more than novelties. *See* KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 59 (2003) ("The earliest records of firearms in Europe date from 1326."). Indeed, it was not until over three-and-a-half centuries later that the English first elevated the right to arms to constitutional status. *See* 1 W. & M., c. 2, § 7 (1689); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 96–122 (1994). By this point, the Statute of Northampton was well understood as regulating that right in a narrow and peripheral way, to the extent it had any continuing vitality at all.

The most explicit recognition of this narrowing of Northampton was prompted by the same series of events as the 1689 Declaration of Rights: James II's efforts to disarm his Protestant detractors. King James hoped to use Northampton to accomplish this goal, so he tested his power under the statute in a 1686 case against

Sir John Knight, "a Bristol merchant and militant Anglican" who had led an effort to enforce the laws against Catholic worship. *Id.* at 104. James had Knight brought before the King's Bench in a high-profile prosecution for violating the Statute of Northampton by going armed "into the Church of St. Michael in Bristol in the time of Divine Service." *Id*. at 104–05. The King's use of the statute was rebuffed. The jury acquitted Knight, and Chief Justice Holt interpreted Northampton as merely declaratory of the common-law rule against "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). "[T]ho' this statute be almost gone into desuetudinem," Holt added, "yet where the crime shall appear to be malo animo"—that is, with a specific, evil intent—"it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) (different reporter).

Other contemporary authorities, both in England and America, confirm Lord Holt's understanding of Northampton. For example, while New York cites Blackstone's Commentaries in support of its reading of Northampton, Blackstone in fact understood Northampton as applying only to going armed "with *dangerous or unusual weapons*," since such conduct "terrif[ied] the good people of the land." 4 BLACKSTONE COMMENTARIES *148–49 (emphasis added). Similarly, William Hawkins's widely read treatise unambiguously explained that "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such

Circumstances as are apt to terrify the People." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1716).

The same understanding prevailed on this side of the Atlantic. While St. George Tucker's influential early American edition of Blackstone reproduced Blackstone's discussion of Northampton (with a notation that Virginia had adopted an analogous law), it also simultaneously (a) explains that "in many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without a sword by his side," and (b) makes clear that Congress would exceed its authority if it "pass[ed] a law prohibiting any person from bearing arms." 1 BLACKSTONE COMMENTARIES App. n.D, at 289 (St. George Tucker ed., 1803); 5 *id.* at 149 & n.14; 5 *id.* at App. n.B, at 19. It is clear from this that Northampton was not understood generally to ban carrying arms in public.

Similarly, William Rawle wrote in his "influential treatise," *Heller*, 554 U.S. at 607, that "the carrying of arms abroad by an individual, *attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace." WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825) (emphasis added). And James Wilson, a leading Framer and Supreme Court Justice, described Northampton in his widely read Lectures on Law as

reaching only the carrying of "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). One of New York's amici disputes the point, Brief for *Amici Curiae* Professors of History and Law, *supra*, at 9–10, but the very historical commentators they cite support our account of Northampton and refute theirs. *See, e.g.*, JOHN HAYWOOD, THE DUTY AND OFFICE OF JUSTICES OF THE PEACE, AND OF SHERIFFS, CORONERS, CONSTABLES 10 (1800) (noting that Northampton-like laws were limited to "dangerous or unusual weapons" and that the ordinary "[w]earing of arms, however, is not within the meaning of the statute, unless accompanied with such circumstances as are apt to terrify the people.").

New York attempts to escape all of this evidence by arguing that *all firearms* were understood as "dangerous and unusual" weapons. Appellees' Br. 23 n.8; *see also* Brief for *Amici Curiae* Professors of History and Law, *supra*, at 8 ("[T]he public carrying of arms . . . was prohibited precisely because it was taken to have a terrifying effect."). That is obviously incorrect. Otherwise, the authorities' repeated assertions that the ordinary "wearing of Arms" falls outside the statute's prohibition, 1 HAWKINS, *supra*, at 136, and that there was "a general connivance to gentlemen to ride armed for their security," *Rex v. Knight*, 90 Eng. Rep. 330, would have been flatly wrong. All Appellees' citations show is that firearms were sometimes

classified as "offensive" arms—not that they were understood to be especially "dangerous and unusual" within the meaning of Northampton's restrictions.

Appellees' account of Northampton also cannot be squared with the common practices and statements of the Founders discussed in our Opening Brief (at p. 21). When Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks,"[1] on New York's telling, he was advocating the violation of a centuries' old law banning public arms bearing. And when John Adams conceded during the Boston Massacre trial that "every private person is authorized to arm himself" and that the colonial citizens thus "had a right to arm themselves at th[e] time [of the Massacre] for their defence,"[2] he must have been simply confused, since Massachusetts had since 1692 prohibited public carry, according to Appellees. Appellees' Br. 24 n.9.

New York also utterly fails to come to grips with the plain text of the Second Amendment. If that provision does not protect the right to carry firearms in public for self-defense independent of the right to *keep them in the home* for that purpose, half of the operative clause's protection has no meaning whatsoever. New York

---

[1] 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884).

[2] John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905).

responds that it is happy to "assum[e] that the Second Amendment confers a right of some kind to carry in public," since *Kachalsky* accepted this premise for the sake of analysis. Appellees' Br. 30. But that concession is *flatly contrary* to the State's contention that at the time of the Founding and for decades thereafter, the Statute of Northampton (and its American analogues) imposed "a prohibition on going armed in public." *Id.* at 21. Appellees provide *no plausible account* of the Second Amendment's text that is conceivably consistent with an absolute prohibition on "going armed in public." *Id.*

New York's citation to the surety-style laws adopted during the 19th century gets it no further. The State says these laws "prohibited . . . carrying a firearm in public" except for those with "reasonable cause," *id.* at 25, but this characterization dramatically misunderstands the effect of these laws. These surety-style laws—which applied only upon complaint of "any person having reasonable cause to fear an injury, or breach of the peace"—required any person who then bore arms in public to post a deposit or "surety" "for keeping the peace," unless the person could show that he had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. The restriction posed by these laws on the right to carry is far more limited than New York suggests, and in reality they provide no support for its "proper cause" law.

To begin, these laws were triggered only when some person who reasonably felt threatened lodged a complaint. 1836 Mass. Laws 750. Moreover, even if there was a complaint, the individual in question could nonetheless continue to carry his firearm, so long as he posted a surety designed to cover the potential costs of any breach of the peace. *Id.* These laws were also accompanied by a safe-harbor provision for anyone carrying a firearm because of "reasonable cause to fear an assault or other injury" to one's person, family, or property. Taken together, these surety-style laws "did not deny a responsible person carrying rights unless he showed a special need for self-defense." *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).

New York's amici resist this conclusion, arguing that these surety laws amounted to a broad, criminal "prohibition on public carry," not merely "a mechanism for discouraging actual violence." Brief for *Amici Curiae* Professors of History and Law, *supra*, at 14, 15. The leading commentators at the time contradict this revisionist account. As Blackstone explains, a law requiring the posting of a surety to keep the peace was "intended merely for prevention" in circumstances where there was "a probable suspicion, that some crime is intended or likely to happen; and consequently *it is not meant as any degree of punishment*, unless perhaps for a man's imprudence in giving just ground of apprehension." 4 BLACKSTONE COMMENTARIES *249 (emphasis added).

The State also attempts to shore up *Kachalsky*'s conclusion that New York's law is *itself* sufficiently "longstanding" to merit a presumption of constitutionality because it was adopted in 1913. 701 F.3d at 90 n.11; *see* Appellees' Br. 20–21. The attempt does not succeed. While the specific restrictions on firearm possession by felons and the mentally ill blessed by *Heller* may only date back to the early 20th century, they are closely analogous to a limitation on the Second Amendment right that *was* understood at the Founding: that the right did not apply, or did not apply fully, to those who had a demonstrated likelihood of misusing firearms because of previous violent, unlawful conduct or incapacity. *Drake v. Filko*, 724 F.3d 426, 450 (3d Cir. 2013) (Hardiman, J., dissenting). New York's "proper cause" restriction is not historically rooted in this way. At best, "proper cause"-type restrictions were enacted by a handful of jurisdictions beginning over a century after the Founding and remain in place in a small minority of jurisdictions even today. That hardly constitutes the type of longstanding, traditional limitation that *Heller* characterized as "presumptively lawful," 554 U.S. at 627 n.26.

The historical record is clear: at the Founding and for many decades thereafter, law-abiding citizens were uniformly understood to enjoy the right to bear arms outside the home. While the government may regulate the *manner* of carrying, ban the carrying of arms for violent or terroristic purposes, and prevent the exercise of the right by individuals it reasonably suspects would misuse their firearms based on

past violent conduct or mental incapacity, it may not prevent law-abiding, ordinary citizens from exercising the right altogether.

**b. New York's "proper cause" requirement is categorically unconstitutional under *Heller*.**

Because Appellees' restrictions on carrying firearms for self-defense effectively operate as a flat prohibition on the core Second Amendment rights of typical, law-abiding citizens, under *Heller*'s teachings—and ordinary principles of constitutional law—they must be categorically struck down. *See* Appellants' Br. 33–35. As explained in our opening brief, that is the clear teaching of *Heller*—which struck down the District of Columbia's handgun ban as *per se* unconstitutional, wholly apart from any "interest-balancing inquiry" like one of the so-called "tiers of scrutiny." 554 U.S. at 634. After all, the Second Amendment "is the very *product* of an interest balancing by the people," and the government—"even the Third Branch of Government"—has no warrant to *re-calibrate* the balance the People struck because judges conclude that a sufficiently "important" or "compelling" governmental interest shows that the right is not "*really worth* insisting upon." *Id.* at 635. *Kachalsky*'s failure to hew to this text-and-history approach is flatly contrary to *Heller*.

It is also contrary to the D.C. Circuit's decision in *Wrenn*. Like New York's "proper cause" restriction, the D.C. law at issue in that case was "necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense

needs," and the *Wrenn* court accordingly struck it down categorically. 864 F.3d at 666. New York argues that *Wrenn* is distinguishable because D.C.'s law required "evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," while New York does not impose that specific evidentiary requirement. Appellees' Br. 41. But that narrow difference fails to reconcile the two cases, because both New York's and D.C.'s restriction share the central feature that renders them both unconstitutional: the requirement that an applicant must show "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Kachalsky*, 701 F.3d at 92. New York is wrong to characterize this as a mild requirement that merely ensures "that the applicant's need for self-defense is non-speculative." Appellees' Br. 42. Speculative or not, New York law *by definition* bans those with *ordinary* self-defense needs from carrying firearms. Like D.C.'s law, it thus "destroys the ordinarily situated citizen's right to bear arms not as a side effect . . . but by design: it looks precisely for needs 'distinguishable' from those of the community." *Wrenn*, 864 F.3d at 666. It was *that* feature of D.C.'s law, not the specific evidentiary requirements implementing it, that formed the basis of the D.C. Circuit's holding.

**c. New York's "proper cause" requirement cannot survive even intermediate scrutiny.**

1. *Kachalsky* not only erred in applying the "tiers of scrutiny" to New York's law in the first place, it also erred in selecting the wrong tier. Because the

right to bear arms is a fundamental right explicitly protected by the Constitution, New York's restriction calls for strict, not intermediate, scrutiny. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 143–47 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. Once again, Appellees completely fail to defend this feature of *Kachalsky*.

2. Even under intermediate scrutiny, however, Appellees' "proper cause" requirement still fails constitutional muster. That is so, first, because the requirement aims not directly at curbing any negative effects of firearms, but rather at simply *suppressing the number of them in public*. New York disputes this, but for reasons that are hard to parse. It states that the purpose and effect of its requirement "is not simply to reduce the overall number of guns carried in the public sphere, but to increase public safety by restricting the number of individuals licensed to carry arms in public to those that have a particular need." Appellees' Br. 33 n.14. That is an utter non-sequitur. Since "[t]he fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns," *Drake*, 724 F.3d at 454 (Hardiman, J., dissenting), the only way "restricting the number of individuals licensed to carry arms in public to those that have a particular need" can conceivably have an impact on public safety is through "restricting the number of individuals licensed to carry arms in public," full stop. Appellees' B. 33

n.14; *see also* Brief of Amicus Curiae Prosecutors Against Gun Violence 20 (May 1, 2019), Doc. 60 (arguing that "[e]liminating discretion in carry licensing" would have adverse public-safety effects simply because it "would increase the numbers of firearms carried in public spaces in New York"). And bluntly curbing the amount of constitutionally-protected conduct is "not a permissible strategy," and thus cannot justify Appellees' ban. *Grace*, 187 F. Supp. 3d at 148; *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449–50 (2002) (Kennedy, J., concurring).

3. New York's law fails intermediate scrutiny even if this threshold objection is set aside. *Kachalsky* conducted only the most cursory analysis of the empirical evidence concerning the public-safety effect of limiting the carriage of firearms in public, and Appellees barely attempt to defend it. Instead, the State claims that "empirical studies conducted since this Court's decision in *Kachalsky*" support its conclusion. Appellees' Br. 34. Not so. As Judge Posner concluded after reviewing the relevant social science in detail, the available studies do not provide "more than merely a rational basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore v. Madigan*, 702 F.3d 933, 939, 942 (7th Cir. 2012).

Judge Posner's conclusion is supported by the National Research Council and the Centers for Disease Control, both of which concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage

of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005); *see also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005) (similar conclusion from task force convened by CDC). New York does not rebut—or even *mention*—these studies.

Instead, the State and its amici primarily rely on an unpublished 2018 paper by Prof. John Donohue and others. John J. Donohue et al., Right-to-Carry Laws and Violent Crime (Nat'l Bureau of Econ. Research, Working Paper No. 23510, 2018) (unpublished manuscript). That study gets New York nowhere. Donohue's article is principally based on a "synthetic control method," which compares crime rates in States that allow law-abiding citizens to carry firearms not with real States that restrict public carry, but with hypothetical States that are constructed by combining pieces of many different States. (The study compares Texas, for example, with "synthetic Texas," which is made up of 57.7% of California, 9.7% of Nebraska, and 32.6% of Wisconsin. *Id.* at 37.) Even the authors are forced to admit that under this analysis, "there will undoubtedly be a deviation from the 'true' counterfactual and our estimated counterfactual." *Id.* at 40. And they concede that they *still cannot show causation*, since it may well be that increasing crime rates "lead to . . . adoption" of a more permissive licensing regime, rather than the other way around. *Id.* at 64. For

all New York's fanfare, then, Donohue's study ultimately *reaffirms* the core finding of the NRC: there is *no evidence* that more-lenient carry regimes *cause* any harm to public safety.

The other social-science studies cited by New York and its amici lead to the same destination. Like Donohue's study, the article by Siegel avowedly *fails* to show any causal link. Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923, 2938 (2017). Similarly, the Crifasi study finds only an *association* between right-to-carry laws and homicide, not any causal link. Cassandra K. Crifasi, et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URBAN HEALTH 383, 387 (2018). And even this finding is contradicted by a more recent study, which finds no statistically-significant association whatsoever between adoption of more permissive firearm carry laws and rates of homicide or other violent crime. Mark E. Hamill et al., *State Level Firearm Concealed-Carry Legislation & Rates of Homicide & Other Violent Crime*, 228 J. AM. C. SURGEONS 1 (2019). Finally, the Branas study cited by New York and its amici—which does not concern the carrying of firearms in public *at all*—likewise finds only an association between gun possession and likelihood of injury. Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB.

HEALTH 2034, 2039 (2009) (finding only an "association" and noting "the potential of reverse causation").

One of New York's amici, the Giffords Law Center, tries a different approach. Giffords asserts that more-lenient carry regimes will increase violent crime because "analyses from states that keep comprehensive records of crimes committed by concealed license holders indicate that licensees are arrested for weapons-related offenses at *higher* rates than the general public." Brief of *Amicus Curiae*, Giffords Law Center to Prevent Gun Violence 13 (May 1, 2019), Doc. 62. But in reality, as shown in our opening brief (at p. 44), there is voluminous data conclusively establishing that license holders are *disproportionately law-abiding*. The Giffords Center does not even attempt to rebut any of these studies.

Instead, Giffords relies on a single, 2000 paper by the anti-gun Violence Policy Center. Violence Policy Center, *License to Kill IV: More Guns, More Crime* (June 2002), https://bit.ly/2ZR4uxe. All that so-called "study" supposedly shows is that handgun-license holders in Texas were arrested at a higher rate than the general population for "weapon-related offenses", *id.* at 5—a category principally comprised of violations of the types of time, place, and manner restrictions on public-firearms-carrying that individuals licensed to carry are *by definition* more likely to commit. Tellingly, the Violence Policy Center does not provide a comparison of crime rates more generally. Those studies that *have* compared these rates—studies conducted

by actual social scientists rather than gun-control activists—consistently show that license-holders in Texas are "much less likely than nonlicensees to be convicted of crimes" and that in those rare instances when licensees do commit crimes, they are more likely to be "lower-prevalence crimes," as opposed to burglary, robbery, or assault. Charles D. Philips et al., *When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009*, 103 AM. J. PUB. HEALTH 86, 86 (2013).

New York and the Giffords Law Center also attempt to dispute the self-defense *benefits* of carrying firearms, but the study they cite relies upon the flawed National Crime Victimization Survey ("NCVS"), which is well known to have dramatically underestimated the number of instances of self-defense. David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTATIVE MED. 22, 22–27 (2015); *see* NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE, *supra*, at 103 (noting that "[a]t least 19 other surveys have resulted in estimated numbers of defensive gun uses that are similar (i.e., statistically indistinguishable) to the results found[ ] by Kleck and Gertz" in the study cited in our opening brief, while "[n]o other surveys have found numbers consistent with the NCVS"). By contrast, the results cited in our opening brief from the National Self-Defense Survey have been repeatedly replicated by other studies. *Id.* Giffords' assertion that *this* is

the study that "has been widely discredited" is thus difficult to comprehend. *Brief of Amicus Curiae* Giffords Law Center, *supra*, at 13. And in all events, even if New York were correct that more freely allowing public carry does not *reduce* violent crime by facilitating self-defense, that would hardly amount to evidence that such a regime would *harm* public safety.

Appellees fall back on the decisions of the First, Third, and Fourth Circuits upholding bans similar to New York's. *See also* Brief of Amicus Curiae Prosecutors Against Gun Violence, *supra*, at 15–19. But those courts made the same errors as *Kachalsky* did: they failed to grapple with the historical evidence showing that the right to carry firearms for self-defense lies at the core of the Second Amendment, and they engaged in a deferential analysis of the empirical evidence concerning the effects of "proper cause"-type restrictions no more rigorous than *Kachalsky*'s weak-tea scrutiny. The fact that these courts have been misled into the same errors does not transform *Kachalsky*'s mistakes into sound legal reasoning.

The new social science evidence cited by New York does nothing to nudge the supposed public-safety justification for the "proper cause" requirement over the line from the barely-plausible to the kind of substantial evidence needed to satisfy intermediate scrutiny.

4. Finally, the challenged law flunks intermediate scrutiny for the independent reason that it is not properly tailored to the State's asserted goal. Even

under intermediate scrutiny, a challenged restriction cannot burden substantially more constitutionally-protected conduct than necessary to achieve the State's interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). As shown in our opening brief, New York has utterly failed to show that any of the many, less-burdensome alternatives available to it—such as objective eligibility restrictions based on criminal history or training requirements—"would fail to achieve the government's interests." *Id.* Once again, New York does not even attempt to answer this argument.

## II. New York State Rifle & Pistol Association has associational standing.

In addition to resisting our Second Amendment arguments, New York argues that the associational plaintiff in this case, Appellant New York State Rifle & Pistol Association ("NYSRPA"), lacks standing to sue. There is no dispute that Plaintiff-Appellant Nash has standing. JA 24 (Memorandum at 6). "Where, as here, at least one plaintiff has standing, jurisdiction is secure," and the Court thus need not address NYSRPA's standing to bring suit on behalf of its members. *Kachalsky*, 701 F.3d at 84 n.2.

To the extent the Court does reach the issue of NYSRPA's standing, Appellants acknowledge that Circuit precedent does hold "that an organization does not have standing to assert the rights of its members in a case brought under 42

U.S.C. § 1983," *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). We contend, however, that this rule is flatly contrary to the Supreme Court's precedent.

The Supreme Court has squarely held that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). What is more, it has held this in cases *brought under Section 1983*. *Warth v. Seldin*, 422 U.S. 490, 493, 511, 515 (1975); *Northeast. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 659, 669 n.6 (1993). This Circuit's outlier approach to associational standing directly contradicts this binding Supreme Court precedent and should be repudiated at the earliest opportunity, by a court with authority to correct it.

## CONCLUSION

For all these reasons, the opinion and order below should be reversed by a court competent to do so.

Dated: May 8, 2019

Respectfully submitted,

s/ David H. Thompson

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

Kathleen McCaffrey Baynes
KATHLEEN MCCAFFREY BAYNES, ESQ., PLLC
1826 Western Avenue
Albany, NY 12203
(518) 641-0401
(518) 449-4798 (fax)
kmb@kmbaynes.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(B) because this brief contains 6,523 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: May 8, 2019

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# SUPPLEMENTAL STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

1831 Ind. Acts 180 .......... Add.1

1859 Ohio Laws 56 .......... Add.23

1864 Pa. Laws 823 .......... Add.25

1866 N.Y. Laws 1523 .......... Add.28

1905 N.J. Laws 324 .......... Add.30

THE

# REVISED LAWS

OF

# INDIANA,

IN WHICH ARE COMPRISED ALL SUCH ACTS OF A GENERAL NATURE AS ARE IN FORCE IN SAID STATE;

ADOPTED AND ENACTED BY THE

## GENERAL ASSEMBLY

AT THEIR FIFTEENTH SESSION.

TO WHICH ARE PREFIXED

*THE DECLARATION OF INDEPENDENCE, THE CONSTITUTION OF THE U. S., THE CONSTITUTION OF THE STATE OF INDIANA,*

AND

SUNDRY OTHER DOCUMENTS, CONNECTED WITH THE POLITICAL HISTORY OF THE TERRITORY AND STATE OF INDIANA.

ARRANGED AND PUBLISHED BY
AUTHORITY OF THE GENERAL ASSEMBLY.

INDIANAPOLIS:

PRINTED BY DOUGLASS AND MAGUIRE.

1831.

probate courts shall hold their said terms on the Mondays succeeding the termination of such term of the said circuit courts, so interfering as aforesaid: *Provided*, That in the counties of Vigo, Knox and Gibson, the said courts shall hold their terms on the first Mondays in February, April, June, October and December, and the second Mondays in August in each and every year.

Proviso.

Terms in Vigo, Knox and Gibson.

Power in will to sell is a power to convey.

SEC. 56. In all cases where a power or direction is given in any last will and testament or codicil, to sell real estate, it shall be taken and construed as a power to sell and convey; and an administrator with the will annexed, shall have all the power that the executor appointed by the will would have had, if he had executed the will.

Proceedings now instituted shall progress to judgment, &c.

SEC. 57. All suits, pleas, plaints, bills in chancery, petitions and proceedings, which may be pending when this act takes effect, in any of the circuit courts, in any way relating to idiots, lunatics, decedents estates or last wills or testaments, shall progess to final judgment or decree in the circuit court where they were commenced, or are now pending, in the same manner as if this act had not passed; and all probate business shall continue to be done and transacted, as it now is in the several counties, until the probate judge is elected and qualified and ready to act.

P. business to be done as now until &c.

---

## CHAPTER XXVI.

### An Act relative to Crime and Punishment.

[APPROVED, FEBRUARY 10, 1831.]

Treason.

SEC. 1. *Be it enacted by the General Assembly of the state of Indiana*, That every person duly convicted of treason, shall suffer death.

Murder.

SEC. 2. That every person of sound memory and discretion, who shall unlawfully kill any reasonable creature in being, and under the peace of this state, with malice aforethought, and be duly convicted thereof, shall be deemed guilty of murder, and suffer death.

Manslaughter.

SEC. 3. That every person, who without malice, either express or implied, shall unlawfully kill any other [another] person, either voluntarily upon a sudden heat, or involuntarily, but in the commission of some unlawful act, shall be deemed guilty of manslaughter, and upon conviction thereof, shall be imprisoned at hard labor in the state prison, for not less than two nor more than twenty-one years, and be fined in a sum not exceeding one thousand dollars.

Burglary.

SEC. 4. That every person, who shall in the night time

break and enter into a mansion house, store house, out house or boat, with intent to commit a felony, shall be deemed guilty of burglary, and upon conviction thereof, shall be imprisoned at hard labour in the state prison, for not less than two, nor more than fourteen years, and be fined in any sum not exceeding one thousand dollars.

Robbery.

SEC. 5. That every person who shall forcibly and feloniously take from the person of another, any money, goods or other article of value, by violence or putting in fear, shall be deemed guilty of robbery, and upon conviction thereof, shall be imprisoned at hard labor in the state prison, for not less than two, nor more than fourteen years, and be fined in any sum not exceding one thousand dollars.

Grand Larceny.

SEC. 6. That every person who shall feloniously steal, take and carry, lead or drive away, the personal goods of another, to the value of five dollars or upwards, shall be deemed guilty of grand larceny, and upon conviction thereof, shall be fined in any sum not exceeding double the value of the goods stolen, and be imprisoned at hard labour in the state prison, for not less than two, nor more than fourteen years, and shall also be disfranchised and rendered incapable of holding any office of trust or profit during life, or for any determinate period. And every person who shall feloniously steal, take and carry, lead or drive away, the personal goods of another, of the value of any sum less than five dollars, shall be deemed guilty of petit larceny, and upon conviction thereof, shall, if a male, be fined in any sum not exceeding five hundred dollars, and be imprisoned at hard labor in the state prison, for not less than one year, and disfranchised and rendered incapable of holding any office of trust or profit during life, or for any determinate period, or fined and disfranchised, and rendered incapable of holding any office of trust or profit as aforesaid, and imprisoned in the jail of the proper county, for any determinate period of time; or if such convict be a female, she shall be imprisoned in the jail of the proper county, for any length of time not exceeding sixty days, and rendered incompetent as a witness in any court of justice during life, or for any determinate period of time, at the discretion of the jury. And any person, male or female, shall upon a second conviction of petit larceny, in any court within this state, suffer the pains and penalties prescribed for those convicted of grand larceny.

Petit Larceny.

If a female.

Second offence punishable as grand larceny.

Receiving, &c. stolen goods.

SEC. 7. That every person who shall buy, conceal or receive, any stolen goods or chattels, knowing the same to be stolen, with intent to defraud the owner, shall upon conviction thereof, be punished as those are punished who are principally guilty. And every person who shall agree to.

Case 19-156, Document 75, 05/08/2019, 2558651, Page40 of 68



Compounding felony. and actually compound for any stolen goods, shall upon conviction thereof, be fined in double the value of such goods.

Bonds, notes, &c. considered goods. SEC. 8. That bonds, bills, notes and other instruments of writing, shall be considered as personal goods, of which larceny may be perpetrated.

Forging and counterfeiting. SEC. 9. That every person who shall falsely make, deface, destroy, alter, forge or counterfeit, or cause or procure to be falsely made, defaced, destroyed, altered, forged or counterfeited, or willingly assist in falsely making, defacing, destroying, altering, forging or counterfeiting, any record, deed, testament, will, codicil, bond, writing obligatory, bill of exchange, promissory note for the payment of money or property, bank note, post note, receipt for money or property, power of attorney, certificate of a justice of the peace, or other public officer, auditor's warrant, treasury note, county order, acceptance or endorsement of any bill of exchange, promissory note, draft or order, or assignment of any bond, writing obligatory or promissory note, for money or property, or any order or draft for the payment of money or property, or any written contract of any nature or kind whatever, or any other instrument in writing whatever, with intent to defraud any person or persons, body politic or corporate; or who shall utter or publish as true, any false, defaced, destroyed, altered, forged or counterfeited record, deed, will, testament, codicil, bond, writing obligatory, bill of exchange, promissory note for the payment of money or property, receipt or acquittance for money or property, power of attorney, certificate of a justice of the peace or other public officer, auditor's warrant, treasury note, county order, commission or pardon, acceptance of a bill of exchange, draft or order, endorsement or assignment of any bill of exchange, promissiory note for money or property, bond, power of attorney or writing obligatory, or any order or draft for the payment of money or property, any written contract of any nature or kind whatever, or any other instrument in writing, knowing the same to be false, defaced, destroyed, altered, forged or counterfeited, or who shall forge or counterfeit, any gold or silver coin, which now is, or at any time hereafter may be current, or in circulation in this state, or utter, pay or tender in payment, any such false, forged or counterfeited coin, or any bank note or notes, bill or bills, knowing the same to be forged or counterfeit, shall be deemed guilty of forgery, and upon conviction thereof, shall be imprisoned at hard labour in the state prison, for a period not less than two, nor more than fourteen years, and fined, in any sum not exceeding one thousand dollars.

Retaining counterfeiting apparatus. SEC. 10. That if any person shall knowingly retain in his possession, any die or dies, plate or plates, or other apparatus made use of in forging or counterfeiting any gold or sil-

Case 19-156, Document 75, 05/08/2019, 2558651, Page41 of 68



ver coin, which is or may be current and in circulation within this state, or in forging or counterfeiting bank notes, such person shall upon conviction of offending as aforesaid, be imprisoned at hard labour in the state prison, for any period of time not longer than five years, and not less than two years, and be fined in any sum not exceeding one thousand dollars.

Rape. SEC. 11. That every person who shall unlawfully and forcibly, have carnal knowledge of a woman against her will, or of a woman child under twelve years of age, shall be deemed guilty of a rape, and upon conviction thereof, shall be imprisoned at hard labour in the state prison, for any period of time not exceeding twenty-one years, nor less than five years. Proof of rape. And in prosecutions for the said offence, proof of penetration shall be deemed sufficient evidence of the commission thereof.

Kidnapping. SEC. 12. That every person who shall forcibly steal and take, or forcibly and unlawfully arrest any man, woman or child, and carry or convey such man, woman or child, to parts without the state of Indiana, or aid or abet therein, or who shall forcibly and unlawfully take or arrest, or aid and abet in forcibly and unlawfully taking or arresting, any person or persons whatever, with intent to take such person or persons, to parts without the state as aforesaid, without having first established a claim upon the services of such person or persons, according to the laws of this state or of the United States, shall be deemed guilty of kidnapping; and upon conviction thereof, shall be fined in any sum not less than one hundred, nor more than five thousand dollars, and be imprisoned at hard labour in the state prison, for any term of not less than two, nor more than fourteen years.

Malicious mayhem. SEC. 13. That every person who shall, on purpose and of malice aforethought, unlawfully disable the tongue, put out an eye, slit the nose, [cut or bite off the nose,] ear, lip or other member of any person, with intent to disfigure or disable such person, shall be deemed guilty of malicious mayhem, and upon conviction thereof, shall be imprisoned at hard labour in the state prison, for a term of not less than two, nor more than fourteen years, and fined in any sum not exceeding one thousand dollars.

Arson. SEC. 14. Every person who shall wilfully and maliciously burn the dwelling house, out house, barn, stable, boat, water craft, mill, mill house, distillery, still house, manufactory, mechanic's or artificer's shop, store house, building or room occupied as a shop or office for professional business, or printing office of another, or any public bridge, court house, jail, market house, church or meeting house, school house, seminary or college edifice, or building belonging thereto, or other public building whatever, shall be deemed guilty of arson, and upon conviction, be fined not exceed-

Case 19-156, Document 75, 05/08/2019, 2558651, Page42 of 68



ing double the value of the property destroyed, and be imprisoned in the state prison at hard labour, for a period not less than two, nor more than ten years; and should the life or lives of any person or persons be lost thereby, such offender shall be deemed guilty of murder, and shall suffer death accordingly.

Bigamy.

SEC. 15. That if any person, being married, shall marry again, the former husband or wife being alive, and the bond of matrimony still subsisting and undissolved, such person so offending, shall be deemed guilty of bigamy, and upon conviction thereof may, at the discretion of the jury, be fined in any sum not exceeding one thousand dollars, or be imprisoned at hard labour in the state prison, for any term of time not exceeding five nor less than two years.

Bribery.

SEC. 16. That if any judge or other officer entrusted with the administration of justice, shall take any undue reward to influence his behaviour in office, or if any person shall offer or give any such reward, he or they so offending as aforesaid, shall be fined in any sum not exceeding treble the amount of the sum so offered, given or received, and be imprisoned at hard labour in the state prison, for any term of time not exceeding ten, nor less than two years.

Negligent escape.

SEC. 17. That if any officer, whose duty it may be to have the custody of prisoners charged with, or convicted of any offence against any law of this state, shall negligently suffer any prisoner, so as aforesaid charged with, or convicted of an offence, to escape out of his custody, he shall be fined in any sum not exceeding ten thousand dollars. And if any

Voluntary escape.

such officer, shall voluntarily suffer any such prisoner, so as aforesaid charged or convicted, to escape out of his custody, he shall suffer the punishment and penalties, by law provided against, or incident to the offence with which such escaping person may have been charged, or whereof he or she may have been convicted, at the time of such

Effecting escape.

escape; and if any private person shall effect the escape of any such prisoner, such private person shall in like manner, suffer the punishment provided against or incident to the offence with which such escaping person may have been charged, or whereof he or she may have been convicted, at

Proviso.

the time of such escape: *Provided*, That if in either of the two cases last above provided against, the punishment provided by law, against or incident to the offence with which the escaping person may be charged, or whereof he or she may have been convicted, be death, the officer so as aforesaid voluntarily suffering, or the private person so as aforesaid effecting the escape of such person charged or convicted as last aforesaid, shall be fined in any sum not exceeding ten thousand dollars, and be imprisoned at hard labour in

the state prison, for any term of time not exceeding twenty-one, nor less than two years.

SEC. 18. That every person who shall knowingly and designedly, by any false pretence or pretences whatever, obtain from another, any goods, wares or merchandize, bonds, bills of exchange, bank notes, or any securities or orders for the payment of money, or transfer of goods, or any valuable thing, with intent to defraud such person, shall be fined in any sum not exceeding double the value of the property, amount or value so obtained, and be imprisoned, at hard labour in the state prison, for any term of time not less than two, nor more than seven years. Obtaining goods, &c. by false pretences.

SEC. 19. That every person who shall alter the mark or brand, of the horse, mare, gelding, mule, ass, sheep, goat, neat cattle, or hog of another, or mark or brand the same, with intent to steal such horse, mare, gelding, mule, ass, sheep, goat, neat cattle, or hog, shall, if the value of the animal or animals so marked be five dollars or upwards, be subject to the punishment inflicted on those guilty of grand larceny; and if the value of such animal or animals, be less than five dollars, such person shall be subject to the punishment inflicted on those guilty of petit larceny. Altering brands, marks &c.

SEC. 20. That every person who may give or accept a challenge to fight a duel, or who shall agree to go out of this state, for the purpose of fighting a duel, or who shall knowingly carry to another person, a challenge to fight a duel, shall upon conviction thereof, be fined in any sum not exceeding two thousand dollars, and be imprisoned, not exceeding one year in the jail of the proper county. Giving, accepting or carrying a challenge.

SEC. 21. That every person who shall actually fight a duel, shall on conviction thereof, be fined in any sum not exceeding five thousand dollars, and be imprisoned, in the jail of the proper county, for any term of time not exceeding one year; and should either party to a duel be killed, the survivor shall be deemed guilty of murder, and shall suffer death. Fighting duel. Killing in a duel, murder.

SEC. 22. That every person, who having taken a lawful oath, or made affirmation in any judicial proceeding, or in any other matter, in which by law an oath or affirmation may be required, shall under or upon such oath or affirmation, swear or affirm, wilfully, corruptly and falsely, touching a matter material to the issue or point in question, shall be deemed guilty of perjury; and every person who shall suborn, cause or procure another person to swear or affirm as aforesaid shall be deemed guilty of subornation of perjury; and every person guilty of perjury, or of subornation of perjury as aforesaid, shall be fined in any sum not exceeding one thousand dollars, and be imprisoned at hard labour Perjury. Subornation of perjury.

Case 19-156, Document 75, 05/08/2019, 2558651, Page44 of 68



in the state prison, for any term of time not exceeding twenty-one, nor less than two years.

Perjury, in voluntary affidavits.

SEC. 23. That every person who shall wilfully, corruptly and falsely, before any justice of the peace, or other officer authorized to administer oaths, under oath or affirmation, make any false certificate, affidavit or statement of any nature, or for any purpose whatever, shall be deemed guilty of perjury, and upon conviction thereof, shall be liable to the punishment and penalties prescribed in the twenty-second section of this act.

Requisites in indictments for perjury.

SEC. 24. That in indictments for perjury, it shall be sufficient to set forth the substance of the offence charged, and by what court, officer or authority, the oath alleged to have been taken was administered, averring such court or officer to have had competent authority to administer the same, together with the proper averment or averments to falsify the matters whereof the perjury or perjuries charged therein may be assigned; without setting forth the bill, answer, information, indictment, or any part of the record or proceedings, either in law or equity, other than as aforesaid, and without setting forth the commission or authority of the court or officer, before whom the perjury may be alleged to have been committed.

Assaults with intent to ravish, murder, &c.

SEC. 25. That every person who shall perpetrate an assault, or an assault and battery with intent to commit a rape, murder, robbery, or other felony, shall upon conviction thereof, be imprisoned at hard labour in the state prison, for any term of time not exceeding fourteen, nor less than two years, and be fined in any sum, not exceeding one thousand dollars.

Assault and battery.

SEC. 26. That every person who shall, in a rude, insolent or angry manner, unlawfully touch, strike, beat or wound another, shall be deemed guilty of an assault and battery, and upon conviction thereof, shall be fined in any sum not exceeding one thousand dollars, to which may be added imprisonment, for any term of time not exceeding six months.

Affray.

SEC. 27. That if two or more persons, shall by agreement fight in any public place, to the terror of the citizens of this state, the persons so offending shall be deemed guilty of an affray, and upon conviction thereof, shall be fined in any sum not exceeding twenty dollars, or imprisoned for any term of time, not exceeding five days each.

Unlawful assemblage.

SEC. 28. That if three or more persons shall assemble together to do an unlawful act, and separate without doing the same or advancing towards it, they shall be deemed guilty of an unlawful assemblage, and upon conviction thereof, shall be fined in any sum not exceeding one hundred dollars.

Case 19-156, Document 75, 05/08/2019, 2558651, Page45 of 68



SEC. 29. That if three or more persons shall meet together to do an unlawful act, upon a common cause or quarrel, and make advances towards the commission thereof, they shall be deemed guilty of a rout, and upon conviction thereof, shall be fined in any sum not exceeding one hundred dollars, or be imprisoned for any term of time not exceeding sixty days each. Rout.

SEC. 30. That if three or more persons shall actually do an unlawful act of violence, either with or without a common cause or quarrel, or even do a lawful act, in a violent and tumultuous manner, they shall be deemed guilty of a riot, and upon conviction thereof, shall be fined in any sum not exceeding five hundred dollars each, and be imprisoned, for any term of time not exceeding three months each. Riot.

SEC. 31. That every person, who shall violently and unlawfully deprive another of the use of any bodily member, or who shall unlawfully and wilfully disable the tongue, or eye, or slit or bite the nose, ear, or lip of another, shall be deemed guilty of mayhem, and upon conviction thereof, shall be fined in any sum not exceeding two thousand dollars, nor less than five dollars, and may be imprisoned for any term of time not exceeding six months, and not less than twenty days. Simple mayhem.

SEC. 32. That every person who shall obstruct the execution of any legal process, or who shall forcibly free any person from legal arrest, knowing such person to be under arrest, shall upon conviction thereof, be fined in any sum not exceeding ten thousand dollars, or be imprisoned for any term of time not exceeding six months. Obstructing legal process.

SEC. 33. That every person who shall maliciously or mischievously, destroy or injure, or cause to be destroyed or injured, any property of another, either real, personal or mixed, or any public property, shall be deemed guilty of malicious trespass, and upon conviction thereof, shall be fined in any sum not exceeding two fold the value of the property destroyed, or of the damage done, and be imprisoned for any term of time, not exceeding twelve months. Malicious trespass.

SEC. 34. That every person who shall cut, box, bore or otherwise injure any tree or sapling, on the land of any other person or persons, or on land belonging to the state, or to any county or township therein, or on any land reserved or granted for the use of schools or seminaries, or without a license so to do from the owner or owners thereof, or from other competent authority, or who, without license as aforesaid, shall take away or remove from any such lands, any timber, stone or other valuable article, shall be deemed guilty of a trespass, and upon conviction thereof, shall be fined in treble the value of the tree or sapling so as aforesaid, or of the property so as aforesaid taken away or removed. Trespass.

Case 19-156, Document 75, 05/08/2019, 2558651, Page46 of 68



Forcible entry and detainer.

SEC. 35. That every person who shall violently take or keep possession, of any lands or tenements, with menaces, force and arms, and without authority of law, shall be deemed guilty of forcible entry or forcible detainer; as the case may be, and upon conviction thereof, shall be fined in any sum not exceeding one thousand dollars.

Disinterring corpse.

SEC. 36. That every person who shall, without the consent of the near relatives of a deceased person, or without the consent of such deceased person being had in his or her life time, remove the dead body, or corpse of such deceased person from interment, in any public or private burying ground, shall upon conviction thereof, be fined in any sum not exceeding one thousand dollars.

Encouraging escape of slaves, &c.

SEC. 37. That if any person, without proper authority, shall give to any one owing service in any state or territory within the United States, a certificate or other testimonial of emancipation, or shall knowingly harbor or employ any such one owing service as aforesaid, or held as a slave, who may have come to this state without the consent of his or her owner, or shall encourage or assist any such one to desert or not go with his or her owner, or shall use any violence, or other means to prevent, let or hinder any person, in lawfully recovering any fugitive, slave or person owing service, such person so offending, shall upon conviction thereof, be fined in any sum not exceeding five hundred dollars, and be liable for damages to any person or persons injured by any of the said acts.

Nuisance.

SEC. 38. That every person who shall erect, or continue and maintain, any public nuisance, to the injury of all, or any part of the citizens of this state, shall be fined in any sum not exceeding one hundred dollars. And after any person shall have been convicted of erecting or maintaining any public nuisance as aforesaid, the circuit court may make it a part of the judgment upon such conviction, that such nuisance be removed by the sheriff. And no inquest, proceedings or judgment, under or in accordance with the laws of this state, allowing and regulating the writ of *ad quod damnum*, shall bar any prosecution under this section.

Spurious money.

SEC. 39. That if any person shall sign, test, endorse, issue, pass, circulate or exchange, any due bill, promissory note, or note purporting to be a bank note, or other instrument of writing for the payment of money or property, or for the performance of any contract, purporting to be the act of any bank, company, secret society or set of men, other than those whose names may be expressed upon the face of such writing, such person so offending, shall upon conviction thereof, be fined in any sum not exceeding ten thousand dollars, nor less than ten dollars, and shall moreover

Case 19-156, Document 75, 05/08/2019, 2558651, Page47 of 68



be liable to any person injured, to the full amount made payable by such writing: *Provided*, That the provisions of this section shall not be construed to affect any bank, legally chartered, nor any mercantile house, touching any note, or other security executed or issued, in the course of common business, on common paper and in common writing. Proviso.

SEC. 40. That every person who shall be a party to any bond, bill of sale, deed, gift, grant or other conveyance, executed with intent to defraud a creditor or creditors of any just demand, or to deceive or defeat any person or persons, shall be deemed guilty of a fraud, and upon conviction thereof, shall be fined in any sum, not exceding one hundred dollars, and pay double damages to the party injured by such fraud. And all bonds, bills of sale, gifts, grants and other conveyances or transfers, executed for any of the purposes aforesaid, shall be absolutely null and void: *Provided*, That the discovery or admission of such fraud, made in the answer of a respondent, in a suit in chancery, shall not be used as evidence, in any prosecution instituted under the provisions of this act. Fraudulent conveyances.

SEC. 41. That every person who shall sell any unwholesome provisions, for wholesome provisions, knowing the same to be unwholesome, shall on conviction, be fined in any sum, not exceeding one hundred dollars. Unwholesome provisions.

SEC. 42. That every person who shall erect, keep up, maintain or continue, any mill dam or other artificial obstruction, in or across the bed or channel of any navigable stream or river, the bed or channel whereof may not have been surveyed and sold as land by the United States, shall upon conviction thereof, be fined in any sum not less than three dollars nor more than five hundred dollars, for each and every week such dam or other artificial obstruction, may have been kept up, maintained or continued as aforesaid. Obstructing navigation.

SEC. 43. That if any ferryman, ferry owner, ferry keeper, or keeper of a toll bridge, shall in his own person, or by any agent or person in his employment, demand or receive, any greater fee or sum, for or on account of ferriage, than is or may be established or fixed, by the proper board doing county business, as the rate or rates of ferriage to be received by such ferryman, ferry keeper or ferry owner; or shall neglect to cause the banks of the creek or river, over or upon which the ferry kept or owned by him may be situate, to be kept in good condition and repair, for the passage of men, horses and loaded wagons, or shall fail or neglect to give all due attendance to the ferry or bridge, kept or owned by him, in the day time, according to the laws in force for the time being, for the regulation of ferries or bridges, he shall upon conviction, of any one act of extor- Negligence & extortion of ferrymen.

Case 19-156, Document 75, 05/08/2019, 2558651, Page48 of 68



tion, or neglect aforesaid, be fined in any sum not exceeding forty dollars.

Influencing jury.

SEC. 44. That every person who shall attempt to influence a jury, by promises, persuasions, entreaties, money, entertainments, or the like, or who, being a juror, shall take gain, or profit, for giving a verdict, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars, be imprisoned for any term of time not exceeding six months, and be ever after incapable of serving as a juror.

Malicious prosecution.

SEC. 45. That if any person shall maliciously, and without probable cause, attempt to cause an indictment to be found against any person or persons; or if two or more persons shall conspire together, to cause an indictment to be found against any person or persons, such person or persons, so sought to be indicted, being innocent, such person or persons so offending, shall be fined in any sum not exceeding one thousand dollars, be imprisoned for any term of time not exceeding six months, and be ever after incapacitated to serve as a juror, give evidence as a witness, or vote at any election.

Barratry.

SEC. 46. That every person who shall frequently excite and stir up quarrels, between or among the citizens of this state, at law, or otherwise, shall be deemed a common barrator, and upon conviction thereof, shall be fined in any sum not exceeding five hundred dollars, and be imprisoned for any term of time not exceeding six months.

Usurpation.

SEC. 47. That every person who shall take upon himself, to exercise and officiate in any office, or place of authority in this state, without being thereunto legally authorized, shall be deemed guilty of usurpation, and upon conviction thereof, shall be fined in any sum not exceeding five hundred dollars.

Official negligence.

SEC. 48. That any clerk of the circuit court, constable, coroner, sheriff, justice of the peace, or other officer entrusted with the administration of justice, who shall be guilty of manifest and wilful negligence, in the discharge of official duty, to the injury of any person, or who shall, in the administration, or under colour of his office, be guilty of any oppressive act, shall upon conviction thereof, be fined in any sum not exceeding one thousand dollars.

Extortion.

SEC. 49. That if any officer shall unlawfully, and by colour of his office, demand or receive any money or thing of value, which may not be due to him, or more than may be due, or before the same may be due, he shall be deemed guilty of extortion, and upon conviction thereof, shall be fined ten fold the amount, so as aforesaid extorted: And in a prosecution under this section, it shall be sufficient to prove the accused an officer, *de facto*.

SEC. 50. That if any clerk of the supreme or circuit courts, shall neglect or refuse to perform, or cause to be performed, any duty required of them by a law of this state, entitled "An Act concerning Clerks," or should any clerk of the said circuit courts fail or neglect to make return, according to law, of any election for representatives to the congress of the United States, or of governor, or lieutenant governor of this state, he shall be deemed guilty of a high misdemeanor, and besides being liable, on conviction thereof, on impeachment, to removal from office, shall moreover, on conviction, upon presentment or indictment in the circuit court, be fined in any sum not exceeding five hundred dollars.

Official negligence of clerks.

SEC. 51. That every trustee or trustees of any county seminary, and any clerk of the circuit court, sheriff, justice of the peace, or other officer, who shall neglect, fail or refuse to perform any duty required of such officer, by the laws in force, for the time being, on the subject of county seminaries, shall on conviction thereof, be fined in any sum not exceeding five hundred dollars, nor less than five dollars.

Official negligence of seminary trustee.

SEC. 52. That any person who shall fail or refuse, to deliver a list of his or her taxable property when called on therefor, according to law, to an asssessor, having a right to demand the same, shall on conviction thereof, be fined in any sum not exceeding fifty dollars.

Failing to give assessor a list of taxables.

SEC. 53. That any and all unlawful acts, committed by any public officer or other person, and any and every neglect of duty, in any public officer, whereby the revenue, either for state or county purposes may be diminished or defrauded, or whereby the collection or payment thereof, into the appropriate treasury may be prevented, hindered or retarded, shall be deemed a fraud against the revenue, and every officer or other person guilty of any such act, shall upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

Offences against the revenue.

SEC. 54. That every person who shall, in proper person or by an agent, shew or exhibit any animal or animals, or other natural curiosity, or any wax work or other figures, or any feats in tumbling, rope or wire dancing, for gain, without being licensed according to law, so to shew or exhibit, shall be fined in any sum not exceeding twenty dollars.

Exhibiting shows without license.

SEC. 55. That every person who shall, in proper person or by an agent, vend any merchandize which may not be the product of the United States, without having a license or permit so to do, as is or may be designated and required by law, shall be fined in any sum not exceeding one hundred dollars.

Vending merchandize without license.

Case 19-156, Document 75, 05/08/2019, 2558651, Page50 of 68



Vending spirits without license.

SEC. 56. That every person, not being licensed according to law to vend spiritous liquors by retail, who may barter or sell any spiritous liquor, to be drank in his or her house, out house, yard or garden, or who may barter or sell any such spiritous liquor, by a less quantity than a quart at a time, shall be fined in any sum not less than two, nor more than twenty dollars.

Failing to put up list of tavern rates, &c.

SEC. 57. That if any licensed tavern keeper shall directly or indirectly, ask, demand or receive, any greater price or higher rates, for any article furnished in the way of his business, than may be fixed and published by him in his schedule of tavern rates, or who shall knowingly neglect, for one whole day, to keep up in the most public room in his tavern, a fair list of the aforesaid rates so by him fixed and published, he or she so offending, shall be fined in any sum not less than five dollars, nor more than fifty dollars.

Carrying concealed weapon.

SEC. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.

Adultery.

SEC. 59. That every person who shall live in open and notorious adultery or fornication, shall upon conviction thereof, be fined, if a male person, in any sum not exceeding three hundred dollars, or if a female, be imprisoned for any term of time not exceeding three months.

Lewdness.

SEC. 60. That every person who shall be guilty of open and notorious lewdness, or of any grossly scandalous and public indecency, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.

Gaming and betting.

SEC. 61. That every person who shall play at any game or games for money, or other valuable consideration, or who shall bet on the hands or sides of such as do play, at a tavern or place licensed to vend spiritous liquors by retail, or in any out house or appendage of the same, shall on conviction thereof, be fined in any sum not exceeding seventy nor less than ten dollars, and be recognized with sufficient security, for his good behaviour for one year, which recognizance shall be forfeited by a second offence, within the time aforesaid.

Losing or winning money.

SEC. 62. That every person who shall, by playing or betting at, or upon any game or wager whatsoever, either lose or win any sum of money or article of value, shall upon conviction thereof, be fined in any sum not exceeding fifty dollars.

Deceit in gaming.

SEC. 63. That if any person by fraud, circumvention, deceit or evil practice, in playing at cards, dice or other game, or by sharing in the stakes or wager, shall win or

Case 19-156, Document 75, 05/08/2019, 2558651, Page51 of 68



obtain any sum of money, or valuable article, the person so offending shall, on conviction thereof, be fined in any sum not less than five, nor more than one thousand dollars, and be bound, with security, in a recognizance for his good behaviour for one year.

Keeping gaming tables.

SEC. 64. That every keeper or exhibiter of either of the gaming tables called A. B. C., or E. O. tables, billiard table, roulette, spanish needle, shuffle board, faro bank, or other gaming table or establishment, for the purpose of winning or gaining money, or any other article or property of value, either directly or indirectly, shall upon conviction thereof, be fined in any sum not less than fifty, nor more than one thousand dollars, and be bound in a recognizance, with good security, to his good behaviour, for one year.

Tavern keepers suffering gaming.

SEC. 65. That every tavern keeper and retailer of spirituous liquors, foreign and domestic groceries, who shall suffer any game or games, prohibited by this act, to be played in his tavern, ordinary or grocery, or in any out-house appendant thereto, shall upon conviction thereof, be fined in any sum not less than fifty, nor more than two hundred dollars, and shall forfeit his license as a tavern or grocery keeper, and not to be re-licensed for one year from the date of such conviction.

Disturbing religious societies, &c.

SEC. 66. That if any person shall interrupt, disturb or molest any religious society, or any member thereof, when met, or meeting together for public worship, or shall sell or give away, any spiritous liquors, at any booth, waggon, or open place within one mlie of any collection of a portion of the citizens of this state, convened for the purpose of worship, or shall interrupt, disturb or molest any collection of the people convened for any lawful purpose, or shall make any contention or disturbance at any public house, court, election, or other lawful public meeting, such person shall upon conviction thereof, be fined in any sum not exceeding te dollars, nor less than one dollar.

Keeping unenclosed salt petre caves.

SEC. 67. That if any person or persons, being the owner or owners, occupier or occupiers, of any cave of salt petre, epsom salts, or other caves of like noxious qualities, shall permit the same to remain unenclosed and exposed to the stock, cattle or horses of the neighbourhood, such person or persons so offending, shall be liable to a fine of ten dollars, for every day such nuisance may be continued, recoverable as in other cases; which when collected, shall be paid over to the proper agent for county seminary purposes; and shall moreover be liable in damages, to the party injured by his, her or their stock using the same.

Assault.

SEC. 68. That every person who shall assault another, shall be fined in any sum not exceeding three dollars.

Case 19-156, Document 75, 05/08/2019, 2558651, Page52 of 68



Infringement of ferry rights.

SEC. 69. That every person, other than a licensed ferryman, who may, for fee or reward, ferry any person over any creek or river, within two miles of any public ferry, licensed as such, and established on such creek or river, shall be fined in the sum of three dollars for every offence.

Vending cards and obscene books.

SEC. 70. That if any person, shall vend or cause to be vended, any playing cards, or any obscene book, pamphlet or print, he shall on conviction thereof, be fined in any sum not less than one, nor more than three dollars for every such pack of cards, book, pamphlet, or print vended.

Breach of sabbath.

SEC. 71. That if any person, of the age of fourteen years or upwards, shall be found, on the first day of the week commonly called sunday, rioting, hunting, fishing, quarrelling, or at common labour, works of necessity and charity only excepted, such person shall be fined in any sum not less than one, nor more than three dollars: *Provided*, that nothing herein contained, shall be construed to affect such as conscientiously observe the seventh day of the week as the sabbath, travellers, families removing, keepers of toll bridges attending the same, or ferrymen acting as such.

Proviso.

Selling spirits on sabbath.

SEC. 72. That every tavern keeper, or other person who may barter or sell any spiritous liquor, to any person on sunday, except to travellers, and in cases of sickness, and every tavern keeper or grocer, who shall sell or give any spiritous liquor at any time to a person under the age of fourteen years without the consent of parent or guardian, shall upon conviction thereof, be fined in any sum not exceeding three dollars.

Or to minors.

Profane swearing.

SEC. 73. That every person, of the age of fourteen years or upwards, who shall profanely swear, aver, curse or imprecate, by, or in the name of God, Jesus Christ or the Holy Ghost, shall be fined for each offence, not less than one, nor more than three dollars: But the fines imposed upon one person for violations of this section, committed on one day, shall not exceed ten dollars.

Playing bullets, &c. on road, or in town.

SEC. 74. That every person, who shall play bullets, along or across any highway, or the street of any town or village, or shall run horses, or shoot at a mark, within the limits of such town or village, or shoot along, or across any such street, shall upon conviction thereof, be fined in any sum not exceeding three dollars.

Abetting crimes.

SEC. 75. That every person, who shall aid, assist, abet, counsel, encourage, hire, or command any other person or persons, to commit, or in committing any crime or offence, in this act mentioned, shall upon conviction thereof, suffer the same punishments and penalties, above in this act prescribed to be inflicted upon principal offenders.

Punishment by hanging.

SEC. 76. The punishment of death, in this act prescribed, shall be inflicted by hanging by the neck, at such time.

Case 19-156, Document 75, 05/08/2019, 2558651, Page53 of 68



not less than fifteen days after conviction, as the court may direct.

Sec. 77. That [in] all offences in this act contained to which the affixed penalty does not exceed three dollars, exclusive jurisdiction is given to justices of the peace of the proper county.

Exclusive jurisdiction of J. P.

Sec. 78. That all prosecutions in the circuit courts, under this act, shall be instituted upon presentment or indictment, found by the grand jury of the county within which an offence may have been committed, and the jury enquiring of the guilt of an accused party, shall also assess the amount of fine or other punishment, or penalty to be inflicted upon the offender, unless such punishment be death. And upon a plea of guilty to an indictment, the court receiving such plea, shall assess such punishment, as to the extent thereof.

Prosecutions by presentment or indictment. Jury shall assess the fine. Except upon plea of guilty.

Sec. 79. That every person, who may hereafter be convicted of the crimes of murder, treason, rape, arson, man-stealing, or wilful and corrupt perjury, shall ever after such conviction be deemed infamous, and shall be incapable of holding any office of trust, honor or profit, voting at any election, serving as a juror, or giving evidence in any court of justice; and no release, reprieve, or pardon, shall restore such person or persons to the privileges aforesaid.

Crimes deemed infamous. Pardon shall not restore.

Sec. 80. That in all cases of conviction of any offence, named in this act, the costs of prosecution shall be included in the judgment rendered against the convict, unless the jury expressly find otherwise.

Costs upon conviction.

Sec. 81. That in all prosecutions for any capital offence, each party accused shall have the right to challenge twenty jurors peremptorily, and in all prosecutions for any offence, punishable by imprisonment in the state prison, each party accused, shall have the right to challenge ten jurors, peremptorily; and in all other cases of prosecution, each party accused may challenge three jurors peremptorily, and no more.

Challenges to jury.

Sec. 82. That if any person, upon being arraigned upon an indictment, shall stand mute and refuse or fail to plead thereto, the court shall cause the plea of not guilty to be entered for such person, and proceed to trial, judgment and execution, as if such person had pleaded to such indictment, in his own proper person.

Trial of culprits standing mute.

Sec. 83. That all criminal prosecutions for offences, the affixed penalty for which is three dollars, or less, shall be commenced within thirty days next after the offence may have been committed, and not after.

Limitation of prosecutions.

Sec. 84. That all prosecutions for offences, except those the fixed penalties of which do not exceed three dollars, and except treason, murder, arson, burglary, man-stealing, horse-

Limitation.

Case 19-156, Document 75, 05/08/2019, 2558651, Page54 of 68



stealing and forgery, shall be instituted within two years next after the offence charged therein may have been committed, and not after: *Provided*, That if the person or persons, against whom such prosecution may be instituted, shall not have been an inhabitant, or usually a resident of this state, within and during the said term of two years, such prosecution may be instituted any time within two years next after such person or persons may have become an inhabitant, or usually resident of this state as aforesaid.

Fines, how replevied.

SEC. 85. That every person convicted of any offence against the penal laws of this state, may entitle himself to a stay of execution, for the fine assessed against him and for the costs adjudged against him, or to a replevy of such execution, for three months from the rendition of judgment therefor, by complying with the same provisions which according to the laws for the time being in force, relative to a stay of execution, or replevy thereof, in civil cases, would entitle him to such stay or replevy, and any recognizance of bail, entered pursuant to the provisions of this section, upon the docket of a justice of the peace, or upon the record of the circuit court, and replevin bonds executed pursuant to the said provisions, shall have the same force and effect, as if the same were entered or executed in a civil case. And nothing herein contained shall authorize the circuit court, or a justice of the peace, to suffer a defendant to go at large until such fine and costs be either paid or replevied.

Effect of replevy.

Defendant in custody until fine and costs are replevied.

Penitentiary sentence, how certified to keeper.

SEC. 86. That when any person shall be convicted and sentenced to imprisonment in the state prison, the clerk of the court in which such person may have been convicted, shall certify a copy of the sentence of the court, and deliver the same to the proper sheriff, or other officer acting as such, who, when he shall deliver such convict to the keeper of the said state prison, shall also hand over to the said keeper the said copy of the sentence of the court, and take from such keeper, a certificate of the delivery of such convict.

Sheriff conveying convict, may call aid.

SEC. 87. That a sheriff, when conveying a prisoner to the state prison aforesaid, shall have the same authority to demand the assistance of any of the people of this state, as if he were acting in his proper county, and all persons shall render to such sheriff assistance, in securing such prisoner, and conveying him or her as aforesaid, under the same penalties prescribed against failing to assist sheriffs in their proper counties.

Penalty for disobeying.

Female convict to be sent to county jail.

SEC. 88. That on the conviction of any female, of any offence in this act named, one or all of the penalties whereof is imprisonment in the state prison, it shall and may be lawful for such female, in lieu of such imprisonment in the state prison,

Case 19-156, Document 75, 05/08/2019, 2558651, Page55 of 68



to be imprisoned in the jail of the proper county, at hard labour, under the direction of the jailer.

Convict escaping shall serve double term.

SEC. 89. That any convict confined in the state prison, who shall escape therefrom, shall on reception be confined at hard labour, for double the length of time for which such escaping convict was originally sentenced, and it shall be the duty of the judge to inform him thereof at the time of his conviction.

Court shall order amount of recognizance to be taken by sheriff.

SEC. 90. That it shall be the duty of the circuit courts, to make an order fixing the amounts in which each person indicted shall be held to bail, and the clerks upon issuing process against such person, shall endorse, upon the process, a memorandum of the said amount of bail required; and the sheriff, in taking security for the appearance of such indicted person, shall govern himself accordingly, and recognizances, for the appearance of any person accused of offences, taken and acknowledged before a proper officer, shall not be void for the want of form.

Recognizance not void for form.

Order of bail on attachment.

SEC. 91, That whenever any attachment shall issue against any person or persons, returnable to any day beyond the term of the court, at which the same may be ordered, the court ordering the issuing thereof, shall also fix the amount in which the said person or persons shall severally be held to bail, making an order accordingly, and the clerk issuing such attachments, shall endorse a memorandum of the amount aforesaid, and the officer executing such attachments shall take a recognizance or recognizances accordingly, which recognizances shall stand on the same footing with recognizances acknowledged in a court of record, and shall not be void for want of form.

Amount to be endorsed by clerk.

Sureties may surrender principal.

SEC. 92. That securities for the appearance of any person or persons, to answer to any offence, or to any attachment, may at any time before final judgment be rendered, upon scire facias issued upon the forfeiture of their recognizances, surrender their principals, either in open court or to the sheriff at any time, who shall be bound to receive such person or persons into custody upon the delivery to him, of a certified copy of the recognizance in which such securities may be bound, and to acknowledge such surrender in writing; and such surrender shall, upon the payment of all costs accruing upon the forfeiture and scire facias, acquit such sureties of the amount of forfeiture incurred.

Terms of surrender.

Jurors shall answer on oath.

SEC. 93. That on the trial of any person accused of any offence against the laws of this state, it shall be lawful for a defendant or the court, to require jurors to answer on oath, whether they have formed or expressed an opinion, relative to the guilt or innocence of such accused person, and from the answer to such question and to such others as may be

Case 19-156, Document 75, 05/08/2019, 2558651, Page56 of 68



asked by the permission of the court, the competency of such jurors shall be determined upon by the court.

This act to be given in charge to grand juries.

SEC. 94. That it shall be the duty of the circuit courts, to give specially in charge to grand juries this act, and so much as may be necessary for such grand juries to refer to, of the laws on the subject of the duties of public officers, revenue, county seminaries, estrays, licensed taverns and groceries, vending merchandize, elections, ferries, fees of public officers and all other laws necessary to be referred to, for a proper understanding of each and all of the provisions of this act.

Neglect of clerk to keep his records in clerks's office.

SEC. 95. Any clerk of the circuit court, who shall refuse or neglect to keep his records and books or any or either of them, whether appertaining to the circuit court, probate court, or board doing county business, in any building previously erected by such board for a clerk's office, or shall neglect or refuse to occupy the same as his office, shall for each day he may so neglect or refuse, be fined in the sum of ten dollars, to be recovered by presentment or indictment, in the proper county.

Injured party competent witness.

SEC. 96. That any person against whom an offence may be committed, shall be a competent witness on the trial of an indictment against the person or persons so offending; and persons of skill may be called upon to testify in prosecutions under this act, or in civil cases, whether any note or notes, bill or bills, are genuine or otherwise, leaving the credibility of such persons to the jury, but three persons at least, shall be required to testify to the same point in such cases: *Provided*, That the single evidence of the cashier of the bank on which any note or bill may purport to be, may be received as competent. All stolen property shall be returned to the owner, or the value thereof may be recovered in any court of competent jurisdiction, by an action of trover and conversion, or other proper action.

Evidence as to bank notes.

Stolen property to be restored.

Firing woods or prairies.

SEC. 97. That if any person shall wilfully and maliciously set on fire, or cause to be set on fire, any woods or prairie, or other grounds within this state, other than his own, or shall intentionally permit the fire to pass from his own prairie or grounds, to the injury of any other person or persons, every person so offending, shall on conviction thereof, for every such offence, be fined in a sum not exceeding fifty dollars, and stand committed until fine and costs are paid, and shall be liable to the action of the party injured, for damages which he, she or they may have sustained in consequence of such fire.

Assaulting peace makers.

SEC. 98. If a person declares his intention to part combatants, and when lawfully and in good faith, is engaged in endeavouring to part combatants, or to prevent a fight, if any other person shall wilfully and maliciously commit an assault

and battery, on any person so attempting to make peace, and having declared such intention, such person so offending, shall be fined in any sum not less than five dollars, nor more than is provided by this act for a common assault and battery.

SEC. 99. That if any person or persons, shall knowingly bring within this state, a pauper or paupers, with the intention of making them a charge upon any of the counties in this state, he shall upon conviction, on presentment or indictment, be fined in any sum not exceeding five hundred dollars, and stand chargeable with the support of such pauper or paupers. Bringing paupers into this state.

## CHAPTER XXVII.

An Act for the relief of Insolvent Debtors.

[APPROVED, FEBRUARY 9, 1831.]

SEC. 1. *Be it enacted by the General Assembly of the state of Indiana*, That any person who is, or may become insolvent and unable to pay his just debts, whether civil process shall have issued against him or not, may obtain relief by filing his petition in writing, in the circuit court of the county where he resides, setting forth the circumstances of his indebtedness, together with such other matters as may be necessarily connected therewith, and praying for relief accordingly; which petition shall be accompanied with a schedule, containing an accurate statement of all debts by said petitioner owing, and of all debts and demands to him due or accruing, together with all property of every kind and description, real as well as personal, by him owned, possessed or claimed, in any way or manner, (except such articles of personal property as may be exempt by law from execution,) and where any real estate shall be inserted in said schedule, the same shall be particularly described and designated by the proper number, metes, bounds, quantity, quality, situation and title, and all and singular his goods, chattels, monies, credits, rights and effects, by a good, sufficient and exact description thereof; and said petitioner shall also at the same time, deliver into court, all monies, bills, notes, bonds, accounts, transcripts of judgments and title papers, together with a sufficient and certain direction how to get possession of all other goods, chattels and effects, set forth in said schedule; which petition and schedule shall be verified by the affidavit of the said petitioner, annexed

Insolvent debtor may file petition in C. court.

Schedule of estate.

Description of real estate.

Debtor shall deliver into court monies, bills, &c.

Schedule to be sworn to.

# ACTS OF A GENERAL NATURE

AND

# LOCAL LAWS AND JOINT RESOLUTIONS,

PASSED BY THE

## FIFTY-THIRD GENERAL ASSEMBLY,

OF THE

## STATE OF OHIO:

AT ITS SECOND SESSION,

BEGUN AND HELD IN THE CITY OF COLUMBUS,

JANUARY 3, 1859,

AND THE FIFTY-SEVENTH YEAR OF SAID STATE.

VOLUME LVI.

COLUMBUS
RICHARD NEVINS, STATE PRINTER,
1859.

## AN ACT

To provide for the working of unfinished turnpike roads by supervisors of the highways.

What turnpike roads supervisor may work, &c.

SECTION 1. *Be it enacted by the General Assembly of the State of Ohio,* That it shall be lawful for the supervisors of the several road districts within this state, to apply such portion of labor, or money, as they may deem reasonable and just, upon any unfinished turnpike road within their respective road districts, when the same is used by the public free of toll; Provided that the directors of any unfinished turnpike road shall first give their consent to the trustees of the township in which such unfinished turnpike road or roads is located.

Consent of directors.

Order of township trustees.

SEC. 2. That upon any turnpike road company giving their consent to the trustees of the township, in writing, it shall be the duty of the trustees to issue their order to the several supervisors through whose districts such unfinished turnpike road is located, for them to apply the work and money as provided in the first section of this act.

SEC. 3. This act to be in force from its passage.

WILLIAM B. WOODS,
*Speaker of the House of Representatives.*
MARTIN WELKER,
*President of the Senate.*

March 18, 1859.

---

## AN ACT

To prohibit the carrying or wearing of concealed weapons.

The offense of carrying or wearing concealed weapons.

SECTION 1. *Be it enacted by the General Assembly of the State of Ohio,* That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Penalty.

When the jury shall acquit the accused.

SEC. 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the

Case 19-156, Document 75, 05/08/2019, 2558651, Page60 of 68



time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

SEC. 3. This act to take effect and be in force from and after the first day of April next.

WILLIAM B. WOODS,
*Speaker of the House of Representatives.*
MARTIN WELKER,
*President of the Senate.*

March 18, 1859.

---

AN ACT

Amendatory to an act entitled "an act to provide for the organization of cities and incorporated villages," passed May 3, 1852. Swan's R. S. 968-9.

SECTION 1. *Be it enacted by the General Assembly of the State of Ohio,* That original section sixty-three, of an act entitled an act to provide for the organization of cities and incorporated villages, passed May 3, A. D. 1852, be so amended as to read as follows: Sec. 63. The city council shall have the care, supervision and control of all public highways, bridges, streets, alleys, public squares and commons, within the city, and shall cause the same to be kept open, and in repair, and free from nuisances. No street or alley, which shall hereafter be dedicated to public use by the proprietor of ground in any city, shall be deemed a public street or alley, or to be under the care or control of the city council, unless the dedication shall be accepted, and confirmed by an ordinance specially passed for such purpose; they shall have the power to prescribe by ordinance the width of the tires of all wagons, carts, drays, and other vehicles, used in the transportation of persons or articles from one part of the city to another, or in the transportation of coal, wood, stone, lumber, or iron, into the city; to establish stands for hackney coaches, cabs, and omnibuses, and to enforce the observance and use thereof, and to fix the rates and prices for the transportation of persons and property in such coaches, cabs and omnibuses, from one part of the city to another. Care, supervision and control of city highways, bridges, streets, alleys, public squares and commons.

SEC. 2. That original section sixty-three of the act to which this is amendatory be and the same is hereby repealed, and this act shall take effect and be in force from and after its passage. Sec. repealed.

WILLIAM B. WOODS,
*Speaker of the House of Representatives.*
MARTIN WELKER,
*President of the Senate.*

March 18, 1859.

# LAWS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF PENNSYLVANIA,

PASSED AT THE

## SESSION OF 1864,

In the Eighty-Eighth Year of Independence.

With an Appendix.




HARRISBURG:
SINGERLY & MYERS, STATE PRINTERS.
1864.

Case 19-156, Document 75, 05/08/2019, 2558651, Page62 of 68



No. 716.

## An Act

To extend the act, entitled "An Act to amend the fee-bill, as to justices of the peace, in the counties of Erie and Crawford," to the counties of Cumberland, Allegheny, Franklin, Lancaster and Fulton.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the provisions of the act, entitled "An Act to amend the fee-bill, as to justices of the peace, in the counties of Erie and Crawford," approved March eighteenth, Anno Domini one thousand eight hundred and sixty-three, be and the same are hereby extended to the counties of Cumberland, Allegheny, Franklin, Lancaster and Fulton.

HENRY C. JOHNSON,
Speaker of the House of Representatives.

JOHN P. PENNEY,
Speaker of the Senate.

APPROVED—The fifth day of May, Anno Domini one thousand eight hundred and sixty-four.

A. G. CURTIN.

---

No. 717.

## An Act

To punish persons for carrying concealed deadly weapons, in the county of Schuylkill.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same* That any person, within the limits of the county of Schuylkill, who shall carry any fire arms, slung shot, dirk knife, or other deadly weapon, concealed upon his person, with the intent, therewith, unlawfully and maliciously, to do injury to any other person, shall be deemed guilty of a misdemeanor, and upon the conviction thereof, shall be sentenced to undergo solitary confinement, at hard labor, in the prison of said county, for a period of not less than one month, nor more than one year, and pay a fine of not less than twenty-five, nor more than

one hundred dollars, or either, or both, at the discretion of the court; and the jury trying the case may infer such intent, as aforesaid, from the fact of the said defendant carrying such weapon, in the manner as aforesaid.

HENRY C. JOHNSON,
Speaker of the House of Representatives.
JOHN P. PENNEY,
Speaker of the Senate.

APPROVED—The fifth day of May, Anno Domini one thousand eight hundred and sixty-four.

A. G. CURTIN.

---

No. 718.

## An Act

To repeal an act to incorporate the Erie City Passenger Railroad Company.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That an act to incorporate the Erie City Passenger Railroad Company, approved April thirteenth, one thousand eight hundred and sixty-four, be and the same is hereby repealed.

HENRY C. JOHNSON,
Speaker of the House of Representatives.
JOHN P. PENNEY,
Speaker of the Senate.

APPROVED—The fifth day of May, Anno Domini one thousand eight hundred and sixty-four.

A. G. CURTIN.

---

No. 719.

## An Act

Extending the provisions of an act, relating to corporations for mechanical, manufacturing, mining and quarrying purposes, approved July eighteenth, one thousand eight hundred and sixty-three, and the supplements thereto, to the county of Berks.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,*

# LAWS

OF THE

# STATE OF NEW YORK,

PASSED AT THE

## EIGHTY-NINTH SESSION

OF THE

## LEGISLATURE,

BEGUN JANUARY SECOND, AND ENDED APRIL TWENTIETH, 1866, IN THE CITY OF ALBANY.

VOL. II.




ALBANY:
LEWIS & GOODWIN, 452 BROADWAY.
1866.

Case 19-156, Document 75, 05/08/2019, 2558651, Page65 of 68



# Chap. 716.

AN ACT to prevent the furtive possession and use of slung-shot and other dangerous weapons.

Passed April 20, 1866.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Penalty for using or carrying concealed weapons, &c.

SECTION 1. Every person who shall within this State use, or attempt to use or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun, shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the State prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

§ 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

§ 3. Chapter two hundred and seventy-eight of the laws of eighteen hundred and forty-nine is hereby repealed; but this repeal shall in nowise affect offenses heretofore committed under that chapter, or any proceedings now pending thereunder.

§ 4. This act shall take effect immediately.

Case 19-156, Document 75, 05/08/2019, 2558651, Page66 of 68

# ACTS

OF THE

# One Hundred and Twenty-Ninth Legislature

OF THE

STATE OF NEW JERSEY

AND

## Sixty-First Under the New Constitution.



PATERSON, N. J.:
NEWS PRINTING COMPANY, STATE PRINTERS.
1905.

## CHAPTER 172.

A Supplement to an act entitled "An act for the punishment of crimes (Revision of 1898)," approved June fourteenth, one thousand eight hundred and ninety-eight.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

Carrying dangerous weapon a misdemeanor.

1. Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade five inches in length or over concealed in or about his clothes or person, shall be a guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both; *provided, however,* that nothing in this act shall be construed to prevent any sheriff, deputy sheriff, police officer, constable, state detective, member of a legally organized detective agency or any other peace officer from carrying weapons in the discharge of his duty; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, from the mayor of any city, borough or other municipality, having a mayor, or from the township committee or other governing body of any township or other municipality not having a mayor, which permits such officers and governing bodies are hereby authorized to grant; said permits shall be issued at the place of residence of the person obtaining the same, and when issued shall be in force in all parts of the state for a period of one year from date of issue, unless sooner revoked by the officer or body granting the same; *and provided further,* that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any such weapon, firearm, stiletto, dagger, razor or knife, or from carrying the same from any place of purchase to his or her dwelling house, or

Penalty.

Proviso.

Proviso.

place of business, or from his or her dwelling house or place of business to any place where repairing is done, to have the same repaired and returned; *and provided further,* that nothing in this act shall be construed to make it unlawful for any person to carry a gun, pistol, rifle or other firearm or knife in the woods or fields or upon the waters of this state for the purpose of hunting; a fee of twenty-five cents may be lawfully charged by such officer or body granting each such permit. **Proviso.**

2. All acts and parts of acts inconsistent with the provisions of this act be and the same are hereby repealed, and this act shall take effect immediately. **Repealer.**

Approved April 18, 1905.

---

## CHAPTER 173.

An Act to provide for the purchase by boards of chosen freeholders, of turnpike or toll roads, or portions thereof, which have been improved by the construction thereon of a macadam, telford, rubble or other stone road, for free public use as county roads, and for the repair, improvement and maintenance of the same.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1. The board of chosen freeholders of any county may agree with the owner or owners of any turnpike or toll road, or portion thereof lying within such county and being not less than one mile in length, which has been improved by the construction thereon of a macadam, telford, rubble or other stone road, upon the price to be paid for the same, and may by resolution agree to purchase the same for free public use at the price agreed upon, subject to the approval of the state commissioner of public roads, and upon receiving the approval of said commissioner in writing **Freeholders may purchase turnpike and maintain same as county road.**